Paul H. Burleigh, Bar No. 112512
pburleigh@klinedinstlaw.com
KLINEDINST PC
777 S. Figueroa St., Suite 2800
Los Angeles, California 90017
(213) 607-2115/FAX (213) 406-1101

Ronald P. Schiller (*pro hac vice* motion to follow)
rschiller@hangley.com
Sharon F. McKee (*pro hac vice* motion to follow)
smckee@hangley.com
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, Pennsylvania  19103
(215) 568-6200/FAX (215) 568-0300


Attorneys for Plaintiff
IRONSHORE SPECIALTY INSURANCE COMPANY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IRONSHORE SPECIALTY INSURANCE COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> UNIVERSITY OF SOUTHERN CALIFORNIA, and GEORGE M. TYNDALL, <br><br> Defendants. | Case No. 2:21-cv-01272 <br><br> **COMPLAINT** |

1.      In this insurance action, Ironshore Specialty Insurance Company ("Ironshore") seeks a declaration that the excess healthcare professional liability policy that it issued to the University of Southern California ("USC") bars or limits coverage for claims asserted against USC, the Board of Trustees of USC (the "Trustees"), and Dr. George Tyndall.  Alternatively, Ironshore seeks rescission of

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

1   the Policy.

2   　　　2.　　　When USC applied for the policy, USC failed to disclose, among other

3   things, that it had forced Dr. Tyndall to resign after a USC investigation,

4   coordinated by USC's General Counsel, found in January 2017 that Dr. Tyndall had

5   violated USC's policies on race and sexual harassment and failed to meet

6   professional medical standards in his interactions with patients.  Despite USC's

7   knowledge of complaints made against Dr. Tyndall by nurses, medical assistants,

8   and patients, and despite its own findings that the complaints had merit, USC kept

9   Ironshore and other insurers in the dark.  These now well-established facts bar

10  coverage under the terms of the **Primary Policy**.  Furthermore, had Ironshore

11  known of these material, serious allegations and the underwriting risks they

12  presented, at a minimum, Ironshore would not have offered to provide insurance to

13  USC on the same terms, and would have expressly excluded coverage for claims

14  arising out of Dr. Tyndall's alleged conduct.

15  　　　　　　　　　　　**JURISDICTION AND VENUE**

16  　　　3.　　　Plaintiff Ironshore Specialty Insurance Company is an insurance

17  company formed under the laws of the State of Arizona and has its principal place

18  of business in Boston, Massachusetts.

19  　　　4.　　　Defendant University of Southern California is a private corporation

20  formed under the laws of California and has its principal place of business in Los

21  Angeles, California.  USC is governed by its Board of Trustees, a self-perpetuating

22  body that has approximately 55 voting members.

23  　　　5.　　　Defendant George Tyndall is an individual who is a citizen of the State

24  of California.

25  　　　6.　　　This dispute concerns an insurance policy with a $20 million limit of

26  liability for the policy period at issue.

27

28

COMPLAINT

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the dispute is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.      Venue in this district is appropriate because the Defendants reside in this district and a substantial part of the events giving rise to this action occurred here.  28 U.S.C. § 1391(b).

9.      Ironshore has not agreed to arbitrate this dispute.

### FACTUAL ALLEGATIONS

### A.      Allegations regarding Dr. Tyndall

10.      A dispute has arisen between Ironshore and the Defendants due to allegations that have been made concerning Dr. Tyndall, who was employed by USC as a physician from approximately 1989 to June 30, 2017.

11.      Dr. Tyndall practiced in the USC Student Health Center, primarily as a gynecologist.

12.      In early June 2016, the USC Office of Equity and Diversity ("OED") opened an investigation into Dr. Tyndall after his colleague, nursing supervisor Cindy Gilbert, raised concerns over Dr. Tyndall's interactions with patients, reporting that some patients were so disturbed by his behavior during exams that they refused further appointments with him, and that Dr. Tyndall did full body scans without noting the fact in the patients' charts.  OED conducted further interviews on June 15, 2016 with other nurses and medical assistants from the Student Health Center who were present during Dr. Tyndall's patient examinations; these witnesses alleged that Dr. Tyndall frequently made inappropriate comments during examinations that upset patients and resulted in patient complaints, that Dr. Tyndall commonly inserted one or two fingers into the patient's vaginal opening before inserting the speculum, that Dr. Tyndall conducted full body checks which he did

not report in the patient's chart, and that Dr. Tyndall did not practice proper hygiene.  They also expressed concern about Dr. Tyndall's practices with respect to advising patients about performing breast examinations.

13.     At approximately the same time as the OED opened its 2016 investigation, the Interim Executive Director of the Student Health Center notified Dr. Tyndall that he had violated the Center's policies and procedures and Medical Staff Bylaws by, among other things, maintaining patient identifiable medical information (patient photographs) in his office.

14.     According to the findings of the U.S. Department of Education, Office for Civil Rights ("OCR"), the investigations into Dr. Tyndall were coordinated by the USC Office of General Counsel.  (*See* Letter dated February 27, 2020 from Anamaria Loya, U.S. Department of Education, Office for Civil Rights, to Dr. Carol Folt, available at https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/09186908-a.pdf, at 22 (hereinafter, the "OCR Report").)

15.     On or about June 17, 2016 USC placed Dr. Tyndall on paid leave while USC's internal investigations proceeded.

16.     Dr. Tyndall had been the subject of prior OED investigation.  A complaint was made in 2013 that Dr. Tyndall made inappropriate sexual and racial comments, and that some students did not want to be seen by Dr. Tyndall because he made them uncomfortable.  In January and April 2016, students reported several instances when Dr. Tyndall allegedly discriminated on the basis of race.

17.     As part of the 2016 OED investigation, the co-directors of the USC Student Health Center engaged MDReview to evaluate the medical justifications that Dr. Tyndall offered to OED.  MDReview conducted further interviews, which yielded allegations similar to those made in the June 2016 interviews.  In its report,

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

MDReview concluded that several of Dr. Tyndall's practices were not "within current standard of care" and that he "repeatedly exhibits behavior that is unprofessional, inappropriate, and/or unusual." The report noted that "a number of significant concerns exist that would raise serious questions about patient physical and psychological safety were Dr. Tyndall to return to practice," including gaps in his "knowledge, clinical judgment, and adherence to current accepted practice guidelines regarding women's health," and failure to follow "current basic fundamentals of hygiene and infection control practices."

18.     On January 31, 2017, OED issued reports on its investigation that concluded that Dr. Tyndall had violated USC's policies on sexual and race harassment. The OED's conclusions were not disclosed to Arch or the public.

19.     USC did not allow Dr. Tyndall to return to work after the OED reports were issued.

20.     USC has stated that "[a]t the conclusion of the investigation by OED and Compliance in 2017, the university began termination proceedings." *See* "Summary of Coordinated Investigation of Student Health Physician," *available at* https://pressroom.usc.edu/files/2018/05/Summary-fact-sheet_5.15.18.pdf.

21.     On or about May 16, 2017, USC told Dr. Tyndall that USC was terminating his employment.

22.     On or about June 23, 2017, USC presented Dr. Tyndall with a severance agreement, which Dr. Tyndall subsequently accepted. Under this agreement, Dr. Tyndall's employment ended effective June 30, 2017. This is one day *before* the inception of the Ironshore Policy under which USC has submitted claims arising from Dr. Tyndall's conduct.

23.     USC did not disclose Dr. Tyndall's termination or the reasons for it to the public or to Ironshore.

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

24.     USC has stated that when Dr. Tyndall was terminated he said that he was retiring from the practice of medicine.  However, when Dr. Tyndall sought reinstatement to USC in early 2018, USC filed a complaint regarding Dr. Tyndall with the Medical Board of California, alleging unprofessional conduct.

25.     On or before May 8, 2018, USC learned that the *Los Angeles Times* planned to publish an article concerning allegations made against Dr. Tyndall.  On May 15, the eve of publication, USC issued its first statements concerning the matter to the public.  Within days, the first lawsuits were filed by Dr. Tyndall's former patients against him and USC, alleging sexual assault and battery, discrimination, and numerous other torts and statutory violations.

26.     On or about June 26, 2019, Dr. Tyndall was arrested and charged with multiple felony counts of sexual assault and battery in state court.  Additional charges were filed in July 2020.  Dr. Tyndall has pleaded not guilty and the criminal action is pending.

### B.     The Underlying Lawsuits

27.     The lawsuits against USC and Dr. Tyndall, and some naming the Trustees, have been filed in this Court and in the Superior Court for the County of Los Angeles.

### 1.     The Federal Class Action

28.     Most of the federal lawsuits were filed as putative class actions, and they were ultimately consolidated as *In re USC Student Health Center Litigation*, Civ. A. No. 2:18-4258 (the "Federal Class Action").

29.     The Federal Class Action resulted in an opt-out settlement on behalf of a nationwide class (the "Federal Settlement").  This Court certified the settlement class and finally approved the Federal Settlement by order entered on February 25, 2020, which was not appealed.  Under the Federal Settlement, USC agreed to pay

1    the settlement class $215 million plus attorney's fees capped at $25 million.

2        30.    Ironshore did not consent to the settlement, but agreed not to raise lack

3    of consent as a defense to coverage under the Policy.

4        31.    Ironshore has paid USC the full limit of liability of the Policy subject to

5    a full reservation of its rights, including the right to reimbursement of the Policy

6    limits in full.

7        32.    The Federal Class Action was settled before any determination of

8    liability on the part of any defendant in the Federal Class Action – USC, the

9    Trustees, or Dr. Tyndall – was made.

10        33.    Under the terms of the Federal Settlement, all former patients of

11    Dr. Tyndall may receive compensation in "Tier One," without alleging or

12    establishing that USC or Dr. Tyndall acted improperly in any way.  Upon

13    information and belief, most members of the Federal Class have elected to accept

14    Tier One compensation and not submit evidence that they are entitled to Tier Two or

15    Tier Three compensation because they were injured by USC or Dr. Tyndall.

16        34.    At the time of the Federal Settlement, the operative Second Amended

17    Complaint (the "Federal Complaint") asserted 12 putative causes of action, most

18    alleging that USC, the Trustees, and Dr. Tyndall acted or failed to act intentionally

19    or otherwise with a mental state beyond mere negligence.  (A true and correct copy

20    of the Federal Complaint is appended as Exhibit C.)  The putative causes of action

21    were:

|  |  | USC | Trustees | Tyndall |
|---|---|---|---|---|
| **Count I** | Negligent Supervision & Retention | X | X | |
| **Count II** | Title IX | X | X | |
| **Count III** | Sexual Abuse & Harassment (Education Code § 220) | X | X | X |

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

| | | | | |
|---|---|---|---|---|
| **Count IV** | Equity in Higher Education Act (§ 66250) | X | X | X |
| **Count V** | Gender Violence (Civil Code § 52.4) | X | | X |
| **Count VI** | Gross Negligence | X | X | X |
| **Count VII** | Invasion of Privacy | X | X | X |
| **Count VIII** | Negligent Failure to Warn, Train or Educate | X | X | |
| **Count IX** | Civil Battery | X | | X |
| **Count X** | Intentional Infliction of Emotional Distress | X | | X |
| **Count XI** | Negligent Infliction of Emotional Distress | X | | X |
| **Count XII** | Ratification | X | X | |

35.     The Federal Complaint alleged that Dr. Tyndall had sexually abused and harassed patients in the guise of providing gynecological care.

36.     The Federal Complaint alleged that USC and the Trustees received complaints concerning Dr. Tyndall over the years but failed to take appropriate action and deliberately concealed Dr. Tyndall's conduct.

## 2.     The Los Angeles Superior Court Actions

37.     Most, if not all, of the actions against USC and Dr. Tyndall filed in the Superior Court of Los Angeles County have been consolidated for pretrial purposes, and the plaintiffs have filed a Master Complaint (the "State-Court Complaint"). (A true and correct copy of the State-Court Complaint is appended as Exhibit D.)

38.     The State-Court Complaint alleges the following putative causes of action against USC and Dr. Tyndall:

| | | **USC** | **Tyndall** |
|---|---|---|---|
| **Count I** | Unruh Act (Civil Code § 51) | x | X |
| **Count II** | Bane Act (Civil Code § 52.1) | x | X |
| **Count III** | Gender Violence (Civil Code § 52.4) | | X |

COMPLAINT

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

| | | | |
|---|---|---|---|
| **Count IV** | Sexual Harassment (Civil Code § 51.9) | x | X |
| **Count V** | Sexual Battery (Civil Code § 1708.5) | x | X |
| **Count VI** | Unfair Business Practices (Bus. & Prof. Code § 17200) | x | X |
| **Count VII** | Intentional Infliction of Emotional Distress | x | X |
| **Count VIII** | Constructive Fraud (Civil Code § 1573) | x | X |
| **Count IX** | Negligence | x | |
| **Count X** | Negligent Supervision | x | |
| **Count XI** | Negligence *Per Se* | x | |
| **Count XII** | Negligent Hiring/Retention | x | |
| **Count XIII** | Negligent Failure to Warn, Train or Educate | x | |
| **Count XIV** | Invasion of Privacy | x | X |
| **Count XV** | Aiding and Abetting | x | |
| **Count XVI** | Fraudulent Concealment | X | |

39.     The State-Court plaintiffs allege that Dr. Tyndall sexually abused, harassed, and molested patients in the guise of providing gynecological care.

40.     The State-Court plaintiffs allege that Dr. Tyndall engaged in acts such as forcing patients to undress in front of him while he watched, groping their breasts, digitally penetrating their vaginas and anuses, often without wearing gloves and with unwashed hands, photographing their genitals and naked bodies, and making racist, misogynistic, and sexually harassing comments to them.  These acts allegedly had no legitimate medical purpose.

41.     The State-Court plaintiffs further allege that Dr. Tyndall's photographing of them without a legitimate medical purpose constituted a violation of the Health Insurance Portability and Accountability Act (HIPAA).

42.     The State-Court plaintiffs allege that USC received complaints concerning Dr. Tyndall from patients and staff since 1988 but failed to take appropriate action and deliberately concealed Dr. Tyndall's conduct, while

promoting the Student Health Center and compelling students to obtain gynecological services from Dr. Tyndall, the only fulltime gynecologist.

43.     The State-Court plaintiffs allege that USC-employed chaperones witnessed sexual abuse of patients by Dr. Tyndall but failed to take appropriate action.

44.     The State-Court plaintiffs allege that USC knew or should have known that Dr. Tyndall and other USC staff had sexually molested or abused students, and therefore had a duty to report these incidents but failed to comply with mandatory reporting laws.

45.     The State-Court plaintiffs alternatively allege that USC was negligent in hiring and retaining Dr. Tyndall, and in failing to adequately supervise him.

46.     The State-Court plaintiffs allege that USC paid Dr. Tyndall a financial settlement in or around June 2017 so that he would resign after the 2016 OED investigation in a deliberate attempt to conceal that Dr. Tyndall was a serial sexual predator and avoid criminal consequences, civil liability, and damage to USC's reputation.

47.     The State-Court plaintiffs seek, in addition to compensatory damages, equitable relief, statutory damages, and punitive damages.

### C.     The Ironshore Policy

48.     For the policy period of July 1, 2017 to July 1, 2018, Ironshore issued Follow Form Excess Policy number 001727904 to USC.  (A true and correct copy of the Policy is appended to the Complaint as Exhibit A.)

49.     The Policy's Limit of Liability is excess of **Underlying Insurance** of $80 million each Occurrence and $90 million aggregate.

50.     The Insuring Agreement states:

> In consideration of the payment of the premium, and in reliance on the **Application**, and subject to all of the

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

terms, conditions, limitations and endorsements of this Policy, the **Insurer** agrees to provide the **Insured** with insurance excess of the **Underlying Insurance**, and in conformance with the terms, conditions, limitation, exclusions, definitions and endorsements of the **Primary Policy**, excess as otherwise stated in this Policy. . . .

51.     The Policy defines the **Primary Policy** as the contract issued by BETA Risk Management Authority ("BETArma"), certificate number HCL-17-807 (the "**Primary Policy**" or "BETA Contract").  (A copy of relevant portions of the BETA Contract is appended as Exhibit B.)

52.     Upon information and belief, USC is and was a member of BETArma at the time periods relevant to this Complaint.

53.     The **Primary Policy** provides Healthcare Entity Professional Liability coverage.  Section 2 of the **Primary Policy** states:

1.     BETARMA will pay those sums which the **Member** is legally required to pay as damages for a **Claim** for **Bodily Injury**, **Property Damage** or **Economic Damages** arising out of the **Member's** negligence in the rendering of, or failure to render, **Professional Services**:

A.     on or after the **Retroactive Date**; and

B.     at a **Covered Location**; and provided that

C.     the **Claim** is first made against the **Member** during the **Contract Period** and is reported in writing to BETARMA as soon as possible during the **Contract Period** but in no event later than thirty (30) calendar days after termination of the **Contract Period**.

2.     BETARMA will pay those sums which the **Member** is legally required to pay as damages for a **Claim** arising from a negligent act, error or omission resulting in actual or alleged denial, suspension, revocation, termination or limitation of medical staff privileges. . . .  This coverage

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

applies only if the **Claim** is first made against the **Member** during the **Contract Period** and is reported in writing to BETARMA as soon as possible during the **Contract Period** but in no event later than thirty (30) calendar days after termination of the **Contract Period**. BETARMA will defend, but will not indemnity, a **Claim** that is otherwise covered under this Section, but alleges an intentional act, error or omission.

[. . .]

4. BETARMA will pay those sums which the **Member** is legally required to pay as damages for a **Claim** arising out of the following offenses:

A. discrimination based upon, without limitation, an individual's race, ethnicity, ancestry, national origin, citizenship, religion, age, sex, sexual orientation or preference, pregnancy, preexisting medical condition, physical or mental disability or handicap, insurance status, economic status or ability to pay for medical services, and

B. sexual abuse, assault, battery, harassment or molestation

if the **Claimant's** injury arises out of the **Member's** negligence in rendering of, or failure to render, **Professional Services** on or after the **Retroactive Date**; and at a **Covered Location**; and provided that the **Claim** is first made against the **Member** during the **Contract Period** but in no event later than thirty (30) calendar days after termination of the **Contract Period**.

BETARMA will defend, but will not indemnify, a **Claim** that is otherwise covered under this Section, but alleges an intentional act or omission.

54. The **Primary Policy** defines a **Member** to include USC and any physician employed or formerly employed by USC, "but only with respect to his or

1    her legal liability when acting within the course and scope of his or her duties" to

2    USC and only to the extent that USC "is permitted or required by law to indemnify

3    her or her."  (Ex. B, § 7, ¶ A; *id.* Am. H310-01.)

4        55.    The **Primary Policy** defines a **Claim** to include a "written demand for

5    damages" including "service of suit."  (Ex. B, § 1.5.)  The **Primary Policy** further

6    states that "no **Claim** shall be deemed first made during the **Contract Period** if:

7    C. the **Claim** or incident was reported before the Effective Date of this Contract to

8    BETARMA or to any liability insurer; or D. any **Member** had knowledge prior to

9    the Effective Date of facts or circumstances that would cause a reasonable person to

10   believe that a **Claim** might be made."

11       56.    The **Primary Policy** defines the **Contract Period** as July 1, 2017 to

12   July 1, 2018.

13       57.    The "Effective Date" of the **Primary Policy** is July 1, 2017.  (Ex. B,

14   Cert. of Participation, ITEM 3.)

15       58.    The **Primary Policy** defines a **Bodily Injury** as "bodily injury,

16   sickness or disease sustained by a person" and includes "mental anguish, mental

17   injury, or shock sustained by that person as a result of such bodily injury, sickness

18   or disease."  (Ex. B, § 1.3.)

19       59.    The **Primary Policy** defines **Economic Damages** as "financial loss and

20   does not include damages arising from **Bodily Injury**…." (Ex B, § 1.10.)

21       60.    The **Primary Policy** defines **Professional Services** to include

22   "medical, surgical, dental or nursing or other healthcare services or treatment to a

23   patient, including custodial care and the furnishing of food or beverages in

24   connection with the treatment" and "the furnishing or dispensing of drugs, or

25   medical, dental or surgical supplies or appliances to a patient if the injury occurs

26   after the **Member** has relinquished possession thereof."  (Ex. B, Am. No. H336-01.)

27

28

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

61.    Section 2 of the **Primary Policy** states that the coverage is subject to the Exclusions in Section 6 and the Total BETArma Will Pay in Section 7 of the **Primary Policy**.

62.    Section 7, Paragraph 10.D, states that if a **Claim** "involves both covered and noncovered allegations, theories of recovery or relief, BETArma shall be responsible only for that portion of the total amount that is covered" by the **Primary Policy**.

63.    Several exclusions bar coverage, in whole or in part, for the Federal Settlement and the putative claims asserted in the State-Court Actions.

64.    Except as otherwise provided in Section 6 of the **Primary Policy**, the exclusions "apply regardless of whether any other cause, act, error, omission, event material or product contributes concurrently or in any sequence to a **Claimant's** injury or damage."

65.    Exclusion 1 of the **Primary Policy** states:

> This Contract does not apply to any **Claim** for damages arising out of the breach of any contract or agreement or liability assumed by the **Member** under any contract or agreement, except that: . . .
>
> B.    this exclusion does not apply . . . for liability arising out of a written agreement entered into before the **Occurrence** or offense under which the **Member** assumed the tort liability of others for injury to a third person or entity caused by the **Member's** negligence or other fault; and
>
> C.    this exclusion does not apply . . . for liability the **Member** would have had in the absence of the contract or agreement.
>
> Coverage is not provided for any liability resulting from guaranteeing the results of treatment.

COMPLAINT

66.   Exclusion 5 of the **Primary Policy** states:

This Contract does not apply to any injury that is expected or intended by the **Member**.  This exclusion does not apply to **Bodily Injury** resulting from the use of reasonable force to protect person or property.

67.   Exclusion 6 of the **Primary Policy** states:

Except for the defense of criminal charges as provided in Section 2.6, this Contract does not apply to any **Claim** arising from or brought about or contributed to by the **Member's** dishonest, fraudulent, criminal or malicious acts or omissions, or to acts or omissions that an insurer could not indemnify under California Insurance Code Section 533.

68.   Exclusion 9 of the **Primary Policy** states:

This Contract does not apply to any **Claim** based, in whole or in part or directly or indirectly, on, attributable to, arising out of, resulting from, or in any way related to any actual or alleged violation of any federal, state or other statutory or common law (including but not limited to the Cartwright Act, California Business & Professions Code § 16600, et. seq., the Unfair Practices Act, Business & Professions Code § 17000, et. seq. and the Unfair Competition Act of the State of California, Business & Professions Code §§ 17200, et. seq. and 17500, et. seq. and Title 15 of the United States Code, all as they may be amended from time to time) that prohibits the unlawful restraint of trade, business or profession, except any liability arising from actions brought against the **Member** by any person or persons alleging the improper or unlawful denial or restriction of medical staff privileges or alleging the **Member's** failure to act upon any application for such privileges.

69.   Exclusion 12 of the **Primary Policy** states:

BETArma will not pay any punitive or exemplary damages, fines, penalties, taxes, trebled damages or any

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

other measure of damages exceeding actual compensatory damages.

70.   Exclusion 16 of the **Primary Policy** states:

BETArma will not pay for equitable remedies or the costs of complying with equitable remedies, governmental requests, directives, orders or recommendations. (Examples of equitable remedies include injunctions, restitution, disgorgement, declaratory relief, constructive trust, and rescission, reformation or specific performance of a contract.)

71.   Exclusion 24 of the **Primary Policy** states:

This Contract does not apply to any damages directly or indirectly arising out of, resulting from or in any way related to any **Privacy Breach Wrongful Act**.

72.   The **Primary Policy** defines a **Privacy Breach Wrongful Act** as "(a) any actual or alleged failure to safeguard or to prevent unauthorized access to or use or disclosure of any **Personal Information**, including any access, use or disclosure that exceeds authorization, (b) failure to give notification of an actual or potential unauthorized access to, or use or disclosure of, any **Personal Information**."

73.   As defined by the **Primary Policy**, "**Personal Information** includes any information defined as 'individually identifiable health information,' 'medical information', 'personal information' or 'personally identifying information' in the Health Insurance Portability and Accountability Act of 1996 or the California Civil Code, as amended from time to time, or in any regulations adopted thereunder."

74.   The Ironshore Policy excludes coverage for "loss or damages, including costs of defense, based on or arising out of any **Unauthorized Personal Information Disclosure**," and Ironshore does not recognize the erosion of any **Underlying Insurance** by the payment of such loss or damage.  (Ex. A, End't 7.)

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

75.   The Ironshore Policy defines **Unauthorized Personal Information Disclosure** as follows:

I.   any access to, collection, of release of, disclosure of any person's or organization's confidential or personal information, including . . . health or medical information or any other type of nonpublic information; including but not limited to violations of Health Insurance Portability and Accountability Act of 1996 (HIPAA) and any amendments thereto, whether the claim is made by or on behalf of a private individual, entity or government agency; or

II.   loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate **Electronic Data**.

76.   The Ironshore Policy defines **Electronic Data** as:

[A]ny information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are or may be used with electronically controlled equipment or other electronic backup facilities, and data transmission or storage by means of the Internet.  "**Electronic Data**" is not tangible property.

77.   Section 7, Paragraph 14.B of the **Primary Policy** states:

With respect to the **Named Member** . . . and the persons identified in Sections 7.1.A(1) and 7.1.A(6)(a), this Contract shall be excess of any valid and collectible insurance or other coverage or self-insurance obtained or maintained by the **Member** or for the **Member's** benefit, whether such coverage or insurance or self-insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such coverage or insurance or self-insurance is written only as specific excess coverage, insurance or self-insurance over and above the Limit of

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

Liability provided under this Contract by reference to the Certificate number of this Contract.

**COUNT I**
**DECLARATORY JUDGMENT**

78.     Ironshore incorporates the allegations of the foregoing Paragraphs of this Complaint.

79.     This is a claim for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.  Ironshore seeks a judicial determination of the rights and duties of the parties under the Policy.

80.     A real and actual controversy exists between Ironshore, on the one hand, and USC and Dr. Tyndall, on the other, concerning whether (a) Ironshore is or was obligated to defend or indemnify USC and/or Dr. Tyndall in the State-Court Actions; and (b) Ironshore is or was obligated to indemnify USC and/or Dr. Tyndall in the Federal Class Action for the Federal Settlement.

81.     The issuance of declaratory relief by this Court will resolve the existing controversy between the parties.

82.     Ironshore is entitled to a judicial declaration that the **Underlying Insurance** has not been exhausted by defense costs or claims covered under the terms and conditions of the **Underlying Insurance** or insurable under applicable law.

83.     The Federal Class Action and State-Court Actions allege that USC, the Trustees, and Dr. Tyndall acted intentionally, deliberately, wantonly, maliciously, recklessly and otherwise with a mental state beyond mere negligence.

84.     Ironshore is entitled to a judicial declaration that it does not have a duty to defend or indemnify USC or Dr. Tyndall in the State-Court Actions, or to indemnify USC or Dr. Tyndall for the Federal Settlement to the extent that the injuries alleged do not arise out of the negligence of USC, the Trustees, and/or

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

Dr. Tyndall in rendering of, or failure to render, **Professional Services**.

85.     Ironshore is entitled to a judicial declaration that it does not have a duty to indemnify USC for the "Tier One" compensation paid in the Federal Settlement because those payments do not arise out of the negligence of USC, the Trustees, and/or Dr. Tyndall in rendering of, or failure to render, **Professional Services** or because the individuals receiving Tier One compensation did not have **Bodily Injury** or otherwise present **Claims** within the scope of the **Primary Policy**'s insuring agreements.

86.     Ironshore is entitled to a judicial declaration that it does not have a duty to defend or indemnify USC or Dr. Tyndall in the State-Court Actions, or to indemnify USC or Dr. Tyndall for the Federal Settlement to the extent that the Trustees or Dr. Tyndall were not acting within the course and scope of their duties to USC and/or did not qualify as **Members** under the **Primary Policy**.

87.     As alleged above, USC and Dr. Tyndall knew before July 1, 2017 of allegations of racial discrimination and sexual harassment and abuse against Dr. Tyndall.  Before that date, USC had concluded that Dr. Tyndall had violated USC's policies against racial discrimination and sexual harassment, and USC had terminated Dr. Tyndall's employment with USC.

88.     A reasonable person would have believed, before July 1, 2017, that a **Claim** might be made against USC, the Trustees, and/or Dr. Tyndall based on the facts and circumstances known to USC and Dr. Tyndall.

89.     Under the terms of the Policy, therefore, the Tyndall **Claim** is deemed first made before July 1, 2017.

90.     USC failed to report the **Claim** to Ironshore before July 1, 2017.

91.     Ironshore is entitled to a judicial declaration that it does not have a duty under the Policy to defend or indemnify USC or Dr. Tyndall in the State-Court

19
COMPLAINT

Actions, or to indemnify USC or Dr. Tyndall for the Federal Settlement because USC, the Trustees, Dr. Tyndall or any other person qualifying as a **Member** under the **Primary Policy** had knowledge prior to the Effective Date (i.e., July 1, 2017) of facts or circumstances that would cause a reasonable person to believe that a **Claim** might be made and failed to report the **Claim**.

92.    Upon information and belief, USC has undertaken a contractual obligation to defend or indemnify Dr. Tyndall and the Trustees.

93.    Ironshore is entitled to a judicial declaration that it does not have a duty to defend or indemnify USC or Dr. Tyndall in the State-Court Actions, or to indemnify USC, the Trustees, or Dr. Tyndall for the Federal Settlement under Exclusion 1 to the **Primary Policy** to the extent that their actual or alleged liability arises out of the breach of any contract or agreement or liability assumed by the **Member** under any contract or agreement.

94.    Ironshore is entitled to a judicial declaration that it does not have a duty to defend or indemnify USC or Dr. Tyndall in the State-Court Actions, or to indemnify USC or Dr. Tyndall for the Federal Settlement under Exclusion 5 to the **Primary Policy** to the extent that USC, the Trustees, or Dr. Tyndall allegedly or actually intended or expected to injure any plaintiff in the State-Court Actions or the Federal Class Action.

95.    Ironshore is entitled to a judicial declaration that it does not have a duty to defend or indemnify USC or Dr. Tyndall in the State-Court Actions, or to indemnify USC or Dr. Tyndall for the Federal Settlement under Exclusion 6 to the **Primary Policy** to the extent that the actual or alleged liability of USC, the Trustees, or Dr. Tyndall arises from, was brought about, or was contributed to by their dishonest, fraudulent, criminal or malicious acts or omissions, or to acts or omissions that an insurer cannot indemnify under California Insurance Code Section

1   533.

2        96.    The State-Court plaintiffs allege that USC and Dr. Tyndall have

3   violated Section 17200 of the Business and Professions Code.

4        97.    Ironshore is entitled to a judicial declaration that it does not have a duty

5   to defend or indemnify USC or Dr. Tyndall in the State-Court Actions under

6   Exclusion 9 to the **Primary Policy** because the actual or alleged liability of USC,

7   the Trustees, or Dr. Tyndall is based, in whole or in part or directly or indirectly, on,

8   attributable to, arising out of, resulting from, or is related to an actual or alleged

9   violation of Unfair Practices Act, Business & Professions Code § 17000, et. seq. and

10  the Unfair Competition Act of the State of California, Business & Professions Code

11  § 17200, et. seq. that prohibits the unlawful restraint of trade, business or profession.

12       98.    Ironshore is entitled to a judicial declaration that it does not have a duty

13  to indemnify USC or Dr. Tyndall in the State-Court Actions or for the Federal

14  Settlement under Exclusion 12 to the **Primary Policy** to the extent that any portion

15  of any judgment or settlement in the State-Court Actions and the Federal Settlement

16  constitutes punitive or exemplary damages, fines, penalties, taxes, trebled damages

17  or any other measure of damages exceeding actual compensatory damages.

18       99.    Ironshore is entitled to a judicial declaration that it does not have a duty

19  to defend or indemnify USC or Dr. Tyndall in the State-Court Actions or to

20  indemnify USC or Dr. Tyndall for the Federal Settlement under Exclusion 16 to the

21  **Primary Policy** to the extent that any portion of any judgment or settlement in the

22  State-Court Actions and the Federal Settlement constitutes equitable remedies or the

23  costs of complying with equitable remedies.

24       100.   The plaintiffs in the Federal Class Action and the State-Court Actions

25  allege that Dr. Tyndall took photographs of plaintiffs' naked bodies in the guise of

26  performing medical services, but that the photographs were not properly maintained

27

28

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

1   and/or were taken for Dr. Tyndall's prurient purposes.

2       101.   Ironshore is entitled to a judicial declaration that it does not have a duty

3   to defend or indemnify USC or Dr. Tyndall in the State-Court Actions, or to

4   indemnify USC or Dr. Tyndall for the Federal Settlement under Exclusion 24 to the

5   **Primary Policy** to the extent that the damages sought directly or indirectly arise out

6   of, result from or in any way relate to any actual or alleged **Privacy Breach**

7   **Wrongful Act**.

8       102.   Ironshore is entitled to a judicial declaration that it does not have a duty

9   to defend or indemnify USC or Dr. Tyndall in the State-Court Actions, or to

10   indemnify USC or Dr. Tyndall for the Federal Settlement to the extent that the loss

11   or damages, including costs of defense, are based on or arise out of any

12   **Unauthorized Personal Information Disclosure** as defined by the Policy.

13       103.   Ironshore is entitled to a judicial declaration that it does not have a duty

14   to defend or indemnify USC or Dr. Tyndall in the State-Court Actions, or to

15   indemnify USC or Dr. Tyndall for the Federal Settlement to the extent that USC or

16   Dr. Tyndall have other insurance as defined by Section 7, Paragraph 14.B of the

17   **Primary Policy**.

18       104.   Ironshore is entitled to a judicial declaration that it does not have a duty

19   to defend or indemnify USC in the State-Court Actions, or to indemnify USC or

20   Dr. Tyndall for the Federal Settlement to the extent that USC ratified Dr. Tyndall's

21   allegedly improper conduct.

22       105.   Ironshore is entitled to a judicial declaration that the allegations of the

23   State-Court Actions and Federal Action constitute a single **Claim** under the term of

24   the **Primary Policy**, which states that "[t] wo or more **Claims** arising out of … an

25   act, error, omission or offense or a series of related … acts, errors, omissions or

26   offenses shall be treated as a single **Claim**" and that "acts, errors, omissions and

COMPLAINT

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

1    offenses are related if they share a causal connection or have as a common nexus

2    any event or transaction or series of events or transactions."

3        106.   Ironshore is entitled to a judicial declaration that it is entitled to recover

4    all amounts that it paid in the event that any carrier below Ironshore recoups or

5    recovers amounts that it paid toward the underlying limits.

6        107.   Ironshore paid the limits of the Policy to USC subject to a full

7    reservation of its rights under the Policy and the law, including under *Buss* and *Blue*

8    *Ridge*, to recover all amounts that it does not have a duty to pay.

9    **COUNT II**
    **RESCISSION**

10

11       108.   Ironshore incorporates the allegations of the foregoing Paragraphs of

12   this Complaint.

13       109.   The Ironshore Policy was issued in reliance on the **Application**.  (Ex.

14   A, § I.)

15       110.   The Policy defines an **Application** as "an application furnished to the

16   **Insurer** (if any), and all other documents, materials or other information furnished

17   or available, and all other statements made, to the **Insurer** and to the insurer(s) of

18   the **Underlying Insurance**, whether directly or indirectly, concerning the business

19   and/or operations of the **Insured**."  (Ex. A, End't 5.)

20       111.   When USC applied to Ironshore to renew the coverage, USC had

21   completed its investigation of the allegations against Dr. Tyndall, had found that he

22   had violated USC's race and sexual harassment policies in response to complaints of

23   patient harm, and upon information and belief had decided to terminate Dr. Tyndall.

24   By the time that USC, through its insurance broker, directed Ironshore to bind

25   coverage, USC had told Dr. Tyndall that his employment was being terminated and

26   had presented him with a severance agreement.

27       112.   Upon information and belief, at all times relevant hereto, USC believed

28

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

that if the allegations of improper medical care and of sexual and racial harassment over multiple years were to be disclosed to the public that Dr. Tyndall and USC would be sued by former patients.

113.   When USC applied to Ironshore to renew the excess policy for the 2017-18 policy period, USC failed to disclose any of the foregoing facts and allegations regarding Dr. Tyndall to Ironshore.

114.   USC knew that the allegations made against Dr. Tyndall would be material to all of the insurers to which USC applied for healthcare professional liability coverage, including Ironshore.

115.   USC knew that it was applying for healthcare professional liability coverage on a claims-made basis and therefore incidents that had happened in previous years would be relevant to an insurer that was evaluating the risk that a claim would be presented in the 2017-18 policy period.

116.   Had USC disclosed the facts and allegations regarding Dr. Tyndall, at a minimum, Ironshore would not have offered insurance coverage on the terms that it did.  The allegations regarding Dr. Tyndall were material to the risk that Ironshore was undertaking in providing excess healthcare professional liability coverage.

117.   Because USC did not disclose any information concerning the allegations to the public until May 16, 2018, Ironshore could not have independently discovered the risk that the allegations made against Dr. Tyndall were likely to result in claims against both Dr. Tyndall and USC.

118.   On May 16, 2018, the *Los Angeles Times* published an article that alleged that USC had allowed Dr. Tyndall to continue practicing in the Student Health Center as a gynecologist "although he had been accused repeatedly of misconduct toward young patients."  *See* Harriet Ryan, Matt Hamilton, Paul Pringle, "A USC Doctor Was Accused of Bad Behavior with Young Women for Years.  The

1  University Let Him Continue Treating Students," *Los Angeles Times*, 16 May 2018,

2  *available at* https://www.latimes.com/local/california/la-me-usc-doctor-misconduct-

3  complaints-20180515-story.html.  The day before the story was published, USC

4  issued statements disclosing that the 2016 investigation by USC "concluded that

5  Tyndall had violated the university's policy on harassment by making repeated

6  racially discriminatory and sexually inappropriate remarks during patient

7  encounters," and that USC therefore began termination proceedings against

8  Dr. Tyndall.  *See* "Summary of Coordinated Investigation of Student Health

9  Physician," *available at* https://pressroom.usc.edu/files/2018/05/Summary-fact-

10  sheet_5.15.18.pdf.

11       119.   On or before May 8, 2018, USC learned of the impending *Los Angeles*

12  *Times* story.

13       120.   Since the *Los Angeles Times* story broke in May 2018, hundreds of

14  plaintiffs have filed lawsuits against Dr. Tyndall and USC.

15       121.   USC demanded coverage from Ironshore for the lawsuits arising from

16  the allegations about Dr. Tyndall's conduct from its healthcare professional liability

17  carriers under the policies issued for the 2017-18 policy period.

18       122.   USC, in applying for healthcare professional liability insurance from

19  Ironshore, had a duty to disclose all facts material to the risk that USC asked

20  Ironshore to undertake.

21       123.   The allegations of unprofessional conduct and resulting harm made by

22  multiple professionals and patients against Dr. Tyndall, who had practiced as a

23  gynecologist for USC for approximately 27 years, were material to the risk that USC

24  was asking Ironshore to undertake for the policy period of July 1, 2017 to July 1,

25  2018.

26       124.   Upon information and belief, when USC applied for the Ironshore

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

Policy, USC believed that the allegations against Dr. Tyndall were likely to result in claims against Dr. Tyndall and USC.  USC gave sufficient credence to the allegations that on January 31, 2017 it found that Dr. Tyndall had violated USC's policies against race and sexual harassment, and USC terminated his employment on or about May 16, 2017.

125.    USC provided its insurers, including Ironshore, with periodic reports of claims and incidents that might result in claims without limiting its reports to incidents potentially involving damages in excess of primary coverage.

126.    Based on USC's reporting practices, Ironshore had no reason to believe that USC was omitting potential claims of the magnitude presented by the allegations against Dr. Tyndall.

127.    USC did not disclose the allegation against Dr. Tyndall to Ironshore when it applied for the Policy.

128.    If Ironshore had known of the allegations against Dr. Tyndall, Ironshore would not have issued coverage on the same terms, and certainly would not have agreed to provide coverage for claims arising out of Dr. Tyndall's alleged misconduct.

129.    Ironshore is entitled to rescission of the Policy pursuant to Section 330 *et seq.* of the California Insurance Code and/or common law.

130.    Accordingly, in the event that the Court does not enter judgment in Ironshore's favor on Count I, the Court should enter an order declaring the Policy void or voidable and granting Ironshore's request that the Policy be rescinded.

WHEREFORE, Ironshore respectfully requests that this Court enter an order:

        a.     Declaring that Ironshore did not have a duty to defend or indemnify USC or Dr. Tyndall; or

        b.     Rescinding the Policy; and

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017

COMPLAINT

1        c.     Ordering USC to reimburse Ironshore for the money that it paid

2               under reservation of rights to USC; and

3        d.     Awarding such further relief as the Court deems appropriate.

KLINEDINST PC

DATED:  February 11, 2021    By:   /s/ Paul H. Burleigh

                                Paul H. Burleigh
                                Attorneys for Plaintiff
                                IRONSHORE SPECIALTY INSURANCE
                                COMPANY

                                Ronald P. Schiller
                                (application for pro hac vice admission to be
                                submitted)
                                Sharon F. McKee
                                (application for pro hac vice admission to be
                                submitted)

KLINEDINST PC
777 S. FIGUEROA ST., SUITE 2800
LOS ANGELES, CALIFORNIA 90017