# EXHIBIT A



| | **Ironshore Insurance Services LLC.** |
|---|---|
| | A subsidiary of Ironshore Holdings (U.S.) Inc. |
| | 175 Powder Forest Drive |
| | 1st Floor |
| | Weatogue, CT  06089 |

May 29, 2018

Collin Wedel
Chivaroli & Associates, Inc.
200 N. Westlake Boulevard
 Suite 101
Westlake Village, CA  91362

|  | **Re:** | University of Southern California |
|---|---|---|
|  |  | 3434 South Grand Avenue, CAL 120 - H |
|  |  | Los Angeles, CA  90089 |
| **Line Of Business:** |  | Healthcare Professional Liability – Excess |
| **Policy Number:** |  | 001727904 |
| **Policy Term:** |  | 7/1/2017 TO 7/1/2018 |

Dear Collin:

Enclosed please find the policy for the above referenced account.  We appreciate your consideration of Ironshore.  Feel free to contact me with any questions or concerns.


Sincerely,


*Nicole M. Hayes*


Nicole Hayes
Vice President
Ironshore Insurance Services LLC.
Office: +1 (860) 408-7803
Mobile: +1 (860) 713-4261
Email: nicole.hayes@ironshore.com



**IRONSHORE SPECIALTY INSURANCE COMPANY**

Mailing Address:
75 Federal Street
5th Floor
Boston, MA  02110
Toll Free: (877) IRON411

**NOTICE:**

**1. THE INSURANCE POLICY THAT YOU (HAVE PURCHASED) (ARE APPLYING TO PURCHASE) IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.**

**2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.**

**3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.**

**4. THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: 800-927-4357. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG.**

**5. FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.**

**6. FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.**

**7. CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV.**

**8. IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE**

**BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.**

**Date: _____**

**Insured: _____**



## IRONSHORE SPECIALTY INSURANCE COMPANY

**Mailing Address:**
**75 Federal Street**
**5th Floor**
**Boston, MA  02110**
**Toll Free: (877) IRON411**

# FOLLOW FORM EXCESS POLICY
# DECLARATIONS

**Policy Number:** 001727904

| Item 1.  NAMED INSURED AND PRINCIPAL ADDRESS | ITEM 2.  POLICY PERIOD |
|---|---|
| University of Southern California<br>3434 South Grand Avenue<br>Los Angeles, CA  90007-4326 | (a) **Effective Date:**   July 01, 2017<br><br>(b) **Expiration Date:**   July 01, 2018<br><br>At 12:01 a.m. Standard Time both dates at the Principal Address stated in ITEM 1. |

**ITEM 3.  LIMIT OF LIABILITY**
Per Claim Limit of Liability:  $20,000,000
Aggregate Limit of Liability:  $20,000,000

☐ Defense expenses are included within the limit of liability
☒ Defense expenses are outside the limit of liability

**RETROACTIVE DATE(S)** 9/1/86 and per schedule of underlying

**ITEM 4.  SCHEDULE OF UNDERLYING POLICIES**

**(a)  Primary Policy:**

| Underwriter | Policy Number | Limits | Coverage |
|---|---|---|---|
| BETA Risk Management Authority | HCL-17-807 | $20,000,000 Per Occurrence<br>$30,000,000 Aggregate<br>Excess of: | Healthcare Entity Professional Liability (Claims Made) |

**(b)  Other Underlying Insurance:**

| Coverage | Limits |
|---|---|
| Excess Healthcare Professional Liability | $60,000,000 Per Claim<br>$60,000,000 Aggregate |

**ITEM 5. PREMIUM:**

*Compliance with all surplus lines placement requirements, including stamping the Policy and collection and payment of surplus lines taxes, is the responsibility of the broker.*

Premium: **REDACTED**

----------------------- -----------------------

Total Amount Due: **REDACTED**

*See Invoice for the date Premium is due and payable. Failure to pay the premium in full may result in voidance of coverage.*

☒ This amount is net of commission – no percentage of the premium will be paid to the broker.
☐ This amount includes commission – a percentage of the premium will be paid to the broker.

**ITEM 6. NOTICES UNDER SECTION VI OF THE POLICY SHOULD BE ADDRESSED TO:**

**USCLAIMS@IRONSHORE.COM**

Vice President of Claims
IronHealth
175 Powder Forest Drive,
Weatogue, CT 06089

All other notices under the Policy should be addressed to:
**Underwriting Department**
**IronHealth**
175 Powder Forest Drive,
Weatogue, CT 06089

**ITEM 7. POLICY FORM**

IHFFXS.COV.001 (11.14 ed.) Follow Form Excess Policy

**& ENDORSEMENTS ATTACHED AT ISSUANCE**

1. OFAC.END.001 (11.14 ed.) OFAC Compliance Notice
2. IHFFXS.025 (2.12 ed.) Charitable Services Coverage
3. IHFFXS.032 (8.08 ed.) Grace Period for Notice of Circumstances Upon Renewal of Policy (with Continuity)
4. IHFFXS.END.125 (11.14 ed.) Additional Coverage Endorsement
5. IHFFXS.END.133 (8.13 ed.) Amend Definition of Application
6. IHFFXS.END.158 (11.14 ed.) Ebola Expense Reimbursement
7. IHFFXS.END.174 (7.15 ed.) Unauthorized Personal Information Disclosure Exclusion

**THESE DECLARATIONS, THE COMPLETED SIGNED APPLICATION AND THE POLICY WITH ENDORSEMENTS SHALL CONSTITUTE THE CONTRACT BETWEEN THE INSURED AND THE UNDERWRITER.**

Ironshore Specialty Insurance Company

**DATE:** May 29, 2018

**BY:** _____

**Authorized Signature**

# CALIFORNIA CONSUMER SERVICES NOTICE

Your policy has been issued by:

**Ironshore Specialty Insurance Company**
**75 Federal Street**
**5th Floor**
**Boston, MA 02110**

If you are having problems, you can contact **Ironshore Specialty Insurance Company** at the following address and telephone number:

**75 Federal Street**
**5th Floor**
**Boston, MA 02110**
**(877) IRON-411**

**THE FOLLOWING ADDRESS AND TOLL-FREE TELEPHONE NUMBER ARE AVAILABLE FOR YOUR USE IN THE EVENT A SATISFACTORY SOLUTION CANNOT BE OBTAINED FROM YOUR INSURANCE AGENT OR COMPANY REGARDING ANY PROBLEMS YOU MAY EXPERIENCE:**

**THE DEPARTMENT OF INSURANCE**
**CONSUMER SERVICES**
**300 SOUTH SPRING STREET**
**LOS ANGELES, CA  90013**
**1-800-927-HELP**



**IRONSHORE SPECIALTY INSURANCE COMPANY**

Mailing Address:
75 Federal Street
5th Floor
Boston, MA  02110
Toll Free: (877) IRON411

**Insured Name:** University of Southern California
**Policy Number:** 001727904

# FOLLOW FORM EXCESS POLICY

**I.    INSURING AGREEMENT**

In consideration of the payment of the premium, and in reliance on the **Application**, and subject to all of the terms, conditions, limitations and endorsements of this Policy, the **Insurer** agrees to provide the **Insured** with insurance excess of the **Underlying Insurance**, and in conformance with the terms, conditions, limitations, exclusions, definitions and endorsements of the **Primary Policy**, except as otherwise stated in this Policy.  In the event that this Policy provides insurance excess of professional liability, the coverage afforded hereunder in respect of such professional liability will apply only on a claims-made basis, regardless of whether the **Primary Policy** provides such coverage on a claims-made or occurrence basis.

**II.   LOSS PAYMENT**

The **Insurer** shall pay on behalf of the **Insured** for loss, damages, settlements and defense expenses by reason of exhaustion of the limits of liability of the **Underlying Insurance** by the issuers of such **Underlying Insurance** and/or the **Insured(s)**, subject to:  (1) the terms and conditions of the **Primary Policy** (as submitted to the **Insurer**), (2) the Limit of Liability stated in ITEM 3 of the Declarations, (3) the applicable **Retroactive Date(s)** stated in ITEM 3 of the Declarations, and (4) the terms and conditions of, and all endorsements attached to, this Policy.

**III.  DEFINITIONS**

(A)   **"Application"** means any application furnished to the **Insurer**, and all other statements made and information furnished to the **Insurer** and to the issuer(s) of the **Underlying Insurance**, whether directly or through public filing.

(B)   **"Insured"** means the persons and organizations insured under the **Primary Policy**.

(C)   **"Policy Period"** means the period set forth in ITEM 2 of the Declarations.

(D)   **"Primary Policy"** means the policy or policies scheduled as such in ITEM 4 of the Declarations and any policy renewing or replacing it/them.

(E)   **"Retroactive Date"** means the applicable date, set forth in ITEM 3 of the Declarations.  No coverage will be available under this Policy for loss, damages, settlements or defense expenses based on or arising out of any act, error, omission or occurrence happening before the applicable **Retroactive Date**.

(F)   **"Underlying Insurance"** means the self-insured retention(s), **Primary Policy** and all other policies which comprise the per claim and aggregate limit(s) of liability described in ITEM 4 of the Declarations, and any policies renewing or replacing them.

(G)    "**Insurer**" means the insurance company identified in the Declarations.

**IV.    UNDERLYING INSURANCE**

No amendment or modification to the **Primary Policy** or any **Underlying Insurance** shall be binding upon the **Insurer** or effective in changing the terms and conditions of, or extending the coverage or limits of liability afforded by, this Policy without the express written agreement of the **Insurer**.

Notwithstanding anything to the contrary contained in this Policy, the **Insurer** will pay for loss, damages, settlements and defense expenses incurred by the **Insured(s)** only upon reduction or exhaustion of the limits of liability of the **Underlying Insurance**. This Policy shall not drop down for any other reason, including without limitation, the inability to collect (in whole or in part) any limits of liability of the **Underlying Insurance**. The risk of such inability to collect any such limits of liability (in whole or in part), whether by reason of financial impairment or insolvency of any issuer of the **Underlying Insurance**, or for any other reason, is expressly retained by the **Insured(s)** and is not in any way or under any circumstances insured or assumed by the **Insurer**.

**V.    LIMIT OF LIABILITY**

The amount stated in ITEM 3 of the Declaration is the limit of the **Insurer's** liability under this Policy, and shall be the maximum amount payable by the **Insurer** under this Policy. Costs and expenses of defense are either within or outside the limit of liability, as specified in ITEM 3 of the Declarations.

**VI.    NOTICE**

As a condition precedent to any right to payment of the **Insured** under this Policy, the **Insured** shall give the **Insurer** written notice of:

(1)    any claim under the **Underlying Insurance** as soon as possible, but in no event later than required for reporting of claims under the **Primary Policy**; *provided*, that the **Insured** shall give the **Insurer** notice of any claim involving professional liability coverage as soon as practicable, but in no event later than ninety (90) days after the expiration of the **Policy Period**; and

(2)    any matter, including a Notice of Circumstance, with respect to which notice has been provided under any **Underlying Insurance;** *provided*, that the Insured shall give the **Insurer** notice of any Notice of Circumstance involving professional liability coverage as soon as practicable, but in no event later than the expiration of the **Policy Period**.

As used herein, the term "Notice of Circumstance" means written notice of specific facts or circumstances of which the **Insured** becomes aware during the **Policy Period** that may subsequently give rise to a claim.

With respect to notices required hereunder:

(a)    the **Insurer** shall accept loss-run or bordereau reporting that includes information generally provided in such formats; and

(b)    such notices shall be delivered to the Vice President of Claims, as set forth in ITEM 6 of the Declarations. *Notice to any other address or department of the Insurer shall not satisfy the requirements of this Section VI.*

**VII.    OTHER TERMS AND CONDITIONS**

(A)    The **Insured** shall not admit liability for, or settle or offer to settle any claim for, any amount that would involve the coverage afforded by this Policy without the **Insurer's** prior written consent.

(B)    The **Insurer** may, at its sole discretion, elect to associate in the investigation, settlement or defense of any claim against the **Insured**, even if the **Underlying Insurance** has not been exhausted. If the **Insurer** so

elects, the **Insured** will cooperate with the **Insurer** and will make available all such information and records as the **Insurer** may reasonably require.

(C)     This Policy will not follow form of any Sub-limited Coverage, and no coverage will be available under this Policy for any claim arising out of or otherwise in connection with any such Sub-limited Coverage. "Sub-limited Coverage" means any coverage afforded under the **Primary Policy** that is expressly subject to a "per-claim" sub-limit of liability under the terms and conditions of the **Primary Policy** (including any endorsement thereto).

(D)     In the event of any payment under this Policy, the Insurer will be subrogated to all the **Insured's** rights of recovery against any person or entity, and the **Insured** shall execute and deliver all instruments and papers and do whatever else is necessary to secure such rights.  The **Insured** shall do nothing that may prejudice the Insurer's position or potential or actual right of recovery. The obligations of the **Insured** under this provision shall survive the expiration or termination of this Policy.

(E)     The person or entity first named in ITEM 1 of the Declarations shall be the sole agent, and shall act on behalf, of the **Insured** with respect to all matters under this Policy, including but not limited to giving and receiving notices and other communications, effecting or accepting any endorsements to or notice of cancellation of this Policy, the payment of premium and the receipt of any return premiums.

(F)     The **Insurer** hereby designates the Director of the Department of Insurance in the state in which this Policy is issued, and his/her successor(s) in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured** arising under or out of this Policy.

**In witness whereof the Insurer has caused this Policy to be executed by its authorized officers.**

Ironshore Specialty Insurance Company by:

Secretary                                        President



**IRONSHORE SPECIALTY INSURANCE COMPANY**
Mailing Address:
75 Federal Street
5th Floor
Boston, MA  02110
Toll Free: (877) IRON411

**Endorsement # 1**

**Policy Number:** 001727904                                    **Effective Date of Endorsement:** July 01, 2017
**Insured Name:**  University of Southern California

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# OFAC COMPLIANCE NOTICE

Payment of Loss under this Policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

All other terms and conditions of this Policy remain unchanged.

_____          May 29, 2018
 Authorized Representative                                        Date



**IRONSHORE SPECIALTY INSURANCE COMPANY**
Mailing Address:
75 Federal Street
5th Floor
Boston, MA  02110
Toll Free: (877) IRON411

**Endorsement #** 2

**Policy Number:** 001727904                    **Effective Date of Endorsement:** July 01, 2017
**Insured Name:**  University of Southern California

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CHARITABLE SERVICES COVERAGE

In consideration of the premium charged,

(1)   If coverage is afforded under the **Underlying Insurance** for any **Charitable Services Claim** (as defined below), the **Underwriter** shall provide the **Insured** with insurance excess of such **Underlying Insurance**, subject to all of the terms, conditions, and endorsement of this Policy.

(2)   If, for any reason, coverage is not afforded under the **Underlying Insurance** for any **Charitable Services Claim**, this Policy shall drop down and the **Underwriter** shall pay on behalf of the **Insured Individual** (as defined below) any loss, damages or settlements, including cost and expenses of defense, that the **Insured Individual** is legally obligated to pay as a result of such **Charitable Services Claim**, subject to the terms and conditions of this endorsement.

(3)   The **Underwriter's** maximum limit of liability for any **Charitable Services Claim** shall be $1,000,000; the **Underwriter's** maximum aggregate limit of liability for all **Charitable Services Claims** happening during the **Policy Period** shall be $1,000,000.  Such amounts shall be in addition to, and not part of, the **Underwriter's** maximum aggregate Limit of Liability set for in ITEM 3 of the Declarations. Payment of the **Underwriter's** maximum aggregate limit of liability for all **Charitable Services Claims** shall terminate the **Underwriter's** obligation to pay any further **Charitable Services Claim(s)** under paragraph (2) above.

(4)   The **Underwriter's** obligation to pay loss, damages or settlements, including costs and expenses of defense, for any **Charitable Services Claim** shall be excess of a self-insured retention of $0 per **Charitable Services Claim**. The **Insured** shall be responsible for payment in full of such self-insured retention.

(5)   For purposes of this endorsement, the following terms shall have the meanings ascribed to them below:

(a)   "**Charitable Services**" means the voluntary provision of **Medical Services** (as defined below) by an **Insured Individual** at the request, or with the permission, of the **Insured**, and without compensation or payment to the Insured Individual of any kind.  **Charitable Services** may be performed anywhere in the world.

(b)  "**Charitable Services Claim**" means any written demand received by an **Insured Individual** for monetary damages, or any notice of any event reasonably expected to result in such a demand, resulting from a **Charitable Services Wrongful Act** (as defined below) which is first made against such **Insured Individual** during the **Policy Period.**  All such demands arising out of a single **Charitable Services Wrongful Act** shall be considered one **Charitable Services Claim**.

(c)  "**Charitable Services Wrongful Act**" means any actual or alleged act, error or omission, or series of acts, errors or omissions, by an **Insured Individual** in rendering, or failing to render, **Charitable Services** on or after the **Retroactive Date** (as defined below).

(d)  "**Insured Individual**" means any person – including any **Medical Practitioner** (as defined below) – who has an assigned work schedule for, and is on the regular payroll of, the **Insured**, with federal and state taxes withheld.  An **Insured Individual's** status as such shall be determined as of the date of the **Charitable Services Wrongful Act** upon which a **Charitable Services Claim** involving the **Insured Individual** is based.

(e)  "**Medical Practitioner**" means any clinical professional including, without limitation, a physician, surgeon, intern, extern, physician's assistant, licensed or registered nurse, certified nurse's assistant, certified registered nurse anesthetist, osteopathic physician and surgeon, podiatrist or dentist.

(f)  "**Medical Services**" means health care, medical care, or treatment provided to any individual, including without limitation any of the following: medical, dental, psychiatric, mental health, chiropractic, osteopathic, nursing, or other professional health care; the furnishing or dispensing of medications, drugs, blood, blood products, or medical, dental, or psychiatric supplies, equipment, or appliances in connection with such care; the furnishing of food or beverages in connection with such care; the providing of counseling or other social services in connection with such care.

(g)  "**Retroactive Date**" means 7/1/17.

(6)  No coverage will be available under this endorsement for:

(a)  Punitive or exemplary damages, or the multiplied portion of any multiplied damage award;

(b)  Any **Charitable Services Claim** based on or arising out of a **Charitable Services Wrongful Act** committed or allegedly committed prior to the **Retroactive Date**;

(c)  Any **Charitable Services Claim** based on or arising out of the rendering, or failure to render, **Medical Services** by someone that is not an **Insured Individual**;

(d)  Any **Charitable Services Claim** for liability under any contract or agreement;

(e)  Any **Charitable Services Claim** for injury to a person which is based on or arises out of employment-related practices, policies, acts or omissions, including the hiring and firing, promotion or demotion, performance evaluation, compensation, discipline, retirement, layoff, transfer, harassment, humiliation or discrimination;

(f)  Any **Charitable Services Claim** based on or arising out of defamation, libel, or slander;

(g)  Any **Charitable Services Claim** based on or arising out of criminal or fraudulent acts, whether or not related to **Medical Services**;

(h)  Ay **Charitable Services Claim** based on or arising out of conduct of a sexual nature, whether or not such conduct involves the rendering of **Medical Services**;

(i)  Any **Charitable Services Claim** based on or arising out of a **Charitable Services Wrongful Act** committed or allegedly committed while the **Insured Individual's** license to practice medicine or license as a health care provider was suspended or revoked;

(j)     Any **Charitable Services Claim** based on or arising out of discrimination in providing **Medical Services** to a patient on the basis of religion, race, sex, age, medical condition or any other basis prohibited by law;

(k)     Any **Charitable Services Claim** based on or arising out of any **Charitable Services Wrongful Act** in which the **Insured Individual**, or someone at the direction of the **Insured Individual**, altered, destroyed, or partially altered or destroyed, any medical or other record for the purpose of concealing any injury, act, error, omission or responsibility related to the **Charitable Services Claim**, whether or not any criminal proceedings or penalties result;

(l)     Any **Charitable Services Claim** based on or arising out of any oral or written statement or publication, whether by or at the **Insured Individual's** direction, with the **Insured Individual's** knowledge that it is untrue; or advertising, publishing, broadcasting, or promotion;

(m)     Any **Charitable Services Claim** based on or arising out of any ownership, rental, occupancy, maintenance or use of any premises;

(n)     Any **Charitable Services Claim** based on or arising out of an **Insured Individual's** illegal abuse of alcohol, drugs or other substance.

(7)     The Insured must notify the Underwriter of (i) a Charitable Services Claim as soon as practicable after the Charitable Services Claim is first made against an Insured Individual, and (ii) a Charitable Services Wrongful Act that an Insured Individual reasonably believes could result in a Charitable Services Claim as soon as practicable after the Charitable Services Wrongful Act first occurs.  Such notice shall give full particulars of the Charitable Services Claim or Charitable Services Wrongful Act, including, but not limited to, a description of the Charitable Services Wrongful Act; the identity of the patient, all potential claimants and health care provider(s) and any Insured Individuals involved; a description of the injury or damages that may result from such Charitable Services Wrongful Act; information on the time, place and nature of the Charitable Services Wrongful Act; the manner in which the Insured first became aware of such Charitable Services Wrongful Act; and the reasons the Insured believes the Charitable Services Wrongful Act is likely to result in a Charitable Services Claim.

(8)     The Underwriter has the right and duty to defend any Charitable Services Claim, even if any of the allegations of such Charitable Services Claim are groundless, false or fraudulent.  No Insured Individual or other Insured under the Policy shall, except at its own cost, incur any expense, make any payment, admit liability for, assume any obligation, or settle any Charitable Services Claim without the Underwriter's written consent. With respect to any Charitable Services Claim, the Underwriter will have the right to investigate, direct the defense, and conduct settlement negotiations it deems appropriate. The Underwriter may make any settlement of any Charitable Services Claim which it deems appropriate.

(9)     The Insured Individual(s) shall cooperate fully with the Underwriter, including providing the Underwriter with all relevant facts that might assist the Underwriter in the investigation and defense of a Charitable Services Claim; attending meetings and court-related proceedings; and providing any other assistance reasonably requested by the Underwriter.  It is expressly understood and agreed that lack of such full cooperation by the Insured Individual(s) shall constitute grounds for voidance of the coverage afforded under this endorsement.

(10)    The coverage afforded under this endorsement applies to Charitable Services Wrongful Acts taking place anywhere in the world.  Any Charitable Services Claim or suit must be made against an Insured, however, in the United States of America, including its territories or possessions, Puerto Rico, or Canada.

(11)    Notwithstanding anything to the contrary contained in this endorsement, the Underwriter shall not be liable under this endorsement for any loss, damages or settlements, including cost and expenses of defense, in connection with a Charitable Services Claim for which the Insured or the Insured Individual has coverage under any other insurance policy, regardless of whether such policy is stated to be primary, contributory, excess, contingent, or otherwise.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____     May 29, 2018
Authorized Representative                                     Date



**IRONSHORE SPECIALTY INSURANCE COMPANY**
Mailing Address:
75 Federal Street
5th Floor
Boston, MA  02110
Toll Free: (877) IRON411

**Endorsement #** 3

**Policy Number:** 001727904                    **Effective Date of Endorsement:** July 01, 2017
**Insured Name:**  University of Southern California

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# GRACE PERIOD FOR NOTICE OF CIRCUMSTANCES UPON RENEWAL OF POLICY (WITH CONTINUITY)

In consideration of the premium charged

1.    *In the event that this Policy is renewed by the Insurer*,

    (a)    Clause (2) of Section VI, Notice, shall be amended to read as follows:

        "(2)    any matter, including a Notice of Circumstance, with respect to which notice has been provided under any **Underlying Insurance;** *provided*, that the Insured shall give the **Insurer** notice of any Notice of Circumstance involving professional liability coverage as soon as practicable, but in no event later than sixty (60) days after the expiration of the **Policy Period**.

    (b)    it is understood and agreed that the amendment set forth in clause (a) above shall apply *only* in the event this Policy is renewed by the **Insurer**. In the event that this Policy is not renewed by the **Insurer**, Section VI of the Policy shall remain unchanged, such that as a condition precedent to any right to payment of the **Insured** under this Policy, the **Insured** shall give the **Insurer** notice of any Notice of Circumstance involving professional liability coverage as soon as practicable, but in no event later than the expiration of the **Policy Period.**

2.    Notwithstanding anything to the contrary contained in this Policy, if this Policy is a renewal of one or more policies previously issued by the **Insurer** to the **Insured,** and the coverage provided by the **Insurer** to the **Insured** was in effect, without interruption, for the entire time between the inception date of the first such other policy and the Inception Date of this Policy, the reference in clause (2) of Section VI, Notice (as amended in paragraph 1(a) above), to the **Policy Period** will be deemed to refer to the period from (i) the inception date of the first policy under which the **Insurer** began to provide the **Insured** with the continuous and uninterrupted coverage of which this Policy is a renewal, to (ii) the Expiration Date set forth in ITEM 2(b) of the Declarations; *provided*, that in the event that any **Underlying Insurance** refuses to accept a Notice of Circumstance that the **Insurer** accepts by reason of this endorsement, in no event will this Policy drop down to provide coverage any earlier or to any greater extent than it would have if such **Underlying Insurance** had accepted such Notice of Circumstance.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

_____                May 29, 2018
Authorized Representative                               Date



**IRONSHORE SPECIALTY INSURANCE COMPANY**
Mailing Address:
75 Federal Street
5th Floor
Boston, MA  02110
Toll Free: (877) IRON411

**Endorsement # 4**

**Policy Number:** 001727904                          **Effective Date of Endorsement:** July 01, 2017
**Insured Name:**  University of Southern California

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL COVERAGE ENDORSEMENT

In consideration of the premium charged,

1.   In addition to the coverage afforded under Section I, INSURING AGREEMENTS, of the Policy, and subject to all of the terms, conditions and limitations of this Endorsement, the Insurer agrees as follows:

(A)   **Evacuation Expense Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Insured**, the Insurer will reimburse the **Insured** up to $25,000 for **Evacuation Expense** actually paid by the **Insured** during the **Policy Period** in connection with an **Evacuation** occurring during the **Policy Period**.

(B)   **Public Relations Expense Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Insured**, the Insurer will reimburse the **Insured** up to $25,000 for **Public Relations Expense** actually paid by the **Insured** during the **Policy Period** in connection with a **Public Relations Event** occurring during the **Policy Period,** provided that the Insurer will have no liability whatsoever for fines, penalties, assessments of costs or other financial awards associated with any such **Public Relations Event**.

(C)   **Disinfection Expense Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Insured**, the Insurer will reimburse the **Insured** up to $25,000 for **Disinfection Expense** actually paid by the **Insured** during the **Policy Period** in connection with a **Disinfection Event** occurring during the **Policy Period**.

(D)   **Abduction Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Insured**, the Insurer will reimburse the **Insured** up to $25,000 for **Abduction Expense** actually paid by the **Insured** during the **Policy Period** in connection with an **Abduction** occurring during the **Policy Period**.

(E)   **Personal Information Protection Expense Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Insured**, the Insurer will reimburse the **Insured** up to $25,000 for **Personal Information Protection Expense** actually paid by the **Insured** during the **Policy Period** in connection

with a **Personal Information Protection Event** occurring during the **Policy Period,** provided that the Insurer will have no liability whatsoever for fines, penalties, assessments of costs or other financial awards associated with any such **Personal Information Protection Event**.

(F)     **Medical Waste Civil Fines Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Insured**, the Insurer will reimburse the **Insured** up to $25,000 for **Medical Waste Civil Fines** actually paid by the **Insured** during the **Policy Period** in connection with a **Medical Waste Event** occurring during the **Policy Period**.

(G)     **Legal Defense Expense Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Insured**, the Insurer will reimburse the **Insured** up to $25,000 for **Legal Defense Expense** actually paid by the **Insured** during the **Policy Period** in connection with a **Legal Defense Event** occurring during the **Policy Period.**

(H)     **Government Billing Legal Expense Reimbursement Insurance**:

Upon satisfactory proof of payment by the **Insured**, the Insurer will reimburse the **Insured** up to $25,000 for **Government Billing Legal Expense** actually paid by the **Insured** during the **Policy Period** in connection with a **Government Billing Event** occurring during the **Policy Period.**

2.     The Insurer's maximum aggregate limit for all **Covered Expense** reimbursed under section 1 of this Endorsement above shall be $75,000, which amount is in addition to, and not part of, the Limit of Liability set forth in ITEM 3 of the Declarations. Payment of such maximum aggregate limit of liability shall terminate the Insurer's obligation to reimburse any further **Covered Expenses** under section 1 above.

3.     The Insurer's obligation to reimburse **Covered Expense** under section 1 above shall be excess of a self-insured retention of $0 per **Covered Event**. The **Insured** shall be responsible for payment in full of such self-insured retention. The self-insured retention shall apply to each **Covered Event**, and shall be eroded (or exhausted) by the **Insured's** payment of **Covered Expense.**

4.     In the event that coverage shall apply to any claim or event under two or more of clauses (A) through (H) of section 1 above, then the Insurer's maximum aggregate limit of liability under all such applicable clauses in respect of such claim or event shall not exceed the largest single available limit of liability under any such clause.  Notwithstanding the foregoing, nothing herein is intended, nor shall it be construed, to obligate or require any payment under any such clause (A) through (H) of section 1 above in respect of such claim or event in any amount exceeding the available limit of liability under such clause.

5.     In addition to the EXCLUSIONS listed in section 6 below,

a.     The Insurer will not pay **Covered Expense** under clause (D) of Section 1 above based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

i.     losses caused by any fraudulent, dishonest or criminal act of the **Insured** or any **Parent**, whether acting alone or in collusion with others;

ii.     **Ransom**; or

iii.     **Abduction Expenses** for which the **Insured** has coverage under any other insurance Policy, regardless of whether such Policy is stated to be primary, contributory, excess, contingent, or otherwise; and

b.     The Insurer will not pay **Covered Expense** under clause (H) of Section 1 above based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any **Government Billing Event** initiated by a Recovery Audit Contractor, Medicare Administrative Contractor, Medicaid Integrity Contractor, Zone Program Integrity Contractor, or any other person or entity with whom the **Government** contracts to recover amounts actually or allegedly billed to the **Government** improperly, and who is paid by the **Government** based on a percentage of the amount recovered.

6.  Except as otherwise expressly provided in this Endorsement, no coverage will be available under this Endorsement, and the Insurer will not pay **Covered Expense** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any:

(A)  **Covered Event** that happened before the Inception Date of the Policy set forth in ITEM 2 of the Declarations;

(B)  **Legal Defense Event** that happened before the **Legal Defense Retroactive Date;**

(C)  **Government Billing Event** that happened before the **Government Billing Legal Expense Retroactive Date**

(D)  dishonest, fraudulent, criminal or intentionally malicious act, error or omission by a **Insured**; or any willful violation of law, statute, rule or regulation by a **Insured**;

(E)  obligation which a **Insured** has assumed under a written or oral contract or agreement; except this clause (d) will not apply to liability a **Insured** would have had in the absence of such contract or agreement.

7.  As used in this Endorsement, the following terms shall have meanings ascribed to them as follows:

(A)  "**Abduction**" means the wrongful **Abduction** of a **Covered Child** by any person or group, other than a **Parent**, from any of the **Insured's** facilities.

(B)  "**Abduction Expenses**" means:

(1)  Reasonable fees and expenses of an independent detective agency retained to locate a **Covered Child** following the **Abduction** of such **Covered Child**;

(2)  Reasonable fees and expenses of an independent public relations consultant incurred solely and directly in connection with, during the period of, and up to the maximum of thirty (30) days after, an **Abduction**;

(3)  Reasonable cost of publicity incurred to locate a **Covered Child** following the **Abduction** of such **Covered Child**;

(4)  Reasonable expenses for travel and accommodation occurred by the **Parent(s)** of a **Covered Child** during the period of the **Abduction** of such **Covered Child** and solely and directly resulting from such **Abduction**;

(5)  Other reasonable and necessary expenses incurred by the **Parent(s)** of a **Covered Child** during the period of the **Abduction** of such **Covered Child** and solely and directly resulting from such **Abduction**;

(6)  The salary of the **Parent(s)** of a **Covered Child** until seven (7) days after the **Covered Child**'s release or twelve (12) months after the date of the **Abduction** of such **Covered Child**, whichever occurs first, if the employer(s) of such **Parent(s)** fail to pay such salary;

(7)  Costs of psychiatric counseling incurred by and for the benefit of the **Parent(s)** of a **Covered Child** for twelve (12) months after the date of the **Abduction** of such **Covered Child**, but not including any remuneration, salaries, overhead, or benefits expenses of the Insured;

(8)  Costs of psychiatric counseling incurred by and for the benefit of a **Covered Child** for twelve (12) months after the date of the **Abduction** of such **Covered Child**, but not including any remuneration, salaries, overhead, or benefits expenses of the **Insured**; and

(9)  A reward paid to any natural person who provided information not otherwise available leading to the location of an abducted **Covered Child** and the arrest and conviction of the person(s) or group responsible for such **Abduction**, if the offer of such reward is approved by law enforcement officials.

(C)     "**Covered Child**" means a child up to the age of seven (7) years.

(D)     "**Covered Event**" means any **Evacuation, Public Relations Event, Disinfection Event, Abduction, Personal Information Protection Event, Legal Defense Event, Medical Waste Event** or **Government Billing Event.**

(E)     "**Covered Expense**" means any **Evacuation Expense, Public Relations Expense, Disinfection Expense, Abduction Expense, Personal Information Protection Expense, Legal Defense Expense, Medical Waste Civil Fines** or **Government Billing Legal Expense** actually paid by the **Insured** as a result of any **Covered Event** for which this Endorsement provides coverage**.   Covered Expense** shall not include fines, penalties, sanctions, fees, government payments or taxes, *other than* **Medical Waste Civil Fines** up to $25,000, or fines, penalties, sanctions, fees, government payments or taxes as a result of any **HIPAA Violation** up to $25,000.

(F)     "**Disinfection Event**" means any case or series of cases of the MRSA virus or other facility-borne infectious virus, bacteria or disease that requires reporting of such case or series of cases to any local, state or federal governmental or healthcare oversight agency or entity.

(G)     "**Disinfection Expense**" means reasonable fees and costs incurred by the **Insured** to clean and disinfect the **Insured's** facility after any **Disinfection Event**. **Disinfection Expense** includes costs (a) to engage third party providers of cleaning/disinfection services; (b) to notify patients/residents, visitors or other potentially affected persons; and (c) incurred in the management of public relations with respect to such **Disinfection Event**. **Disinfection Expense** does not include any remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of the **Insured,** or cost of cleaning/disinfecting supplies or products.

(H)     "**Evacuation**" means the removal from one or more of the **Insured's** facilities to any other location of a majority of the patients of such facility(ies) as a result of any natural or man-made occurrence that, in the reasonable judgment of the **Insured's** management, causes or could potentially cause such facility(ies) to be unsafe for such patients.

(I)     "**Evacuation Expense**" means reasonable costs incurred in connection with an **Evacuation**, including costs associated with transporting and lodging patients who have been evacuated.   **Evacuation Expense** does not include any remuneration, salaries, overhead or benefit expenses of the **Insured**.

(J)     "**Government**" means any federal or state (including the District of Columbia) governmental entity or agency acting with legal authority to implement, administer and/or enforce federal or state health benefit programs. For purposes of the the coverage afforded under this Endorsement, the term **Government** will be deemed to include a whistleblower.

(K)     "**Government Billing Event**" means any alleged violation by the **Insured** of any of the statutes, regulations, directives or bulletins promulgated by the **Government** pertaining to billing for medical services under government-sponsored health benefit plans.

(L)     "**Government Billing Legal Expense**" means reasonable fees of attorneys, experts and consultants incurred in the investigation, adjustment, defense and or appeal of a **Government Billing Event**; provided that **Government Billing Legal Expense** shall not include remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of the **Insured.**

(M)     "**Government Billing Legal Expense Retroactive Date**" means 7/1/17.

(N)     "**HIPAA Violation**" means any proceeding brought by a government entity (other than proceedings in the ordinary course of the **Insured's** business) alleging a violation of the privacy provisions of the Health Insurance Portability and Accountability Act of 1996 (HIPAA).

(O)     "**Legal Defense Event**" means:

      (1)   criminal charges, filed during the **Policy Period**, relating to an act, error or omission that took place on or after the **Legal Defense Retroactive Date** set forth below, arising out of the rendering or failure to render **Medical Services**; and

      (2)   any administrative, regulatory, disciplinary or licensure proceeding, filed or initiated during the **Policy Period**, relating to an act, error or omission that took place on or after the **Legal Defense Retroactive Date,** arising out of the rendering or failure to render **Professional Services.**

(P)   "**Legal Defense Expense**" means the reasonable fees of attorneys, experts and consultants incurred in the investigation, adjustment, defense and or appeal of a **Legal Defense Event**; provided that **Legal Defense Expense** shall not include remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of the **Insured.**

(Q)   "**Legal Defense Retroactive Date**" means 7/1/17.

(R)   "**Medical Services**" means health care, medical care, or treatment provided to any individual, including without limitation any of the following: medical, dental, psychiatric, mental health, chiropractic, osteopathic, nursing, or other professional health care; the furnishing or dispensing of medications, drugs, blood, blood products, or medical, dental, or psychiatric supplies, equipment, or appliances in connection with such care; the furnishing of food or beverages in connection with such care; the providing of counseling or other social services in connection with such care; and the handling of, or the performance of post-mortem examinations on, human bodies.

(S)   "**Medical Waste**" means medical, infectious or pathological waste.

(T)   "**Medical Waste Event**" means the improper storage, handling or treatment of **Medical Waste**, or the discharge, dispersal, release, escape or seepage of **Medical Waste** in, into, or upon land and/or structures thereupon, the atmosphere, surface water, or groundwater.

(U)   "**Medical Waste Civil Fines**" means civil fines and/or penalties imposed on the **Insured** by any federal, state or local regulatory agency as a direct result of any **Medical Waste Event**. Other than as expressly set forth above, **Medical Waste Civil Fines** shall not include any costs incurred by the **Insured** in connection with any **Medical Waste Event**, including without limitation any costs incurred (a) in the processing, treatment or disposal of **Medical Waste**, or (b) in the remediation of **Medical Waste**; or (c) in the notification or treatment of patients, visitors or other potentially affected persons  or (d) in the management of public relations with respect to such **Medical Waste Event**.

(V)   "**Insured**" means the entity identified in ITEM 1 of the Declarations.

(W)   "**Parent**" means the individual(s) recognized by a court of competent jurisdiction to have legal custody of a **Covered Child.**

(X)   "**Personal Information Protection**" means maintaining the confidentiality of information regarding **Medical Services** or information obtained in the provision of **Professional Services** and limiting the release or use of such information in conformance with requirements of law.

(Y)   "**Personal Information Protection Event**" means any **HIPAA Violation**, or any other failure to maintain the confidentiality of information regarding **Medical Services** or information obtained in the provision of **Professional Services** or unauthorized release or use of such information.

(Z)   "**Personal Information Protection Event Expense**" means reasonable fees and costs of attorneys, experts and consultants, including third-party media consultants, incurred in the management or investigation of an actual or alleged **Personal Information Protection Event.  Personal Information Protection Event Expense** includes costs incurred in (1) the management of public relations with respect to such **Personal Information Protection Event**, (2) notification of affected parties, and (3) credit monitoring if applicable, but does not include any remuneration, salaries or benefit expenses of the **Insured**. **Personal Information Protection Event Expense**

does not include any regulatory or administrative fines or penalties imposed upon the **Insured** as a result of a **Personal Information Protection Event.**

(AA) "**Professional Services**" means:

(1) **Medical Services**;

(2) the activities of an **Insured** as a member of a formal accreditation, standards review or similar professional board or committee, including executing the directives of such board or committee;

(3) supervising, teaching or proctoring others at the request of the **Insured**; or

(4) reviewing the quality of **Medical Services** or providing quality assurance on behalf of the **Insured**.

(BB) "**Public Relations Expense**" means reasonable fees and costs incurred in the investigation, mitigation and/or defense of an actual or alleged **Public Relations Event**.  **Public Relations Expense** includes costs (a) of attorneys, experts and consultants, including third-party media consultants; and (b) incurred in the management of public relations with respect to such **Public Relations Event.  Public Relations Expense** does not include any remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of the **Insured**.

(CC) "**Public Relations Event**" means any criminal investigation, criminal complaint, indictment, administrative hearing or licensing or other agency proceeding (other than proceedings in the normal course of **Insured's** business), in any such case relating to the alleged violation or infringement of one or more state or federal statutes or regulations regarding:

(1) physical or sexual abuse;

(2) hiring practices and reference checking with respect to potential employees; and

(3) any other similar law or regulation applicable to operations of the **Insured** and intended to protect the rights or safety of patients.

(DD) "**Ransom**" means cash surrendered by or on behalf of the **Insured** to meet a demand for the release of a **Covered Child** who has been the subject of an **Abduction.**

8. In the event that the **Insured** incurs **Covered Expense,** the **Insured** shall give the Insurer written notice thereof as soon as practicable thereafter.  Such notice shall give the full particulars of the **Covered Event**, including but not limited to, information on the time and place of the **Covered Event**, a description of the **Covered Event**, the identity of the **Insured** involved, and any other salient facts or information concerning the **Covered Event**.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

May 29, 2018
Date



## IRONSHORE SPECIALTY INSURANCE COMPANY

Mailing Address:
75 Federal Street
5th Floor
Boston, MA  02110
Toll Free: (877) IRON411

**Endorsement #** 5

**Policy Number:** 001727904                                      **Effective Date of Endorsement:** July 01, 2017
**Insured Name:**  University of Southern California


THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# AMEND DEFINITION OF APPLICATION


In consideration of the premium charged, the term "Application, as defined in clause (A) of Section III of the Policy, is amended to read as follows:

(A)  "**Application**" means an application furnished to the **Insurer** (if any), and all other documents, materials or other information furnished or available, and all other statements made, to the **Insurer** and to the issuer(s) of the **Underlying Insurance**, whether directly or indirectly, concerning the business and/or operations of the **Insured**.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.


_____                     May 29, 2018
Authorized Representative                                      Date



## IRONSHORE SPECIALTY INSURANCE COMPANY

Mailing Address:
75 Federal Street
5th Floor
Boston, MA  02110
Toll Free: (877) IRON411

**Endorsement #** 6

**Policy Number:** 001727904                    **Effective Date of Endorsement:** July 01, 2017
**Insured Name:**  University of Southern California

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## EBOLA EXPENSE REIMBURSEMENT

In consideration of the premium charged, the **Additional Coverage Endorsement** attached to this Policy is amended as follows:

(1)    Section 1 is amended by adding the following thereto:

   (I)    **Ebola Event Expense Reimbursement Insurance**

          Upon satisfactory proof of payment by the **Insured**, the Insurer will reimburse the **Insured** up to $25,000 for **Ebola Event Expense** actually paid by the **Insured** during the **Policy Period** in connection with an **Ebola Event** occurring during the **Policy Period,** provided that the Insurer will have no liability whatsoever for fines, penalties, assessments of costs or other financial awards associated with any such **Ebola Event**.

(2)    Section 4 is amended to read as follows:

       In the event that coverage shall apply to any claim or event under two or more of clauses (A) through (I) of Section 1 above, then the Insurer's maximum aggregate limit of liability under all such applicable clauses in respect of such claim or event shall not exceed the largest single available limit of liability under any such clause.  Notwithstanding the forgoing, nothing herein is intended, nor shall it be construed, to obligate or require any payment under any such clause (A) through (I) of Section 1 above in respect of such claim or event in any amount exceeding the available limit of liability under such clause.

(3)    Clause (D) of Section 7 is amended to read as follows:

   (D)    **"Covered Event"** means any **Ebola Event, Evacuation, Public Relations Event, Disinfection Event, Abduction, Personal Information Protection Event, Legal Defense Event, Medical Waste Event** or **Government Billing Event.**

(4)    The first sentence of clause (E) of Section 7 is amended to read as follows:

   (E)    "**Covered Expense**" means any **Ebola Event Expense, Evacuation Expense, Public Relations Expense, Disinfection Expense, Abduction Expense, Personal Information Protection Expense, Legal Defense Expense, Medical Waste Civil Fines** or **Government Billing Legal Expense** actually paid by the **Insured** as a result of any **Covered Event** for which this Endorsement provides coverage**.**

(5)     Section 7 is amended by adding the following Definitions thereto:

"**Ebola Event**" means the pre or post diagnosis triage, care and/or treatment at an **Insured's** facility of any person (other than an **Insured**) suffering from the Ebola virus infection, as confirmed by the Centers for Disease Control, whether such person is admitted or not.

"**Ebola Event Expense**" means reasonable fees and costs incurred by the **Insured to:**

(a)     purchase specialized equipment and/or materials for use in treating persons with Ebola (such as HazMat suits or other personal protective gear), or otherwise controlling the spread of the Ebola virus;

(b)     clean and disinfect the **Insured's** facility (or any portion thereof) after any **Ebola Event,** including costs to dispose of Ebola-contaminated materials or waste and/or to engage third party providers of cleaning/disinfection services;

(c)     notify patients, visitors or other potentially affected persons of the **Ebola Event**; and

(d)     manage public relations with respect to such **Ebola Event**. **Ebola Event Expense** does not include any remuneration, salaries, overhead, fees or loss of earning reimbursement or benefit expenses of the **Insured**.

All other terms and conditions of this Policy remain unchanged.

_____          May 29, 2018
Authorized Representative                                              Date



## IRONSHORE SPECIALTY INSURANCE COMPANY

Mailing Address:
75 Federal Street
5th Floor
Boston, MA  02110
Toll Free: (877) IRON411

**Endorsement #** 7

**Policy Number:** 001727904                                    **Effective Date of Endorsement:** July 01, 2017
**Insured Name:**  University of Southern California

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## UNAUTHORIZED PERSONAL INFORMATION DISCLOSURE EXCLUSION

In consideration of the premium charged,

1.  Notwithstanding anything to the contrary contained in the **Primary Policy** or any **Underlying Insurance**, no coverage will be available under this Policy for loss or damages, including costs of defense, based on or arising out of any **Unauthorized Personal Information Disclosure**.

2.  For purposes hereof:

    a.  "**Unauthorized Personal Information Disclosure**" means:

        I.  any access to, collection of, release of, disclosure of any person's or organization's  confidential or personal information, including patient's lists, financial information, credit card information, health or medical information or any other type of nonpublic information; including but not limited to violations of Health Insurance Portability and Accountability Act of 1996 (HIPAA) and any amendments thereto, whether the claim is made by or on behalf of a private individual, entity, or government agency; or

        II.  loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate **Electronic Data.**

    b.  "**Electronic Data**" means any information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are or may be used with electronically controlled equipment or other electronic backup facilities, and data transmission or storage by means of the Internet.  "**Electronic Data**" is not tangible property.

3.  For purposes of determining when coverage under this Policy shall attach, the Insurer will *not* recognize erosion of the **Insured's** self-insured retention by reason of payment(s) by the **Insured**, or any party on behalf of the **Insured**, of any loss or damages, including costs of defense, in connection with an **Unauthorized Personal Information Disclosure**; nor will the Insurer recognize erosion of the limits of liability of any **Underlying Insurance** by reason of payment(s) by the issuers of such **Underlying Insurance** and/or the **Insured** and/or any other party on behalf of the **Insured**, of any loss or damages, including costs of defense, in connection with an **Unauthorized Personal Information Disclosure.**

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

May 29, 2018
Date