# EXHIBIT C

Steve W. Berman (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292
steve@hbsslaw.com

Annika K. Martin (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013
(212) 355-9500
akmartin@lchb.com

Daniel C. Girard (SBN 114826)
GIRARD SHARP LLP
601 California Street, Suite 1400
San Francisco, California 94108
(415) 981-4800
dgirard@girardsharp.com

*Interim Class Counsel and Plaintiffs' Executive Committee*
*[Additional Counsel Listed on Signature Page]*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *IN RE USC STUDENT HEALTH CENTER LITIGATION* | No. 2:18-cv-04258-SVW-GJS |
| Plaintiffs Jane Doe R.B., Jane Doe A.T., Jane Doe J.L., Jane Doe M.S., Shannon O'Conner, Jane Doe L.K., Jane Doe 5, Jane Doe M.V., Jane Doe K.M., Jane Doe A.S., Jane Doe A.F., Joyce Sutedja, Jane Doe M.G., Jane Doe D.D., Jane Doe M.D., Jane Doe A.D., Jane Doe K.Y., Meggie Kwait, Jane Doe M.M., Jane Doe P.A., Jane Doe S.A., Jane Doe L.R., Jane Doe R.K., Jane Doe H.R., Jane Doe 1HB, Jane Doe J.P., Jane Doe 1LC, Jane Doe C.N., Jane Doe J.L., Vanessa Carlisle, Jane Doe J.C., Jane Doe F.M., Jane Doe J.K., Jane Doe C.L., | [consolidated with 2:18-cv-04940-SVW-GJS, 2:18-cv-05010-SVW-GJS, 2:18-cv-05125-SVW-GJS, and 2:18-cv-06115-SVW-GJS] <br><br> <u>CLASS ACTION</u> <br><br> **SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

1  Jane Doe S.R., Jane Doe K.P., Jane Doe 2,
2  Betsayda Aceituno, Jane Doe D.C., Jane
   Doe N.K., Jane Doe C.C., Jane Doe 4, Jane
3  Doe C.B., Jane Doe 3, Jane Doe J.W.,
4  Mehrnaz Mohammadi, Jane Doe A.N., Jane
   Doe L.Y., Jane Doe A.H, and Elisabeth
5  Treadway,

6                              Plaintiffs,

7       v.

8  UNIVERSITY OF SOUTHERN
   CALIFORNIA, BOARD OF
9  TRUSTEES OF THE UNIVERSITY OF
   SOUTHERN CALIFORNIA, and
10 GEORGE TYNDALL, M.D.,

11                             Defendants.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1723274.2

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................. 1

II.   JURISDICTION AND VENUE ............................................ 2

III.  THE PARTIES ..................................................................... 3

    A.    Plaintiffs ..................................................................... 3

    B.    Defendants .................................................................. 6

IV.  FACTS .................................................................................. 7

    A.    The standard of care for the treatment of women's health ...................... 7

    B.    Students (and their parents) entrusted their medical care to USC. .......................................................................... 11

    C.    Tyndall's and USC's abuse of trust and violation of the standard of care. ............................................................ 13

    D.    Patients complained about Tyndall's behavior to USC and refused to be scheduled with him again. ......................... 17

    E.    USC admits it was on notice of Tyndall's violation of female students. ......................................................... 19

    F.    Dr. Tyndall and USC violated the standard of care. .............................. 24

    G.    Plaintiffs were abused by Dr. Tyndall, who flagrantly violated the standard of care, with the knowledge of USC. ......................................................................... 25

        1.    Jane Doe R.B. (1990) .................................. 25

        2.    Jane Doe A.T. (1991-1992) ........................... 26

        3.    Jane Doe J.L. (1991-1993) ............................ 28

        4.    Jane Doe M.S. (1992) .................................. 29

        5.    Shannon O'Conner (1993) ............................. 30

        6.    Jane Doe L.K. (1996-1997) ........................... 32

        7.    Jane Doe 5 (1998) ...................................... 33

        8.    Jane Doe M.V. (2000) .................................. 35

        9.    Jane Doe K.M. (2000-2001) .......................... 36

        10.   Jane Doe A.S. (2000-2001) ........................... 38

1723274.2

| | | |
|---|---|---|
| 11. | Jane Doe A.F. (2003-2004) | 39 |
| 12. | Joyce Sutedja (2003-2005) | 41 |
| 13. | Jane Doe M.G. (2003-2007) | 44 |
| 14. | Jane Doe D.D. (2005-2006) | 45 |
| 15. | Jane Doe M.D. (2006) | 48 |
| 16. | Jane Doe A.D. (2006) | 50 |
| 17. | Jane Doe K.Y. (2007-2011) | 51 |
| 18. | Meggie Kwait (2008) | 53 |
| 19. | Jane Doe M.M. (2008) | 55 |
| 20. | Jane Doe P.A. (2008) | 56 |
| 21. | Jane Doe S.A. (2008) | 58 |
| 22. | Jane Doe L.R. (2008) | 59 |
| 23. | Jane Doe R.K. (2009) | 61 |
| 24. | Jane Doe H.R. (2010) | 63 |
| 25. | Jane Doe 1HB (2010-2011) | 64 |
| 26. | Jane Doe J.P. (2010-2011) | 67 |
| 27. | Jane Doe 1LC (2010-2016) | 68 |
| 28. | Jane Doe C.N. (2011) | 70 |
| 29. | Jane Doe J.L. (2011-2013) | 72 |
| 30. | Vanessa Carlisle (2011-2015) | 74 |
| 31. | Jane Doe J.C. (2011 – 2015) | 77 |
| 32. | Jane Doe F.M. (2012-2013) | 78 |
| 33. | Jane Doe J.K. (2012-2013) | 80 |
| 34. | Jane Doe C.L. (2013) | 83 |
| 35. | Jane Doe S.R. (2013) | 86 |
| 36. | Jane Doe K.P. (2013) | 88 |
| 37. | Jane Doe 2 (2013-2014) | 89 |
| 38. | Betsayda Aceituno (2013-2015) | 91 |

1723274.2

39. Jane Doe D.C. (2013-2015) .......................................................... 92

40. Jane Doe N.K. (2013-2017) .......................................................... 94

41. Jane Doe C.C. (2014) .................................................................... 95

42. Jane Doe 4 (2015) ......................................................................... 95

43. Jane Doe C.B. (2015) .................................................................... 96

44. Jane Doe 3 (2015-2016) ................................................................ 98

45. Jane Doe J.W. (2015-2017) ......................................................... 101

46. Mehrnaz Mohammadi (2016) ...................................................... 101

47. Jane Doe A.N. (2016) .................................................................. 103

48. Jane Doe L.Y. (2016) .................................................................. 104

49. Jane Doe A.H. (2016) .................................................................. 106

50. Elisabeth Treadway (1999) .......................................................... 108

H. The statute of limitations is tolled based on the continuing violations doctrine and fraudulent concealment ............................................................................... 109

V. CLASS ALLEGATIONS ....................................................................... 113

VI. CAUSES OF ACTION ......................................................................... 116

COUNT I  NEGLIGENT SUPERVISION AND RETENTION (AGAINST USC AND USC TRUSTEES) ............................................................................... 116

COUNT II  VIOLATIONS OF TITLE IX, 20 U.S.C. § 1681(A), *ET SEQ.* (AGAINST USC AND USC TRUSTEES) ............................................................... 116

COUNT III   SEXUAL ABUSE AND HARASSMENT IN THE EDUCATIONAL SETTING [CAL. EDUC. CODE § 220] (AGAINST USC, USC TRUSTEES, AND TYNDALL) ............................................................................... 117

COUNT IV   VIOLATION OF THE CALIFORNIA EQUITY IN HIGHER EDUCATION ACT [CAL. EDUC. CODE § 66250] (AGAINST USC, USC TRUSTEES, AND TYNDALL) ............................................................. 118

COUNT V  GENDER VIOLENCE [CAL. CIV. CODE § 52.4] (AGAINST TYNDALL AND USC) ............................................................................... 119

COUNT VI  GROSS NEGLIGENCE (AGAINST USC, USC TRUSTEES, AND TYNDALL) ............................................................................... 120

COUNT VII  INVASION OF PRIVACY (AGAINST USC, USC TRUSTEES, AND TYNDALL) ............................................................................... 121

- iii -

COUNT VIII  NEGLIGENT FAILURE TO WARN, TRAIN, OR EDUCATE (AGAINST USC AND USC TRUSTEES) ...................................................... 124

COUNT IX  CIVIL BATTERY (AGAINST TYNDALL AND USC) ................... 125

COUNT X  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (AGAINST TYNDALL AND USC) ............................................................ 127

COUNT XI  NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (AGAINST TYNDALL AND USC) ...................................................................... 128

COUNT XII  RATIFICATION (AGAINST USC AND USC TRUSTEES) ......... 129

PRAYER FOR RELIEF .......................................................................... 130

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1723274.2

Plaintiffs, individually and on behalf of all women who received a women's health medical examination or procedure from Dr. George Tyndall at the University of Southern California, allege as follows:

## I.  INTRODUCTION

1.  Trust is an essential part of the relationship between physician and patient. "Without trust, how could a physician expect patients to reveal the full extent of their medically relevant history, expose themselves to the physical exam, or act on recommendations for tests or treatments?"[1]

2.  George Tyndall, M.D. violated this trust by taking advantage of female students who sought women's-health-related medical care from a gynecologist at the University of Southern California's ("USC") student health center. These women were highly vulnerable: naked or partially unclothed in a closed examination room with the expectation that physical contact would occur for medical treatment only in accordance with the standard of care.

3.  Tyndall violated this trust and his female patients by causing physical contact, including in the form of sexual abuse, molestation, and unwanted touching, that was not for the purpose of providing medical care and was not performed within the standard care, but was for the purpose of providing Tyndall with sexual gratification.

4.  USC violated its female students' trust by knowingly putting women in the room for treatment by Tyndall, knowing that inappropriate physical contact and violations of the standard of care would occur. In fact, USC nurses, chaperones, and other staff members were regularly present in the examination rooms, observed the

---

[1] Susan Dorr Goold, MD, MHSA, MA, *Trust, Distrust and Trustworthiness: Lessons from the Field*, 17 J. GEN. INTERNAL MED. 79, 79–81 (2002) (citations omitted).

- 1 -

inappropriate sexual molestation and failures to abide by the standard of care, and took no steps to stop it as it occurred.

5. Moreover, even as numerous supervisors and administrators became aware of Tyndall's harmful and unlawful conduct and failure to follow the standard of care, USC failed to act to protect its female students by not removing Tyndall from his position even though it was clear he was abusing his position and was unfit to treat patients.

6. Tyndall's sexual abuse, molestation, unwanted sexual touching and contact, and failure to follow the standard of care, and the ratification of Tyndall's conduct by the University of Southern California and the Board of Trustees of the University of Southern California (collectively, "USC Defendants"), and their failure to supervise and stop his unlawful conduct, and the recent public revelation of the above, have caused damage to Plaintiffs and the Class.

## II.    JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States. Plaintiffs allege violations of Title IX, 20 U.S.C. § 1681(a), *et seq*. This Court also has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; there are thousands of proposed Class members; the aggregate amount in controversy exceeds the jurisdictional amount or $5,000,000.00; and Defendants are citizens of a state different from that of Plaintiffs and members of the Class.

8. Venue is proper in this District under 28 U.S.C. § 1391(a)-(d) because, *inter alia*, substantial parts of the events or omissions giving rise to the claim occurred in the District and/or a substantial part of property that is the subject of the action is situated in the District.

# III.    THE PARTIES

## A.    Plaintiffs

9.    Jane Doe R.B. is a resident of The Woodlands, Texas and a citizen of the United States.

10.    Jane Doe A.T. is a resident of New York, New York, and Basel, Switzerland and a citizen of the United States.

11.    Jane Doe J.L. is a resident of Bellevue, Washington and a citizen of the United States.

12.    Jane Doe M.S. is a resident of New York and a citizen of the United States.

13.    Shannon O'Conner is a resident of Harris County, Texas and a citizen of the United States.

14.    Jane Doe L.K. is a resident of San Francisco, California and a citizen of the United States.

15.    Jane Doe 5 is a resident of San Francisco, California and a citizen of the United States.

16.    Jane Doe M.V. is a resident of Santa Monica, California and a citizen of the United States.

17.    Jane Doe K.M. is a resident of Rosemead, California and a citizen of the United States.

18.    Jane Doe A.S. is a resident of Fountain Valley, California and a citizen of the United States.

19.    Jane Doe A.F. is a resident of Honolulu, Hawaii and a citizen of the United States.

20.    Joyce Sutedja is a resident of Long Beach, California and a citizen of the United States.

- 3 -

21. Jane Doe M.G. is a resident of Gainesville, Florida and a citizen of the United States.

22. Jane Doe D.D. is a resident of Sherman Oaks, California and a citizen of the United States.

23. Jane Doe M.D. is a resident of Los Angeles, California and a citizen of the United States.

24. Jane Doe A.D. is a resident of Los Angeles, California and a citizen of the United States.

25. Jane Doe K.Y. is a resident of Valley Village, California and a citizen of the United States.

26. Meggie Kwait is a resident of New York, New York and a citizen of the United States.

27. Jane Doe M.M. is a resident of Nashville, Tennessee and a citizen of the United States.

28. Jane Doe P.A. is a resident of San Carlos, California and a citizen of the United States.

29. Jane Doe S.A. is a resident of Chicago, Illinois and a citizen of the United States.

30. Jane Doe L.R. is a resident of San Marcos, California and a citizen of the United States.

31. Jane Doe R.K. is a resident of Costa Mesa, California and a citizen of the United States.

32. Jane Doe H.R. is a resident of Los Angeles, California and a citizen of the United States.

33. Jane Doe 1HB is a resident of Los Angeles, California and a citizen of the United States.

- 4 -

34.     Jane Doe J.P. is a resident of Santa Monica, California and a citizen of the United States.

35.     Jane Doe 1LC is a resident of Los Angeles, California and a citizen of the United States.

36.     Jane Doe C.N. is a resident of San Francisco, California and a citizen of the United States.

37.     Jane Doe J.L. is a resident of Sherman Oaks, California and a citizen of the United States.

38.     Vanessa Carlisle is a resident of Los Angeles, California and a citizen of the United States.

39.     Jane Doe J.C. is a resident of Chicago, Illinois and a citizen of the United States.

40.     Jane Doe F.M. is a resident of Los Angeles, California and a citizen of the United States.

41.     Jane Doe J.K. is a resident of Los Angeles, California and a citizen of the United States.

42.     Jane Doe C.L. is a resident of Culver City, California and a citizen of the United States.

43.     Jane Doe S.R. is a resident of Playa Del Rey, California and a citizen of the United States.

44.     Jane Doe K.P. is a resident of Los Angeles County, California and a citizen of the United States.

45.     Jane Doe 2 is a resident of Studio City, California and a citizen of the United States.

46.     Betsayda Aceituno is a resident of Los Angeles, California and a citizen of the United States.

- 5 -

47.     Jane Doe D.C. is a resident of Newport Beach, California and a citizen of the United States.

48.     Jane Doe N.K. is a resident of Los Angeles, California and a citizen of the United States.

49.     Jane Doe C.C. is a resident of Dallas, Texas and a citizen of the United States.

50.     Jane Doe 4 is a resident of New York and a citizen of the United States.

51.     Jane Doe C.B. is a resident of Santa Monica, California and a citizen of the United States.

52.     Jane Doe 3 is a resident of San Francisco, California and a citizen of the United States.

53.     Jane Doe J.W. is a resident of Mountain View, California and a citizen of the United States.

54.     Mehrnaz Mohammadi is a resident of Los Angeles, California and a citizen of the United States.

55.     Jane Doe A.N. is a resident of Los Angeles, California and a citizen of the United States.

56.     Jane Doe L.Y. is a resident of St. Louis, Missouri and a citizen of the United States.

57.     Jane Doe A.H. is a resident of West Hollywood, California and a citizen of the United States.

58.     Elisabeth Treadyway is a resident of Lake Worth, Florida and a citizen of the United States.

**B.     Defendants**

59.     Defendant USC's principal place of business is in Los Angeles County, California.

- 6 -

60.     A private corporation, USC is governed by the Board of Trustees of The University of Southern California ("USC Board of Trustees"), which has approximately 55 voting members. The USC Board of Trustees is a self-perpetuating body, electing one-fifth of its members each year for a five-year term of office. Hereinafter, USC and the USC Board of Trustees are referred to collectively as the USC Defendants or simply as USC.

61.     Defendant George Tyndall, M.D. is an adult male who is a resident of Los Angeles County and a citizen of the United States. In or about 1989, Tyndall started working as a gynecologist at USC's student health center, where he examined up to 16 women per day.

## IV.     FACTS

**A.     The standard of care for the treatment of women's health**

62.     The standard of care is the level at which the average, prudent provider in a given—field of medicine here, gynecology—would practice. It is how similarly qualified practitioners would have managed the patient's care under the same or similar circumstances.

63.     *Gathering health information in a clinical and unobtrusive manner is essential for building patient trust, creating an accurate history, and identifying potential health concerns.*  The standard of care in gynecology is to afford the patient as much modesty as possible. Doctors should begin by taking a patient's health history in a private setting while the patient is fully clothed and prior to any physical examination.[2] After taking the patient's history, doctors should leave the room while the patient disrobes.[3] As described below, Tyndall's regular practice was to require

---

[2] Daniela A. Carusi, MD, MSc, *The Gynecologic History and Pelvic Examination*, UpToDate, Last Updated Mar. 27, 2017 (last accessed Aug. 15, 2018)(available at https://www.uptodate.com/contents/the-gynecologic-history-and-pelvic-examination).

[3] *Id.*

- 7 -

patients to remove their clothes in front of him while he took their history and not to offer any sense of modesty.

64.     *Taking a patient's medical history does not include invasive questions concerning sexual "likes" and "dislikes."* At the outset of a gynecology patient visit, the physician should take a gynecologic medical history, including sexual history, before the patient disrobes. A brief set of screening questions relating to sexual history is adequate to determine whether a problem exists that requires further inquiry, namely whether the patient has sexual concerns, is having sexual relations, has a new partner or sexual contacts, uses protection from pregnancy and sexually transmitted infections, would like to be screened for sexually transmitted infections, needs contraception or preconceptional counseling, or is currently experiencing or has experienced previous sexual abuse. Doctors are expected to afford patients equal treatment and objective, non-judgmental counseling regardless of their sexual orientation or history.[4]  Tyndall's regular practice, however, was to: (i) inquire into patients' favorite sexual positions, the kinds of detailed sexual acts in which they engaged, and their orgasm experiences; (ii) describe lewd sexual experiences he and others had experienced, or that the patient could experience, as well as to offer to demonstrate sexual positions or experiences; and/or (iii) make sexually charged comments regarding the patient's naked body.

65.     *No need for pelvic exams of women before 21 years of age*. There is no medical evidence to support the need for an internal examination of a healthy, asymptomatic female patient before 21 years of age. Pelvic examinations for patients younger than 21 should be performed only when indicated by the medical history, such as a specific risk for cancer or a patient's description of current symptoms of a sexually-transmitted disease or significant sexual activity.  In disregard of the standard

---

[4] Committee Opinion, Heath Care for Lesbians and Bisexual Women, No. 525 (May 2012), https://www.acog.org/Clinical-Guidance-and-Publications/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/Health-Care-for-Lesbians-and-Bisexual-Women.

of care, Tyndall conducted medically unnecessary pelvic exams on thousands of female patients under the age of 21.

66. *Internal pelvic exams are not necessary before a patient seeks birth control.* Studies do not support the need for an internal pelvic examination before initiating oral contraceptives in otherwise healthy, asymptomatic individuals or as a screening examination for sexually transmitted infections. Thus, unless a patient who expressly requests birth control is symptomatic, a pelvic examination is not necessary. Tyndall's normal practice was to force birth control prescriptions on women who did not request them and/or declined them as a pretext for to conduct pelvic examinations, even when the patients were asymptomatic.

67. *Informed consent is required.* The decision to perform an internal pelvic examination, breast examination, or both should be made by the physician and the patient after shared communication and decision making. Tyndall's normal practice was to order patients to undress, without explaining the particular need for a pelvic or breast examination to the patient. Tyndall regularly failed to obtain or even request informed consent.

68. *During an examination, patients should be draped except for the area being examined.* Patients should never be required to lie or stand in an exam room while completely naked. Exams normally need not last any longer than a few minutes. Any communication with the patient during an exam should be confined to gathering medically relevant information. Tyndall's normal procedure violated these standards as he almost always failed to drape patients, exposing them instead to prolonged examination.

69. *Presence of chaperones.* In addition, chaperones are often present as a precautionary measure for pelvic examinations. Tyndall's regular practice was to not have chaperones in the room, and he frequently resisted patients' requests that a chaperone be present.

- 9 -

1723274.2

70. *Digital penetration to "loosen" the vagina at the outset of a pelvic examination is not normal procedure.* In a normal pelvic examination, the vagina is first inspected using a speculum of appropriate size, lubricated with warm water or a water soluble lubricant. Atraumatic insertion is aided by assisting muscle relaxation at the opening of the vagina. This may be accomplished by advising the patient to relax her legs to the sides and also by inserting a finger into the distal vagina and gently applying downward pressure while inserting the speculum. It is not normal practice to digitally penetrate prior to inserting the speculum disassociated from the time when the speculum is inserted. It is also not normal practice to move fingers in and out of the vagina, or to make comments while doing so. Full digital penetration is not normal procedure. Where used to guide the speculum, digital contact would last no more than a few seconds.[5] Tyndall's regular practice was to digitally penetrate the patient's vagina with one or two fingers at the outset of the physical examination, using his fingers to make sexual movements, including, but not limited to, prolonged pumping in and out and/or trying to touch the patient's "G-spot" or otherwise attempting to sexually stimulate the patient. Tyndall's regular practice of digitally penetrating patients was disconnected from his use of a speculum, and was not medically justified.

71. *Pelvic exams should be performed once a year at the most, absent a specific medical issue.* Performing bimonthly or quarterly exams is not standard—,and is a sign that a doctor is preying on the patient. Tyndall frequently required patients to return at two- to three-month intervals to obtain refills for their oral contraceptive prescriptions as a pretext to allow him to conduct additional pelvic exams.

72. *Hygiene is important.* Examination rooms should be hygienic and free of trash and food. Doctors should wash their hands before touching patients, and they

---

[5] *See id.*

- 10 -

should wear gloves during pelvic and breast exams. Tyndall regularly failed to wash his hands or wear gloves while digitally penetrating the patients. Moreover, he did not maintain a hygienic appearance, exam room, or office.

73. *Diagnoses and records.* All diagnoses should follow proper testing, and recommended treatments and medications should be in accordance with standard, up-to-date methods and research. All information from a patient's history and exam should be accurately recorded. Tyndall regularly failed to conduct proper testing, provide appropriate advice, prescribe appropriate medications after informed consent, or accurately document the patient's history and exam.

**B.     Students (and their parents) entrusted their medical care to USC.**

74. Experts believe health is an important factor for academic achievement in higher education.[6] "Health complaints limit students' capacity to perform adequately at university."[7] Thus, a university's promotion of health and well-being of its students promotes effective learning.[8]

75. To that end, USC touts the services of its student health center to its students. It regularly runs workshops designed to build the trust of students, such as a series of "Feel Better Workshops" entitled "Relationships and Connection," "Addressing Academic Anxiety," "Stress Management," and "Calm Your Anxiety."[9]

---

[6] Walid El Ansari & Christiane Stock, *Is the Health and Wellbeing of University Students Associated with their Academic Performance?* 7 INT'L J. ENVTL. RES. PUB. HEALTH 509, 509–527 (2010) (citations omitted).

[7] *Id.*

[8] *Id.*

[9] USC Student Health, *Upcoming Events*, https://engemannshc.usc.edu/events/ (last accessed May 19, 2018).

76. All women are encouraged to start seeing a gynecologist once a year when they turn 18 years old.[10] Because many women first enroll as college students when they are 17 or 18 years old, many of the women who are examined at USC's student health center have never had a gynecological examination before.[11]

77. The primary care team at USC's student health center "is available for contraception counseling, well-women visits, pap smears, STI testing, and other concerns women may have."[12]

78. USC's invitation to its female students to discuss concerns about their health presumes a relationship of trust.

79. Trust is essential to both physician and patient.[13] "Without trust, how could a physician expect patients to reveal the full extent of their medically relevant history, expose themselves to the physical exam, or act on recommendations for tests or treatments?"[14]

80. "Presumed consent is a critical manifestation of trust that makes possible much of routine doctor visits."[15] Absent a presumption of trust, patients might avoid essential medical care.[16]

---

[10] 4CollegeWomen, *The First Gynecological Exam*, http://www.4collegewomen.org/fact-sheets/firstgyno.html (last accessed May 21, 2018).

[11] Harriet Ryan, *et al.*, *A USC doctor was accused of bad behavior with young women for years. The university let him continue treating students*, L.A. TIMES (May 16, 2018), https://www.latimes.com/local/california/la-me-usc-doctor-misconduct-complaints-20180515-story.html.

[12] Eric Cohen Student Health Center of USC, *Women's Health*, https://ecohenshc.usc.edu/medical/womens-health/ (last accessed July 13, 2018).

[13] Dorr Goold, *supra* note 1.

[14] *Id.*

[15] *Id.*, citing Ruth Faden & Tom Beauchamp, A HISTORY AND THEORY OF INFORMED CONSENT 274–80 (Oxford Univ. Press 1986).

[16] *Id.*

- 12 -

81.     "Important as it is to measure trust in individual clinicians and the actions and circumstances that affect it, it is equally important, in today's health system, to study (empirically and normatively) trust and trustworthiness in organizations and institutions."[17]

82.     Knowing female students would place their trust in its physicians, USC had a duty to ensure that Tyndall used his trusted position and the safe confines of a doctor's exam room at the USC student health center consistent with the standard of care and certainly not to abuse that trust through the molestation of students.

**C.     Tyndall's and USC's abuse of trust and violation of the standard of care.**

83.     USC hired Tyndall in 1989 after his residency. For nearly 30 years, Tyndall was the USC student health clinic's only full-time gynecologist.

84.     According to an internal report prepared by USC, Tyndall used his position of trust to forego the standard of care.

85.     In the years after Tyndall started working at USC, some chaperones reportedly became alarmed about the frequency with which he used a camera during pelvic exams.[18] Tyndall's chaperones questioned his motivations, with one reporting that Tyndall took multiple pictures of hundreds of patients' genitals, while another said she witnessed 50 to 100 patients being photographed.[19]

86.     According to the *Los Angeles Times*, Bernadette Kosterlitzky, a USC clinic nurse from 1992 to 2013, said that after a chaperone alerted administrators to Tyndall's use of a camera, then-Executive Director Dr. Lawrence Neinstein ordered the camera removed.[20]

---

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

87.     In fact, a member of the USC student health center's oversight committee purportedly admitted that: (i) in the early 2000's, several students submitted letters concerning inappropriate touching and remarks by Tyndall; and (ii) those complaint letters were read aloud during monthly committee meetings.[21]  One member of the committee confronted Tyndall, and that confrontation is allegedly contained in university records that corroborate the committee member's account.[22]

88.     After USC opened the Engemann Student Health Center in or about 2013, chaperones continued to express concern regarding Tyndall's treatment of female patients.

89.     Chaperones were concerned about "full body scans," where "Tyndall frequently had women lie naked on the exam table while he slowly inspected every part of their body, down to the area between their buttocks."[23] While a woman's annual gynecological visit might include a discussion of skin problems, such "meticulous" inspections of a patient's naked body "would be highly unusual if not inappropriate."[24]

90.     While Tyndall conducted examinations, he made comments that the nursing staff found "unseemly," describing patients' skin as "flawless," "creamy" or "beautiful." He told students they had "perky breasts."[25]

91.     In the spring of 2013, eight chaperones reported concerns about Tyndall to their supervisor, veteran nurse Cindy Gilbert. Gilbert went to Neinstein, the clinic's executive director, and Tammie Akiyoshi, the then-head of clinic nursing and now the

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

- 14 -

clinic's executive director. Gilbert said Neinstein told her that he had talked to Tyndall about his behavior in the past.[26]

92.     Neinstein reportedly referred the complaints to USC's Office of Equity and Diversity, which investigates sexual misconduct and racial and gender discrimination. USC has stated that an investigator interviewed seven employees and a patient. Gilbert and multiple chaperones who complained said they were never informed of the probe or questioned by the investigator, however.[27]

93.     The investigation apparently concluded there was no violation of USC policy. The only action that Neinstein took was to bar Tyndall from locking the door of his office when patients were present.[28]

94.     Tyndall continued to subject patients, particularly of Chinese and other Asian backgrounds to various types of sexual abuse and racially-oriented commentary.[29]

95.     In his office, Tyndall had a map of China and encouraged women to point out their home province. He kept a bamboo plant, the traditional Chinese symbol of longevity and vitality, on a shelf above his desk. He sometimes showed off a photo of his Filipina wife and shared details of their relationship.[30]

96.     Tyndall also took steps to require patients to return for appointments more frequently than medically necessary. For example, while most physicians will prescribe one year's worth of oral contraceptive pill refills, Tyndall would only

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

- 15 -

1723274.2

prescribe two months. He would not extend the prescription until the patients returned for another examination.[31]

97.  However, as Tyndall's efforts to cross the boundaries of proper medical care increased, so did the chaperones' concerns.

98.  Throughout Tyndall's tenure at USC, chaperones discussed with each other the way Tyndall used his fingers at the outset of the pelvic exam for many young women. Before inserting a speculum, the metal duck-billed device that spreads open the walls of the vagina and enables the doctor to view the cervix, Tyndall would voice concern that the speculum might not fit.[32]

99.  The *Los Angeles Times* reported:

> "He would put one finger in and say, 'Oh, I think it will fit. Let's put two fingers in,'" said a chaperone who worked with Tyndall for years. Four people familiar with Tyndall's exams said that while he spoke, he was moving his fingers in and out of the patients.

> They said he made nearly identical statements to hundreds of women as he probed them: My, what a tight muscle you have. You must be a runner.

> The chaperone who worked with Tyndall for years said she witnessed at least 70 such exams and remembered thinking the physician would eventually become embarrassed about repeating the same words to student after student.

> "He never was," she said.

> During some exams, Tyndall made explicit reference to sexual intercourse while his fingers were inside patients, according to five people who heard the remarks or were told about them.

---

[31] *Id.*

[32] *Id.*

- 16 -

"He would tell young ladies their hymens are intact. 'Don't worry about it, your boyfriend's gonna love it,'" a chaperone recalled.[33]

100.    The chief of Female Pelvic Medicine and Reconstructive Surgery at University Hospitals Cleveland Medical Center, Dr. Sangeeta Mahajan, has stated that she has never heard of a gynecologist moving his fingers in and out of a vagina to determine whether a speculum fit, calling it "very odd" and "creepy."[34]  An assistant professor of gynecology at Harvard Medical School, Dr. Louise King, noted that this practice was not standard.[35]

101.    Cate Guggino, a women's health nurse practitioner who was a patient of Tyndall's 16 years ago, wrote: When I recall the events of that exam through my trained eyes, I'm left with a sad, sinking feeling in my gut. I know far more about female genital anatomy now. And because bodies have the ability to remember pain even years after it occurred, I also know where I felt pain that day. It was not near the location of my hymen, it was deeper than that, on the anterior vaginal wall—an area commonly known as the G spot. Palpation of the G spot in a completely asymptomatic woman is not part of a normal pelvic exam, not even a very thorough normal pelvic exam. … What happened in my case -- and I can only speculate happened in so many other cases like mine -- was not normal and was not acceptable."[36]

**D.    Patients complained about Tyndall's behavior to USC and refused to be scheduled with him again.**

102.    Throughout Tyndall's employment at USC, beginning in the early 1990s, patients and USC medical staff regularly commented on Tyndall's odd and

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] http://www.latimes.com/opinion/op-ed/la-oe-usc-gynecologist-20180523-story.html.

- 17 -

inappropriate behavior and unauthorized physical contact with female patients. Despite these observations and frequent complaints about Tyndall's behavior, USC failed to take any action to remove Tyndall from its staff because USC personnel lacked appropriate training and supervision to identify and act upon the complaints concerning Tyndall's behavior, and USC had failed to implement reasonable administrative procedures required to properly respond to improper sexual and racially tinged actions and commentary on the part of USC medical staff members.

One nurse said that in 2013-2014, she spoke to at least five women who refused to be scheduled with Tyndall despite having gynecological problems that needed immediate attention. The patients reported feeling like "he was inappropriately touching them, that it didn't feel like a normal exam," and "like they were violated." The nurse told her immediate supervisor and later Akiyoshi, the head of nursing, who said they would look into it.[37]

103.   During the 2013-2016 period, one clinician received unsolicited complaints from at least three students who refused to see Tyndall again. The clinician gave the students the email addresses for administrators and encouraged them to put their complaints in writing.[38]

104.   Having already felt uncomfortable about how Tyndall violated her with his hand during a gynecological exam before the speculum was inserted, one student was told on her second visit that Tyndall wanted her to remove all her clothes. After waiting for Tyndall while she was completely naked, she got dressed, after asking herself why she had needed to take off all her clothes. She told a female clinic employee she wanted to see another doctor. That employee told the student "there were a lot of complaints" about Tyndall.[39]

---

[37] Ryan, *et al.*, *supra* note 7.
[38] *Id.*
[39] *Id.*

- 18 -

1723274.2

105.    Chaperones reported the names of women "who seemed particularly shaken" by Tyndall's exams to their supervisor, nurse Gilbert. Gilbert allegedly contacted patients and explained how to make a written complaint against the doctor. Some did, but others responded they just wanted to find another gynecologist and forget about the experience.[40]

106.    Gilbert stated that she repeatedly expressed concerns about Tyndall to Akiyoshi, Neinstein, and other clinic administrators from 2014 to 2016, but they seemed uninterested.[41]

107.    Chaperones forwarded some complaints about Tyndall to Sandra Villafan, who became the USC clinic's head of quality and safety in 2013. Villafan has stated that she relayed any concerns to clinic administrators and USC leadership, but was not privy to the outcomes of any investigations.[42]

108.    Finally, in 2016, Gilbert went to USC's rape crisis center, known as Relationship and Sexual Violence Prevention and Services, and spoke to Executive Director Ekta Kumar. That complaint (and the discovery of a box of film of women's genitalia in Tyndall's office) finally prompted the investigation that led to Tyndall's removal.[43]

**E.      USC admits it was on notice of Tyndall's violation of female students.**

109.    On May 15, 2018, USC issued a press release titled "Summary of Coordinated Investigation of Student Health Physician" ("Statement") from Todd R. Dickey, Senior Vice President for Administration, Gretchen Dahlinger Means, Title

---

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

- 19 -

1723274.2

IX Coordinator and Executive Director of the Office of Equity and Diversity, and Laura LaCorte, Associate Senior Vice President for Compliance.[44]

110. The Statement admitted that, in June 2016, USC's Office of Equity and Diversity ("OED") received a complaint from a staff member at the USC student health center regarding sexually inappropriate comments made to patients by Tyndall in front of medical assistants.[45]

111. As a result of the Statement, USC stated, it conducted an investigation. USC reported that medical assistants who assisted Dr. Tyndall during clinic visits reported concerns about the way he conducted pelvic examinations. Specifically, these medical assistants questioned Tyndall's practice of a digital insertion prior to insertion of a speculum.[46]

112. USC purportedly consulted with a gynecology expert who stated that this could be considered an acceptable practice, but then contracted with an outside medical review firm, MD Review, to review Dr. Tyndall's clinical practice. MD Review concluded that this examination practice was not the standard of care.[47]

113. USC stated that, during its investigation, a box of clinical photos of cervixes and surrounding internal tissue, allegedly from 1990-1991, was found during a search of Tyndall's office.[48]

114. USC reported that it also reviewed the files of Dr. Larry Neinstein, the former health center director from 1995-2014 (who is now deceased), which showed earlier patient complaints about Tyndall, including complaints about his clinical

---

[44] Todd R. Dickey, *et al.*, USC, *Summary of Coordinated Investigation of Student Health Physician* (May 15, 2018), https://pressroom.usc.edu/files/2018/05/Summary-fact-sheet_5.15.18.pdf.

[45] *See id.*

[46] *See id.*

[47] *See id.*

[48] *See id.*

practice. The files contained eight complaints lodged between 2000 and 2014 that were concerning. The complaints reported that Tyndall had made racially insensitive and other inappropriate comments, reported concerns that he was not adequately sensitive to patient privacy, and included complaints of feeling "uncomfortable," that Tyndall "gave me the skeevies," and that he was "unprofessional."[49]

115.   USC admitted that these complaints provided sufficient basis to terminate Tyndall and should have been elevated for "proper investigation."

116.   Dr. Neinstein's notes also purportedly indicated that he brought in outside experts to review USC's clinical practices, although the Statement does not identify those experts nor the results of those engagements.[50]

117.   USC stated that OED had previously conducted a review in 2013 of complaints of inappropriate comments made by Tyndall and raised by staff members, but that there was insufficient evidence to find a violation of USC policy.[51]

118.   USC was silent on its failure to report Tyndall to criminal authorities, the attorney general, or anyone outside the university for the purposes of conducting an independent investigation.[52]

119.   USC concluded its 2016 investigation, finding that "Tyndall had violated the university's policy on harassment by making repeated racially discriminatory and sexually inappropriate remarks during patient encounters." The Statement was silent as to any conclusions concerning sexual assault, violation, or molestation.[53]

120.   Ultimately, in 2017, USC began termination proceedings against Tyndall. But USC did not contact law enforcement, the California attorney general, or the state

---

[49] *See id.*

[50] *See id.*

[51] *See id.*

[52] *See id.*

[53] *See id.*

1723274.2

medical licensing board.[54] USC made no effort to inform Tyndall's patients of its conclusions regarding Tyndall's behavior.[55] Because Tyndall threatened a wrongful termination lawsuit against USC, USC entered into a separation agreement with Tyndall under which he was allowed to resign with one year's pay.[56] USC entered into this agreement with the intent and effect of continuing to conceal Tyndall's misconduct from Plaintiffs, the university community, and the public.

121.   USC states that, once Tyndall sent a letter to USC asking to return to his position at the student health center in 2018, USC finally made a report to the California Medical Board on March 9, 2018. According to USC, this was the first report to authorities it had made despite being on notice of Tyndall's behavior for decades.[57]

122.   USC has had a systemic problem with properly handling sexual harassment and sexual abuse allegations, contrary to its federal mandates under Title IX.  In 2013, the United States Department of Education opened an investigation into how USC responded to reports of on-campus rapes.  During this investigation, more than 100 USC students came forward to describe USC's "gross mishandling" of rape cases.  In 1992, a USC-commissioned panel of experts found that the university's response to sexual assault complaints "leaves victims feeling unsupported" and stripped of important rights.

123.   In a pair of May 15, 2018, statements, high-ranking USC officials acknowledged Tyndall's decades-long pattern of abuse and USC's failure to adequately respond to the reported misconduct and protect its students.

---

[54] *See id.*

[55] Ryan, *et al.*, *supra* note 7.

[56] *See* Statement, *supra* note 40.

[57] *See id.*

1723274.2

124.  First, in a public letter to the USC community, then-president C.L. Max Nikias addressed the "deeply troubling" events surrounding Tyndall.  According to Nikias, "the manner in which Dr. Tyndall performed physical exams did not meet current practice standards" and "he made inappropriate remarks to patients, in some cases during the examination process.  Some of these comments were racially discriminatory and sexually inappropriate in nature."

125.  Nikias acknowledged that "there had been complaints about Dr. Tyndall in prior years" and that "we have no doubt that Dr. Tyndall's behavior was completely unacceptable.  It was clear violation of our Principles of Community, and a shameful betrayal of our values."

126.  Nikias advised that USC was implementing structural changes to improve its complaint handing and investigation processes.  He apologized to "any student who may have visited the student health center and did not receive the respectful care each individual deserves."

127.  Second, USC's Chief Health Officer, Sarah Van Orman, stated in a public letter to USC's students that she was "deeply troubled" by the events surrounding Tyndall and referencing "significant changes" that had "professionalized [USC's] care."  Van Orman reassured students that she is personally responsible for "[g]overnance and oversight of these practitioners and all care delivered at student health centers[,]" which "ensures responsible and transparent health care services."

128.  Van Orman emphasized new, "extensive training on staffing and complaint reporting . . . to ensure that when concerning behavior and actions are noticed, they are quickly reported and addressed."  She further stated that "[w]e plan to strengthen our . . . mechanisms for reporting concerns."

129.  On May 18, 2018, Nikias said in another public statement that Tyndall's "behavior distresses us deeply.  He should have been removed and referred to the authorities years ago."

- 23 -

1723274.2

130.   "[H]ow could this behavior have gone on for so long?" Nikias continued. "Once again, I want to personally apologize to any student who visited our student health center and was made to feel uncomfortable . . . . You deserved better, and we let you down."

131.   Nikias resigned as president on May 25, 2018.  In an accompanying statement, USC's Board of Trustees wrote that "something is broken" in regard to USC's response to Tyndall's predatory treatment of the women under its care.

**F.     Dr. Tyndall and USC violated the standard of care.**

132.   Non-exhaustive examples of the many ways Dr. Tyndall violated standard procedures—as witnessed and known by the USC Defendants—are as follows:

- Failing to seek or obtain informed consent to invasive procedures;

- Asking patients unnecessarily personal questions about sexual activities;

- Giving unsolicited advice about sex;

- Performing unnecessary pelvic exams;

- Performing pelvic examinations without any chaperone present;

- Performing pelvic exams improperly;

- Making inappropriate sexual comments during pelvic examinations;

- Touching patients inappropriately and in a sexual manner during medical examinations and/or procedures;

- Simulating sexual positions;

- Offering unsolicited descriptions of sexual escapades or sexual positions;

- Failing to perform proper testing;

- Failing to provide proper treatment recommendations;

- 24 -

1723274.2

- Prescribing birth control without discussing potential side effects and other options;

- Unnecessarily requiring medical examinations as a condition for obtaining birth control and birth control refills;

- Performing unnecessarily long breast exams or touching of the breasts without explanation;

- Having student-interns deliver test results;

- Having patients undress fully for pelvic examinations and/or procedures;

- Not leaving the room while patients dressed and undressed;

- Putting false information in patients' medical records;

- Making inappropriate comments during medical appointments;

- Disclosing sensitive medical information about other students, including information about other students' sexual activity, during medical appointments;

- Touching and examining patients' breasts in a sexual manner;

- Performing prolonged pelvic examinations and/or procedures for his sexual pleasure rather than for clinical purposes.

**G.      Plaintiffs were abused by Dr. Tyndall, who flagrantly violated the standard of care, with the knowledge of USC.**

**1.      Jane Doe R.B. (1990)**

133.    In 1990, Jane Doe R.B. was a junior at USC.  At the time, Jane Doe R.B. was an avid runner, running 12-15 miles per day.

134.    During or about January to May 1990, Jane Doe R.B. called the student health center to make an appointment because, based on the best of her recollection, she needed a refill of her birth control prescription. She tried to get an appointment with a female practitioner, but was advised that Dr. Tyndall was the only practitioner available.

- 25 -

135.   At her appointment with Dr. Tyndall, a nurse or chaperone was present in the room for her examination.

136.   Dr. Tyndall advised Jane Doe R.B. that he was going to do a pap smear. Before doing so, however, he used his fingers to penetrate her. No other doctor had digitally penetrated her before inserting a speculum, so it surprised Jane Doe R.B. and made her very uncomfortable. However, Jane Doe R.B. questioned her own discomfort given that a nurse was present.

137.   Dr. Tyndall then commented, while penetrating her with his fingers, "you are so tight from all that running." Jane Doe R.B. found Dr. Tyndall's comment extremely inappropriate and disturbing.

138.   Distressed by what had occurred, Jane Doe R.B. told her friend about Dr. Tyndall's comment. Her friend, then a senior at USC, responded: "I told you not to go to him."

139.   Since that time and as a result of the distress Dr. Tyndall (and USC) caused, Jane Doe R.B. has always seen female physicians for her gynecological needs.

139.   On or about May 15, 2018, Jane Doe R.B. read the articles that disclosed Tyndall's wrongdoing. Jane Doe R.B. became extremely upset and angry that USC let Tyndall violate her and others over such a long period of time.

140.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) performing an unnecessary pelvic exam; (2) making inappropriate comments during the pelvic exam; and (3) unnecessary digital penetration prior to inserting the speculum.

141.   Jane Doe R.B. has thus been damaged by Dr. Tyndall's and USC's actions.

**2.      Jane Doe A.T. (1991-1992)**

142.   Jane Doe A.T. was an undergraduate accounting student at USC from 1991-1995. She saw Dr. Tyndall for a pap smear and pelvic exam in or about 1991 or 1992.

- 26 -

1723274.2

143.   Dr. Tyndall examined Jane Doe A.T. without a chaperone in the room. Because of her age and relative inexperience, Jane Doe A.T. did not know to ask for one. As the appointment began, Jane Doe A.T. felt very alone—it did not seem like there were many people around or within earshot.

144.   Dr. Tyndall told Jane Doe A.T. to get undressed and put on an examination gown. He did not leave the room while she undressed.

145.   As Jane Doe A.T. lay on the examination table, naked but for the gown and with her legs spread, Dr. Tyndall commented that she was very beautiful and her vagina was attractive.

146.   Dr. Tyndall examined Jane Doe A.T. with his fingers. As he was touching her, he asked her if she would like him to show her G-spot. She immediately said "no." She felt frightened, trapped, and violated. There was no one else in the examination room with Dr. Tyndall, and she felt as though Dr. Tyndall was trying to communicate that he had power over her body; that he was in control and he knew something she did not. Jane Doe A.T. desperately wanted to leave.

147.   Jane Doe A.T. is Vietnamese and Chinese-American. She was raised to never question her elders or authority figures, especially physicians. She also feels that her culture associates great shame with sexual abuse and molestation such that speaking up as a victim could bring shame on one's family.

148.   Jane Doe A.T. feels that her cultural background made her an easy target for Dr. Tyndall, and she is outraged and distressed that he abused many Asian women in the decades following her appointment.

149.   The experience with Dr. Tyndall had lasting effects on Jane Doe A.T. Although all doctors since then have treated her with respect and professionalism, she continues to have an aversion to seeing any gynecologist. In addition, Dr. Tyndall made Jane Doe A.T. feel belittled and sexualized. As a result, she had a negative relationship with her own body and sexuality for many years.

- 27 -

1723274.2

150.  Dr. Tyndall violated the standard of care by, *inter alia*: (1) remaining in the room while Jane Doe A.T. undressed; (2) performing a pelvic exam without a chaperone in the room; (3) offering to perform a sexual act; and (4) making inappropriate sexual comments during the pelvic exam.

151.  Jane Doe A.T. has thus been damaged by Dr. Tyndall's and USC's actions.

**3.    Jane Doe J.L. (1991-1993)**

152.  Jane Doe J.L. attended USC from 1988-1993. She saw Dr. Tyndall for an examination in or about 1992 or 1993 due to a concern of a possible vaginal yeast infection.

153.  Dr. Tyndall examined Jane Doe J.L. without a chaperone in the room. Jane Doe J.L. was wearing a skirt/dress that day; Dr. Tyndall told her to remove her underpants for the examination. Dr. Tyndall did not ask Jane Doe J.L. to undress for the examination, nor did he provide her with an examination gown.

154.  Dr. Tyndall examined Jane Doe J.L. with his fingers. As he was touching her, Dr. Tyndall asked if she had another female student perform oral sex on her. Jane Doe J.L. immediately said "no" and asked "why?" In response, Dr. Tyndall told her that if a girl had been licking her vagina, it may have caused her yeast infection. Jane Doe J.L. explained to Dr. Tyndall that she was heterosexual. Dr. Tyndall described for Jane Doe J.L. in detail how females perform oral sex on one another and asked if she was sure she had never done anything like that before.

155.  Jane Doe J.L. was very uncomfortable by the tone and subject matter of the conversation. She sat up after he was done touching her and quickly left the examination room.

156.  After the appointment, Jane Doe J.L. told her cousin she had a bad experience with Dr. Tyndall and that she was never going back to him again.

- 28 -

157.   When Jane Doe J.L. heard about the accounts of other women in his care, she realized that she had been the victim, not of an isolated occurrence, but rather of a series of abuses. The distress she felt at the time of her examination came flooding back to her. She continues to be upset and feels betrayed that USC allowed this to happen to her and so many other women.

158.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) performing an unnecessary pelvic exam without a chaperone present; (2) remaining in the room while Jane Doe J.L. undressed; (3) making inappropriate sexual comments and describing sexual acts unsolicited during the pelvic exam; (4) failing to perform proper testing to determine if Jane Doe J.L. had a vaginal yeast infection; and (5) failing to provide proper treatment recommendations.

159.   Jane Doe J.L. has thus been damaged by Dr. Tyndall's and USC's actions.

**4.     Jane Doe M.S. (1992)**

160.   In 1992, Jane Doe M.S. made an appointment at the student health center for an annual exam. She was 22 or 23 at the time and a graduate student in USC's School of Cinema-Television.

161.   Dr. Tyndall performed a pelvic exam as part of Jane Doe M.S.'s appointment. As he was looking at Jane Doe M.S.'s vagina, he mentioned that he saw something on her cervix that indicated she might have cervical cancer.

162.   Dr. Tyndall then told Jane Doe M.S. that he had a new method of visually diagnosing cervical cancer using iodine and a camera. Jane Doe M.S. agreed because she was afraid for her health and did not know that Dr. Tyndall's methods were improper.

163.   Dr. Tyndall then asked Jane Doe M.S. to spread her legs on the exam table. He painted her vagina with a red substance and asked her to use her fingers to spread open her labia. He then took photos of her. At the time, Jane Doe M.S. felt very

- 29 -

uncomfortable—both because of the red substance and because she could not tell
whether Dr. Tyndall was photographing her genitalia only, or the rest of her face and
body with her legs spread.

164.    Dr. Tyndall delivered the "results" of her test—which were negative—
some weeks later.

165.    After her initial appointment, Jane Doe M.S. started going to Planned
Parenthood for gynecological care instead of USC, because Dr. Tyndall gave her an
uneasy feeling. After some years of going to Planned Parenthood, she began to realize
that the iodine "test" was not normal. At that point, she confided in a friend about her
appointment with Dr. Tyndall.

166.    Dr. Tyndall violated the standard of care by, *inter alia*: (1) telling Jane
Doe M.S. that he could visually diagnose cervical cancer; (2) painting her vagina with
iodine; (3) photographing Jane Doe M.S.; and (4) delivering results of an improper
"test," as if they were conclusive as to whether Jane Doe M.S. had cervical cancer.

167.    Jane Doe M.S. is distressed and disappointed that USC has been
subjecting more women to Dr. Tyndall's abusive behavior and substandard medical
care in the decades since she was a student. She has thus been damaged by USC's and
Dr. Tyndall's actions.

**5.    Shannon O'Conner (1993)**

168.    Shannon O'Conner was an undergraduate student at USC in the early
1990s, and was enrolled in a USC student health plan. In or around the spring of 1993,
she made an appointment at the USC student health center.

169.    When Ms. O'Conner arrived at the clinic, she was taken to an exam room
and told to take off all of her clothes and put on a gown. Tyndall soon came into the
room, and told her to lie down and place her legs in elevated stirrups. He told her to
spread her legs, which she did. He immediately began thrusting his fingers inside her
vagina and moving them in and out rapidly. She reacted by pulling her hips back, but

- 30 -

1723274.2

Tyndall grabbed her hip with one hand and forcibly pressed it down to the exam table while continuing the in-and-out motion with the fingers from his other hand.

170.   Tyndall then asked Ms. O'Conner if she had a boyfriend. She responded that she did. Tyndall then said that Ms. O'Conner's boyfriend must love her vagina.

171.   During this conversation, Tyndall was moving his ungloved fingers in and out of Ms. O'Conner's vagina, hooking them upward in an attempt to arouse her.

172.   Ms. O'Conner panicked and said that her mother had told her a female nurse needed to be in the room. Tyndall replied that there was no need for a nurse, but Ms. O'Conner insisted. Tyndall stood up, walked to the door, and called for a nurse. A woman wearing medical scrubs and a dark green cardigan sweater came into the room.

173.   Tyndall said, "Okay, now you've got a nurse in the room," and sat back down on his stool. The nurse seated herself in a chair and read a paperback while Tyndall continued the examination.

174.   Tyndall pulled Ms. O'Conner's knees apart and placed his fingers back inside of her. She was shaking. He put one of his hands on her hip and held it down. He continued to move his ungloved fingers in and out of her, using two and sometimes three fingers, hooking them upward as if trying to stimulate her sexually.

175.   After several minutes, Tyndall aggressively inserted a speculum and swabbed Ms. O'Conner's cervix. He then told her the exam was over and that she could get dressed. He left the room, followed by the woman in the green sweater. Over the course of the appointment, Tyndall never explained what he was doing or why. The woman never said anything to Ms. O'Conner.

176.   Ms. O'Conner dressed and left the exam room. She approached the female receptionist at the front desk and told her that the doctor had said sexual things to her and that the exam didn't feel right. The receptionist replied that Ms. O'Conner was a pretty girl and should get used to stuff like that.

177. Ms. O'Conner never went back to the USC student health center for another gynecological examination. She attempted to suppress her memory of Tyndall's examination, and has avoided being examined by male gynecologists.

178. Because a nurse or medical assistant sat silently in the room as Tyndall abused her for a second time that day, and because Tyndall was a permanent employee of USC's medical facility, Ms. O'Conner reasonably believed at the time that Tyndall's examination must have fallen within the bounds of a legitimate medical treatment, although she now knows that Tyndall's conduct was sexual abuse.

179. When news of Tyndall's predatory behavior emerged in May 2018, Ms. O'Conner recognized Tyndall's face. She realized, for the first time, that Tyndall's actions were sexual assaults. Her realization that Tyndall's examination was a sexual assault has caused her to experience harm as alleged below, including severe psychological and emotional distress.

180. Dr. Tyndall violated the standard of care by, *inter alia*: (1) performing a pelvic exam without a chaperone present; (2) making inappropriate sexual comments during the pelvic exam; (3) unnecessary digital penetration prior to inserting the speculum; (4) and failing to advise and inform Ms. O'Conner of the procedures being performed.

181. Ms. O'Conner has thus been damaged by Dr. Tyndall's and USC's actions.

**6. Jane Doe L.K. (1996-1997)**

182. Jane Doe L.K. studied communications at USC from 1996 to 2000.

183. In or about 1996 or 1997, Jane Doe L.K. was examined by Dr. Tyndall at the USC student health center.

184. After the exam, and while Jane Doe L.K. was still partially unclothed, Dr. Tyndall began asking her questions about her genital piercing. Dr. Tyndall told Jane Doe L.K. that he was "conducting a study," and for the study, he needed to know

- 32 -

whether it had been easier or more difficult for her to orgasm since she received the genital piercing.

185.   Jane Doe L.K. felt an immediate rush of panic—she did not think that doctors were supposed to ask questions like that. She felt extremely ashamed and violated. However, because she did not have much experience with gynecologists, she did not know for certain that the question was inappropriate. After all, Dr. Tyndall was an authority figure, so Jane Doe L.K. questioned whether she must be the one in the wrong for feeling embarrassed.

186.   Jane Doe L.K. is outraged that Dr. Tyndall was able to make her feel embarrassed and ashamed through his own misconduct.

187.   Jane Doe L.K. feels betrayed by USC and angry that it has subjected so many young, vulnerable women to the type of abuse she experienced more than two decades ago.

188.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) performing a pelvic exam without a chaperone present; and (2) making inappropriate sexual comments during the exam.

189.   Jane Doe L.K. has thus been damaged by USC's and Dr. Tyndall's actions.

**7.     Jane Doe 5 (1998)**

190.   Jane Doe 5 studied at USC from 1996-2000.

191.   Jane Doe 5 paid for student health insurance as part of her tuition.

192.   In the summer of 1998, Jane Doe 5 made an appointment at the student health center because she wanted to get a prescription for birth control. She had never been to a gynecologist before.

193.   Jane Doe 5 requested a female gynecologist. She was told that there was no one available except Dr. Tyndall, but not to worry because there would be a female chaperone in the room.

- 33 -

1723274.2

194.    To start their appointment, Dr. Tyndall asked Jane Doe 5 many questions that she found invasive, including whether she had a boyfriend, how many times she had had sex, and whether she had sex with multiple partners. They spoke at Dr. Tyndall's desk, which was in the examination room.

195.    Dr. Tyndall then told Jane Doe 5 to disrobe and put on an examination gown, but he did not leave the room. Instead, he turned his back while she changed.

196.    Before the examination began, a chaperone entered the room. However, she left the room shortly in to their examination

197.    During the exam, Dr. Tyndall digitally penetrated Jane Doe 5 without gloves. At the time, there was still a chaperone in the room.

198.    After the chaperone left the room, Dr. Tyndall told Jane Doe 5 to sit upright and open her robe for a breast exam. As he was touching her breasts, he looked at them in a sexual manner. Jane Doe 5 was mortified; she did not understand what was happening, and she desperately wanted it to end.

199.    After that experience, Jane Doe 5 was traumatized. As a result, she did not see a gynecologist for several years.

200.    Jane Doe 5's family is from Northern India, and she was raised in a culturally conservative household. She felt deeply ashamed of what happened with Dr. Tyndall, and she did not feel as though she could go to her family for support.

201.    Now that Jane Doe 5 is an adult, she understands that Dr. Tyndall's behavior was deeply inappropriate and violating. She feels deceived by the student health center because they promised her that there would be a chaperone in the room during her appointment, but the chaperone left halfway through. Jane Doe 5 is distressed that USC allowed similar abuse to continue unabated for many years.

202.    Dr. Tyndall violated the standard of care by, *inter alia*: (1) digitally penetrating Jane Doe 5 without gloves; (2) leering at Jane Doe 5's breasts while touching them, while she was sitting upright; (3) not leaving the room while Jane Doe

- 34 -

5 disrobed; (4) allowing the chaperone to leave the room during Jane Doe 5's exam, even though Jane Doe 5 has been promised that a chaperone would be present; and (5) asking Jane Doe 5 unnecessarily invasive questions about her sexual activities.

203.   Jane Doe 5 has thus been damaged by USC's and Dr. Tyndall's actions.

**8.   Jane Doe M.V. (2000)**

204.   Jane Doe M.V. saw Dr. Tyndall at USC's Student Health Center in or about 2000 due to a concern of a possible urinary tract infection.

205.   When Jane Doe M.V. arrived for her appointment, Dr. Tyndall asked her why she was there, and she told him she thought she might have a urinary tract infection. Dr. Tyndall told Jane Doe M.V. that she would need to have a pelvic exam so he could determine what the cause may be. Jane Doe M.V. had not planned to get an examination done. Based on her experience, she expected Dr. Tyndall to take a urine sample, test it, and then give her a prescription for medication if needed.

206.   Dr. Tyndall told Jane Doe M.V. to get undressed and lie down on the examination table. There was no chaperone present in the examination room.

207.   Dr. Tyndall examined Jane Doe M.V. with his fingers. He was not wearing gloves.

208.   As the examination continued, Dr. Tyndall commented that Jane Doe M.V. had a small hemorrhoid on her bottom and offered to remove the hemorrhoid for her. When Jane Doe M.V. asked Dr. Tyndall why he was recommending hemorrhoid removal when the reasons appeared to be only cosmetic, Dr. Tyndall told her she should have it done in case she wants to be in pornographic films. Jane Doe M.V. was shocked by Dr. Tyndall's comments. Dr. Tyndall asked Jane Doe M.V. why she was so surprised and told her "lots of young women [her] age do it."

209.   Dr. Tyndall's comments made Jane Doe M.V. extremely upset and uncomfortable. She left the appointment feeling humiliated, demeaned, and violated.

- 35 -

1723274.2

210.   Dr. Tyndall also prescribed Jane Doe M.V. oral contraceptive pills. He did not explain the numerous options for birth control or the medication's potential side effects. She returned a couple of months later after experiencing particularly horrible side effects including chest pain, hair loss, dizziness, mood swings, and menstrual pain. Dr. Tyndall gave her different birth control pills again without discussing their potential side effects or other options. Jane Doe M.V. felt pressured by Dr. Tyndall to continue taking birth control pills. She again experienced severe side effects from the birth control pills he prescribed.

211.   When Jane Doe M.V. heard about the accounts of other women in Dr. Tyndall's care, she realized she had been the victim, not of an isolated occurrence, but of a series of abuses. She is upset and feels betrayed that USC allowed this to happen to her and so many other women.

212.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) performing an unnecessary pelvic exam without a chaperone present; (2) performing the pelvic exam without wearing gloves; (3) making inappropriate sexual comments during the pelvic exam; (4) failing to perform proper testing to determine if Jane Doe M.V. had a urinary tract infection; (5) recommending treatment for her hemorrhoid that was not medically necessary; and (6) prescribing birth control without discussing potential side effects and other options.

213.   Jane Doe M.V. has thus been damaged by USC's and Dr. Tyndall's actions.

**9.     Jane Doe K.M. (2000-2001)**

214.   Jane Doe K.M. attended USC from 1998 to 2000. She graduated with a B.A. in communications.

215.   In about 2000 or 2001, Jane Doe K.M. scheduled an appointment with Dr. Tyndall at the USC student health center because her period was more than one

- 36 -

week late. She took a pregnancy test and underwent pelvic and breast exams and a pap smear. It was her first visit to a gynecologist.

216.   Jane Doe K.M. had not previously undergone a pelvic exam.

217.   There was a chaperone in the room during Jane Doe K.M.'s exam. The chaperone stood with her back to Jane Doe K.M. and Dr. Tyndall throughout the exam and did not speak.

218.   Dr. Tyndall performed a breast exam on Jane Doe K.M. without explaining the process. He opened the gown exposing both breasts without notification. He did not tell Jane Doe K.M. that she could perform breast exams on herself at home. It seemed to Jane Doe K.M. as though the breast exam lasted a very long time, making her uncomfortable.

219.   During the course of the pelvic exam, Dr. Tyndall made numerous jokes about the instruments he was using on Jane Doe K.M. He did this while touching her. At one point, while the speculum was inside of Jane Doe K.M.'s vagina, Dr. Tyndall sarcastically asked if he could "please have his speculum back."

220.   Jane Doe K.M. felt as though Dr. Tyndall's joking unnecessarily prolonged the pelvic exam. Worse, she felt that his comments were highly inappropriate and violating. She left the appointment feeling compromised, exposed, and uncomfortable.

221.   Jane Doe K.M. felt so uncomfortable after the appointment that she confided in her friend and her boyfriend (now husband) about the experience.

222.   Ever since her experience with Dr. Tyndall, Jane Doe K.M. has never felt safe being treated by a male gynecologist. Many years later, Jane Doe K.M. was faced with a difficult decision about delivering her baby. Her female gynecologist would not be available to deliver her baby the week she was due, and as a result, she would have a male doctor instead. But Jane Doe K.M. was still not comfortable with male

- 37 -

gynecologists because of her experience with Dr. Tyndall. She elected to induce one week early so that her regular doctor—a woman—could deliver the baby.

223.   Jane Doe K.M. is angry that USC failed to protect her and so many others. She wants USC to be held accountable for breaching the trust of its young female students.

224.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) performing an unnecessarily long breast exam without explanation; (2) conducting pelvic and breast examinations while the chaperone's back was turned; (3) making inappropriate comments during the pelvic exam; and (4) failing to perform proper testing to determine why Jane Doe K.M. was experiencing irregular periods.

225.   Jane Doe K.M. has thus been damaged by USC's and Dr. Tyndall's actions.

**10.    Jane Doe A.S. (2000-2001)**

226.   Jane Doe A.S. saw Dr. Tyndall for a gynecological exam in or about 2000 or 2001. Prior to her appointment with Dr. Tyndall, she had never been examined by a gynecologist before.

227.   Jane Doe A.S. made an appointment for access to birth control and testing for a possible sexually-transmitted disease ("STD").

228.   Because it was her first experience with a gynecologist, Jane Doe A.S. did not know what to expect. Dr. Tyndall examined her without a chaperone in the room. Because of her age and relative inexperience, Jane Doe A.S. did not know to ask for one.

229.   Dr. Tyndall performed a pelvic exam and inserted his fingers into Jane Doe A.S.'s vagina. While his fingers were inside of her, Dr. Tyndall claimed Jane Doe A.S. was "particularly tight." He also commented that she had a "beautiful vagina." Jane Doe A.S. found Dr. Tyndall's comments to be inappropriate and disturbing. At the time, Jane Doe A.S. felt uncomfortable, but because she had no prior experience

with gynecologists, she did not know that Dr. Tyndall's methods were abnormal and inappropriate.

230. When Jane Doe A.S. returned for her follow-up appointment to receive her STD test results from Dr. Tyndall, she instead was informed of her results by a student/intern. She was told that she had genital herpes. For ten years, Jane Doe A.S. lived with fear and unease about what she had been told, but never experienced any symptoms. She was later retested by another doctor and discovered that she did not have genital herpes.

231. Although all doctors Jane Doe A.S. after her visits with Tyndall have treated her with respect and professionalism, she continues to have unease and mistrust around male doctors and has since refused to have a male doctor perform a pelvic exam.

232. When Jane Doe A.S. heard the reports about Dr. Tyndall in the media, she recognized that Dr. Tyndall had acted inappropriately while examining her and conveying her test results. She feels violated and is upset that USC failed to protect her.

233. Dr. Tyndall violated the standard of care by, *inter alia*: (1) performing a pelvic exam without a chaperone present; (2) making inappropriate sexual comments during the pelvic exam; and (3) having a student/intern relay incorrect test results.

234. Jane Doe A.S. has thus been damaged by Dr. Tyndall's and USC's actions.

**11.    Jane Doe A.F. (2003-2004)**

235. Jane Doe A.F. was a student at USC from August 2002 to May 2005. She saw Dr. Tyndall at the student health center during the 2003-2004 school year for two visits. At the time, Jane Doe A.F. had only been to one other gynecologist and her visits with Tyndall were only the second or third time she had ever had a gynecology exam.

1723274.2

236.   Jane Doe A.F. made an appointment at USC's Student Health Center due to vaginal concerns. During the interview, Dr. Tyndall asked Jane Doe A.F. detailed questions about her relationships, how long she had been dating her boyfriend, and how they met. Dr. Tyndall then made inappropriate comments about Jane Doe A.F.'s boyfriend being in the military and told her "you can't trust those people, they're promiscuous and are known to have multiple partners." Dr. Tyndall continued to rant to Jane Doe A.F. about military men and told her they are known to have a lot of STDs and that she needed to be careful. Jane Doe A.F. felt extremely uncomfortable with the conversation, but because she had little experience with the gynecologist, she did not know the degree to which it was abnormal and inappropriate.

237.   For the examination, Dr. Tyndall instructed Jane Doe A.F. to fully undress, which made her uncomfortable because she did not understand why she needed to remove her top.

238.   Dr. Tyndall was very rough during the pelvic exam, causing Jane Doe A.F. physical pain. He forcefully shoved the speculum inside her and commented that she was "very tight." This comment made Jane Doe A.F. even more uncomfortable, and her body became tense. In response, Dr. Tyndall barked at Jane Doe A.F. to "relax," "stop moving," and "keep your legs open." Jane Doe A.F. wanted the whole thing to be over with.

239.   Dr. Tyndall diagnosed Jane Doe A.F. with a vaginal infection, prescribed antibiotics, and instructed Jane Doe A.F. to make a follow-up appointment with him. At the follow-up appointment, Dr. Tyndall told Jane Doe A.F. "congratulations" and that her STD tests had come back negative.  His statements at first made her feel ashamed, then later angry about how he informed her. Jane Doe A.F. did not even know that she was being tested for STDs during her initial appointment.

240.   Jane Doe A.F. resolved to never see Dr. Tyndall again because it was such a horrible experience. For a period of several years she avoided going to see a

- 40 -

gynecologist altogether. And, although she now has a gynecologist who is professional, gentle, and patient, she still feels uneasy and anxious because of how she was treated by Dr. Tyndall.

241.   Jane Doe A.F's experience with Dr. Tyndall also had an effect on her sexual relationship as there was a period where she was not interested in sex which caused turmoil in her relationship.

242.   When Jane Doe A.F. first saw the televised media report about Dr. Tyndall, on *Inside Edition*, she froze and tears welled up in her eyes. She feels extremely violated and distressed and is upset by the way USC handled the situation.

243.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) making inappropriate comments to Jane Doe A.F. both before and during the pelvic exam; (2) instructing Jane Doe A.F. to fully undress for a pelvic exam; (3) making inappropriate sexual comments during the pelvic exam; and (4) making inappropriate comments while delivering test results.

244.   Jane Doe A.F. has thus been damaged by USC's and Dr. Tyndall's actions.

**12.     Joyce Sutedja (2003-2005)**

245.   Joyce Sutedja, M.D. was examined by Dr. Tyndall on one occasion between 2003 and 2005, during her freshman or sophomore year at USC. She had been having abnormal periods, so she scheduled an appointment for an evaluation with Dr. Tyndall.

246.   At the time, Dr. Sutedja was 17 or 18 years old, and she had very little experience with visiting a gynecologist. She had never had sexual intercourse. She did not know the normal procedures for a pelvic exam, so she had no way of knowing whether Dr. Tyndall's methods were improper.

- 41 -

247.    While Dr. Tyndall was examining Dr. Sutedja, who was gowned and had her legs spread, he looked her in the eye and told her that she had "a beautiful face" and that she "should be a model." Dr. Sutedja immediately felt unsafe and vulnerable.

248.    After the exam was over, Dr. Sutedja met with Dr. Tyndall alone in his office. There, he told her that his wife is Filipino and that he had gone to medical school in the Philippines. She became very uncomfortable. She did not understand why the doctor would share information about his personal life during their conversation. Dr. Sutedja suspected that Dr. Tyndall was trying to somehow appeal to her Indonesian heritage, and she found his comments invasive and offensive.

249.    Dr. Tyndall also gave Dr. Sutedja unsolicited advice about sex. But rather than advice about preventing pregnancy and STDs, which OB/GYNs regularly provide when asked, Dr. Tyndall gave Dr. Sutedja advice about sexual positions. He told her to make sure that she used lubricant for her "first time," because otherwise it would hurt. He said that her partner, on the other hand, would like having sex with her very much. He also told her about different sexual positions that he thought she might find comfortable or pleasurable. Dr. Sutedja felt extremely uncomfortable, but because of her lack of experience, she did not know that it was abnormal for OB/GYNs to provide sex advice. Still, in her gut, something felt very wrong.

250.    Dr. Tyndall only prescribed several months' worth of oral contraceptives for Dr. Sutedja's irregular periods, which required her to return several months later to have her prescription refilled. When Dr. Sutedja returned to the USC student health center for her refill, she saw a female OB/GYN who prescribed her a years' worth of birth control. It struck her at the time that it was much easier to procure birth control from the female doctor than it was with Dr. Tyndall. She did not know that doctors were permitted to prescribe a year's worth of birth control.

251.    Dr. Sutedja confided in the female OB/GYN about her experience with Dr. Tyndall. The doctor pressed her to file a complaint. But in the interim, Dr. Sutedja

- 42 -

had learned from a friend who worked at the USC student health center that the center had already received numerous complaints about Dr. Tyndall and had done nothing. She hoped that the female OB/GYN would take action against Dr. Tyndall on her own.

252.   Dr. Sutedja was unwilling to see a male OB/GYN for more than a decade after her experience with Dr. Tyndall.

253.   Dr. Sutedja is now a first-year resident (PGY-1) in the program in Obstetrics & Gynecology at University of California, Irvine. She pursued a specialty in OB, in part, because she wanted to help create a safe and professional environment for women to receive vital health care services. She believes that having a profoundly disturbing experience with Dr. Tyndall early on drove her to want to make a difference for other women.

254.   Now that she has been trained and has provided safe, professional, and high-quality OB/GYN patient care, Dr. Sutedja looks back on her experience with Dr. Tyndall with complete outrage. She now fully understands the position of privilege and responsibility that OB/GYNs hold vis-à-vis their patients—especially young and inexperienced patients. She knows that Dr. Tyndall's practices were not only inappropriate, they were highly violative and abusive. And Dr. Sutedja now fully comprehends the severity of USC's failure to protect their female students.

255.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) performing an unnecessary pelvic exam; (2) making inappropriate comments during the pelvic exam; (3) making inappropriate comments and providing unsolicited and inappropriate sex advice after the pelvic exam; (4) and requiring Dr. Sutedja to return within months to refill birth control prescription.

256.   Dr. Sutedja has thus been damaged by USC's and Dr. Tyndall's actions.

### 13. Jane Doe M.G. (2003-2007)

257.   Jane Doe M.G. attended USC as an undergraduate from 2003 to 2007, and saw Dr. Tyndall for an appointment at the student health center one or two times during that period.

258.   Jane Doe M.G. always requested female practitioners to perform her pap smears, but would see male doctors if she needed a prescription refilled or for non-invasive issues.

259.   During her appointment with Dr. Tyndall, he performed a whole body mole scan.  Jane Doe M.G. thought this was very unusual because she had not made the appointment for a mole check, nor had concerns about her skin or any moles (of which she had very few), and she knew that he was not a dermatologist.

260.   Dr. Tyndall inspected every inch of her body and took an extremely long time, which made Jane Doe M.G. uncomfortable. She could not understand why he was inspecting her skin on every inch of her body so closely given her lack of moles. However, there was a female attendant in the room, which made this uncomfortable experience seem like it was standard procedure.

261.   Without performing any medical tests, Dr. Tyndall told Jane Doe M.G. she "likely had PCOS." According to the Mayo Clinic: "Polycystic ovary syndrome (PCOS) is a hormonal disorder common among women of reproductive age. Women with PCOS may have infrequent or prolonged menstrual periods or excess male hormone (androgen) levels. The ovaries may develop numerous small collections of fluid (follicles) and fail to regularly release eggs."

262.   Dr. Tyndall's offhand comment caused Jane Doe M.G. mental distress for many years. When Jane Doe M.G. raised Dr. Tyndall's "diagnosis" to her later OB/GYNs, they were shocked to hear that a doctor would say a patient had PCOS without any medical proof (and confirmed that she does not have this disorder).

263.   Since that time and as a result of the distress Dr. Tyndall (and USC) caused, Jane Doe M.G. has always seen female physicians for her gynecological needs.

264.   On or about May 15, 2018, Jane Doe M.G. read the articles that disclosed Tyndall's wrongdoing. Jane Doe M.G. was disturbed and upset that she had been used by Dr. Tyndall for his sexual gratification—and that USC let Dr. Tyndall use her and others for a sexual purpose over such a long period of time.

265.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) performing a mole check that was not requested; (2) drawing out the inspection of Jane Doe M.G.'s body; and (3) improperly diagnosing Jane Doe M.G. with PCOS after failing to perform any medical tests.

266.   Jane Doe M.G. has thus been damaged by USC's and Dr. Tyndall's actions.

**14.   Jane Doe D.D. (2005-2006)**

267.   Jane Doe D.D. was a student at USC from 2004 to 2009.

268.   In or about 2005, Jane Doe D.D. made an appointment for a pap smear and pelvic exam at the USC student health center. It was Jane Doe D.D.'s first ever visit to the OB/GYN.

269.   Dr. Tyndall first performed an external exam on Jane Doe D.D. while there was no chaperone in the room.

270.   While Dr. Tyndall was examining Jane Doe D.D.'s breasts, Jane Doe D.D. noticed that he was not doing it in a way that seemed clinical, as opposed to what she eventually saw other doctors do in the years after this first gynecological visit. Specifically, he did not examine her breasts quickly in a padding motion with his closed fingertips. Instead, Jane Doe D.D. felt as though Dr. Tyndall was fondling her breasts by feeling them for a long time.

- 45 -

1723274.2

271.    After Dr. Tyndall had his hands on Jane Doe D.D.'s naked breasts, he commented "mmm, very perky." Jane Doe D.D. became very nervous, but she tried to remain calm and brush off the comment.

272.    Then, Dr. Tyndall checked Jane Doe D.D.'s skin, which required her to lay down in front of him with her shirt off. He looked her up and down and commented that she was in great shape.

273.    While he was examining her, Dr. Tyndall mentioned his wife and pointed to his desk, mentioning that he had a photo of her there. At that moment, Jane Doe D.D. felt relieved because up until that point it had seemed to her as though Dr. Tyndall was sexualizing her.

274.    Before Dr. Tyndall performed the pap smear and pelvic exam, a chaperone came into the room.

275.    Dr. Tyndall put gloves on and informed Jane Doe D.D. that he was going to insert two fingers into her vagina to help the speculum fit in. He then inserted two fingers into Jane Doe D.D.'s vagina and said that he was going to check the strength of Jane Doe D.D.'s pelvic floor.

276.    Dr. Tyndall then moved his fingers back and forth three times fast while they were inside of Jane Doe D.D. He said to Jane Doe D.D., "you have a very strong muscle there. You must be a runner." Jane Doe D.D. laughed nervously and said, "no I'm a swimmer." Jane Doe D.D. again felt nervous, but she tried to reassure herself that maybe Dr. Tyndall was simply stating a fact. She told herself that his actions were normal, even though it did not feel normal.

277.    Toward the end of the exam, Dr. Tyndall asked Jane Doe D.D. if she would mind if he used a camera. He held up the small camera to show her, and he said that using it would help them to see any sexually-transmitted diseases or any irregular tissue. Dr. Tyndall presented the camera in a way that made it seem as though it was not required. Instead, he encouraged Jane Doe D.D. to allow him to use the camera in

1723274.2

a friendly, nonchalant tone. At the time, Jane Doe D.D. was sexually active and had a legitimate fear of contracting sexually-transmitted diseases. She agreed because she wanted to do anything she could to increase her chances of detection in the event that she actually had an STD.

278.   Dr. Tyndall never showed Jane Doe D.D. the camera footage.

279.   As Jane Doe D.D. lay on the examination table with her legs spread, she realized that Dr. Tyndall was looking at her vagina for a very long time. While staring at her vagina, the doctor said, "It's clean, very clean, you're very clean." Jane Doe D.D. felt very embarrassed and uncomfortable.

280.   Jane Doe D.D. thought that Dr. Tyndall's procedures and comments were inappropriate and intrusive. However, because there was a chaperone in the room, and Jane Doe D.D. had not been examined by a gynecologist before, she reassured herself that everything must be normal.

281.   Jane Doe D.D. left the appointment feeling very uneasy. Several days later, Dr. Tyndall left her a voicemail with the results of her examination, which she did not return.

282.   Jane Doe D.D. felt violated by Dr. Tyndall's comments and procedures.

283.   Jane Doe D.D. later saw a female physician for a pelvic exam and pap smear at the USC student health center. The female doctor acted professionally, and Jane Doe D.D. felt comfortable.

284.   Jane Doe D.D. has suffered emotional distress as a result of Dr. Tyndall's treatment, and is upset that neither USC nor the chaperones stopped him.

285.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) improperly examining Jane Doe D.D's breasts and skin; (2) making inappropriate comments during the breast and skin examinations; (3) unnecessary digital penetration prior to inserting the speculum; (4) inappropriate comments during digital penetration and during examination; (5) unnecessary use of camera during pelvic exam;

- 47 -

286.   Jane Doe D. D. has thus been damaged by USC's and Dr. Tyndall's actions.

**15.   Jane Doe M.D. (2006)**

287.   Jane Doe M.D. attended USC from 2004-2007 for her undergraduate degree in communications. She is currently a graduate student at USC.

288.   In or about the winter or spring of 2006, Jane Doe M.D. saw Dr. Tyndall for a routine exam. She had recently had sexual intercourse for the first time, so she wanted to make sure that she was healthy and safe. At the time, she had only experienced a pelvic exam once before.

289.   Jane Doe M.D. originally scheduled her appointment with a female OB/GYN, but she had to reschedule her appointment. When she rescheduled, Dr. Tyndall was the only doctor available for her preferred time. She expressed concern to the USC student health center about seeing a male OB/GYN, but she was told not to worry because a woman would be in the exam room the whole time.

290.   There was in fact a female chaperone in the room during Jane Doe M.D.'s exam with Dr. Tyndall.

291.   Once Jane Doe M.D. was gowned and her legs were spread on the examination table, Dr. Tyndall digitally penetrated her. He did not explain what he was doing or why his fingers were inside of her.

292.   While his fingers were inside of her, he asked looked at her face and said: "So you're Filipino, huh?" Jane Doe M.D. was taken aback. She thought it was extremely strange for the doctor to inquire about her ethnicity—especially while she was in such a vulnerable position.

293.   Jane Doe M.D. answered that she was, indeed, Filipino. Dr. Tyndall then told her that his wife is Filipino, and that she reminded him of his wife. This made Jane Doe M.D. feel unsafe and violated. She felt that Dr. Tyndall comparing her to his

- 48 -

1723274.2

wife was extremely inappropriate, especially while his fingers were inside of her on the examination table.

294. Jane Doe M.D. left the examination feeling extremely uncomfortable and violated. She could not believe that a male OB/GYN would compare her to his wife while he was examining her. She never returned to Dr. Tyndall.

295. Because she had very little prior experience with OB/GYNs, Jane Doe M.D. did not know at the time that Dr. Tyndall's method of inserting his fingers into her was not normal. But his comments did cause her to feel very uncomfortable.

296. Jane Doe M.D. worried that she was "over thinking" things, and that she just did not "have it in her" to see a male OB/GYN. In the end, she tried her best to move forward and forget the experience.

297. Jane Doe M.D. has seen other OB/GYNs over the years. The first time she saw another OB/GYN—about a year after her experience with Dr. Tyndall—she was taken aback by how professional and comfortable her experience was.

298. Years later, Jane Doe M.D. visited a male OB/GYN again, this time to have an IUD inserted. On that occasion the doctor was very professional, and she felt comfortable throughout the appointment.

299. When Jane Doe M.D. first heard reports that Dr. Tyndall had abused many women, she immediately remembered being examined by him. That day, she told her colleague about her experience.

300. Later, when Jane Doe M.D. read *the L.A. Times'* report about Dr. Tyndall, she was horrified to read that others were echoing her story. The memories—and the knowledge that Dr. Tyndall abused so many women over the years—have caused Jane Doe M.D. severe distress.

301. Jane Doe M.D. looks back on the appointment with Dr. Tyndall—one of her first experiences with an OB/GYN, and shortly after her first time having sexual intercourse—as a traumatic event. She knows that the experience has negatively

- 49 -

affected her relationship and comfort level with doctors and with her own personal health.

302.    Jane Doe M.D. now works in media, so it is her practice and personal habit to absorb news. With the story of Dr. Tyndall everywhere in the news media, Jane Doe M.D. has been reliving the trauma of her experience with Dr. Tyndall, which has caused her severe emotional distress.

303.    Dr. Tyndall violated the standard of care by, *inter alia*: (1) inappropriate comments during pelvic exam; (2) unnecessary digital penetration; (3) and failing to advise and inform Jane Doe M.D. of the procedures being performed.

304.    Jane Doe M.D. has thus been damaged by USC's and Dr. Tyndall's actions.

## 16.    Jane Doe A.D. (2006)

305.     Jane Doe A.D. attended USC from 2005-2010. She saw Dr. Tyndall for an examination in or about 2006, due to a concern regarding symptoms for a cold sore on her lip and sought medication.

306.    Dr. Tyndall performed a pelvic exam (even though she was there because she had a cold sore on her lip). During the exam, he made the comment that she was "very tight." The comment made Jane Doe A.D. feel weird but, because of her age and inexperience, she did not really know how inappropriate it was at the time. She later told a friend about it, and the friend explained to her the sexual connotation associated with the comment.

307.    Jane Doe A.D. avoided going to the gynecologist after that. During the time she was not seeing a gynecologist, she developed two vaginal infections. She finally went to Planned Parenthood to get an exam and was prescribed medications. However, Jane Doe A.D. has been extremely susceptible to vaginal infections ever since.

308. When Jane Doe A.D. heard about the accounts of other women in his care, she realized she had not been a victim of an isolated occurrence, but rather the victim of a series of abuses. She is upset and feels betrayed that USC allowed this to happen to her and so many other women.

309. Jane Doe A.D. recently requested the medical records from her visit with Dr. Tyndall and was shocked to read in Dr. Tyndall's notes a comment that she "said she can have orgasms with clitoral stimulation but not vaginal intercourse." Jane Doe A.D. never discussed orgasms with Dr. Tyndall during the appointment. She is extremely embarrassed that this information was included in her medical record because other doctors would presumably review Dr. Tyndall's record as part of her medical history.

310. Dr. Tyndall violated the standard of care by, *inter alia*: (1) performing an unnecessary pelvic exam; (2) making inappropriate sexual comments during the pelvic exam; and (3) providing incorrect/false information in Jane Doe A.D.'s medical record.

311. Jane Doe A.D. has thus been damaged by Dr. Tyndall's and USC's actions.

**17. Jane Doe K.Y. (2007-2011)**

312. In or about 2007, Jane Doe K.Y. was enrolled as a film student at USC. At the time, the USC film school was across the street from the USC student health center. Jane Doe K.Y. worked hard to pay her way through film school.

313. Jane Doe K.Y. is a Chinese immigrant, has a spinal muscle atrophy condition, and uses a wheelchair to get around. Jane Doe K.Y. distrusts doctors and generally feels vulnerable around them.

314. Dr. Tyndall was the first OB/GYN Jane Doe K.Y. ever saw. She made an appointment at the U.S.C medical center to see Dr. Tyndall for a routine pelvic exam and to get birth control.

- 51 -

315.    Dr. Tyndall required Jane Doe K.Y. see him multiple times per year to procure birth control refills. At that time, she was using a NuvaRing.

316.    To the best of her recollection, Jane Doe K.Y. saw Dr. Tyndall 5-10 times during her time as a student at USC, and he gave her a pelvic exam 3 or 4 times.

317.    During each exam, Dr. Tyndall digitally penetrated Jane Doe K.Y. and moved his fingers around inside of her. At the time, Jane Doe K.Y. felt uncomfortable, but because this was her first experience with an OB/GYN, she did not know that his methods were abnormal and inappropriate.

318.    Jane Doe K.Y. recalls that there was a chaperone in the room for her first pelvic exam, but she does not recall a chaperone being present for her subsequent pelvic exams.

319.    On visits when Dr. Tyndall only met with Jane Doe K.Y. but did not examine her, he asked her invasive questions about her sexual history and proclivities, and he complimented her on her skin.

320.    During their conversations, Dr. Tyndall mentioned to Jane Doe K.Y. that his wife was Asian. The conversation about Dr. Tyndall's wife's ethnicity made Jane Doe K.Y. extremely uncomfortable. Jane Doe K.Y. felt that Dr. Tyndall was sharing unnecessary personal information, and she did not understand why. In hindsight, she suspects that he was trying to relate to her as a Chinese immigrant.

321.    After graduation, Jane Doe K.Y. saw a new OB/GYN one time because she wanted to change birth control methods. Although she felt more comfortable with this doctor, the experience with Dr. Tyndall made her decide to stop scheduling regular visits to the OB/GYN.

322.    Jane Doe K.Y. did not see an OB/GYN from 2011 until 2017 because her experience with Dr. Tyndall had left her traumatized. It was not until she was very overdue for a checkup that she forced herself to schedule a visit.

- 52 -

323.   Jane Doe K.Y. stopped going to the OB/GYN because the visits with Dr. Tyndall had been distressing. But because she had not seen other OB/GYNs, she did not know that Dr. Tyndall's examinations were improper until she read about them in the *L.A. Times.* She is very upset and disturbed to learn that she was violated in this way. She feels angry and betrayed that USC—an institution she made a great financial sacrifice to attend—allowed this to happen to her.

324.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) requiring Jane Doe K.Y. to return multiple times per year to procure birth control; (2) performing unnecessary multiple pelvic exams over a short period of time; (3) improper digital penetration; (4) performing pelvic exams without a chaperon present; (4) making inappropriate comments during appointments; and (4) asking inappropriate questions when taking Jane Doe K.Y.'s social and sexual history.

325.   Jane Doe K.Y. has thus been damaged by USC's and Dr. Tyndall's actions.

**18.   Meggie Kwait (2008)**

326.   In 2008, Meggie Kwait was an undergraduate student at USC. She made an appointment at the student health center with Dr. Tyndall because she was concerned about some unusual vaginal bleeding.

327.   During the physical examination, Dr. Tyndall proceeded to examine her vagina.  Throughout the examination, he kept talking about very personal things.  Dr. Tyndall seemed fixated on Ms. Kwait's weight and the fact that she had engaged in sexual encounters with both men and women.

328.   Dr. Tyndall insisted on calling her "a virgin" because "let's be honest: no penis, no sex." At one point, without consulting Ms. Kwait, he made a telephone call, presumably to a colleague, to express his amazement that an insurance company "had made a virgin have a pelvic exam."

- 53 -

329. While penetrating Ms. Kwait with his fingers, Dr. Tyndall said, "I bet you're pretty used to this."

330. Dr. Tyndall urged Ms. Kwait to lose weight and told her if she became skinnier, she could probably "get a guy instead of a girlfriend."

331. During a breast exam, he called her breasts "lovely" and "very symmetrical for their size" and handled them roughly. Throughout the appointment, Dr. Tyndall did not communicate what he was doing or why. At the conclusion of the appointment, he ridiculed Ms. Kwait for her concern over the bleeding and said that she had wasted his time.

332. Dr. Tyndall's comments made Ms. Kwait extremely upset and uncomfortable. She left the appointment with Dr. Tyndall in tears and did not return to the USC student health center for gynecological issues.

333. Ms. Kwait filled out a Health Center comment card as she left the appointment. Ms. Kwait described Dr. Tyndall's inappropriate comments and demeanor but never received any response from USC.

334. When Ms. Kwait read the news about Dr. Tyndall, she felt horrible that she had not elevated her complaint. Dr. Tyndall's conduct made her feel humiliated, demeaned, and violated, and USC's failure to protect her and other students has caused her additional distress.

335. Dr. Tyndall violated the standard of care by, *inter alia*: (1) making inappropriate comments during physical examination; (2) making a telephone call during the examination and discussing Ms. Kwait's sexual history medical care during the call; (3) improperly examining Ms. Kwait's breasts; (4) making inappropriate comments during the breast exam; (5) failing to perform proper testing to determine the cause of improper bleeding.

336. Ms. Kwait has thus been damaged by Dr. Tyndall's and USC's actions.

- 54 -

**19.    Jane Doe M.M. (2008)**

337.    In or about 2008, Jane Doe M.M. was studying cinema as an undergraduate at USC. She made an appointment at the USC student health center with Dr. Tyndall because she suspected that she had a urinary tract infection.

338.    Before meeting with Dr. Tyndall, Jane Doe M.M. gave a urine sample to a nurse.

339.    When she arrived at her appointment, Jane Doe M.M. met with Dr. Tyndall at his desk, which was separated from the examination area by a curtain. As they talked, Dr. Tyndall showed Jane Doe M.M. a photo of his wife. Jane Doe M.M. had not asked him about his wife or asked to see a photo. When she viewed the photo, it occurred to Jane Doe M.M. that the wife looked quite a bit younger. Then Dr. Tyndall also brought up Lady Gaga, which made Jane Doe M.M. feel awkward. She suspected that Dr. Tyndall was trying to relate to her. Jane Doe M.M. felt put off that Dr. Tyndall had shared unnecessary information about his personal life.

340.    Dr. Tyndall then did an external exam with Jane Doe M.M. partially undressed. As Dr. Tyndall pressed on Jane Doe M.M.'s bare abdomen to feel for any pain, he declared that her "abs" felt very strong and asked if she was a runner.

341.    Jane Doe M.M. recalled other doctors asking if she was a runner, but they had always asked while checking her blood pressure or other vitals, and she had always been fully clothed. This time, the question felt different, and inappropriate.

342.    Jane Doe M.M. began to feel extremely tense and nervous. She was already very uncomfortable because Dr. Tyndall had tried to engage her in a personal conversation about his wife and Lady Gaga. Dr. Tyndall's comments about her body compounded Jane Doe M.M.'s uneasy feeling.

343.    Jane Doe M.M. left the appointment feeling distraught and uncomfortable. She made a note never to see Dr. Tyndall again.

1723274.2

344.   After reading the reporting about Dr. Tyndall in the *Los Angeles Times*, Jane Doe M.M. realized that her distress during her visit to the student health center was valid. She is upset that USC failed to provide her and other female students with safe, appropriate, and professional health care.

345.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) inappropriate comments during appointment; (2) performing an unnecessary examination of Jane Doe M.M.'s body while she was partially undressed; and (3) inappropriate comments during examination.

346.   Jane Doe M.M. has thus been damaged by Dr. Tyndall's and USC's actions.

**20.   Jane Doe P.A. (2008)**

347. Jane Doe P.A. attended USC 2006-2011. In 2008, she made an appointment at the USC student health center with the only gynecologist available.

348.   When Jane Doe P.A. arrived for her appointment, Dr. Tyndall told her to get completely undressed and put on a gown. Although Jane Doe P.A. did not understand why she needed to completely undress for the procedure she was having, she followed the doctor's instructions and took off all of her clothes.

349.   Before Dr. Tyndall performed the procedure, a chaperone came into the room.

350.   Dr. Tyndall made comments that Jane Doe P.A. found inappropriate and unprofessional. As Jane Doe P.A. lay on the examination table, naked but for the gown, with her legs in elevated stirrups, Dr. Tyndall commented that she was very beautiful and that she had probably had sex with a lot of people.

351.   After the procedure was over, Dr. Tindall told her he needed to do an internal exam. He then examined Jane Doe P.A. with his fingers. Dr. Tyndall did not explain to Jane Doe P.A. why he needed to feel around inside of her vagina or what he was looking for during the pelvic exam.

- 56 -

1723274.2

352.   It seemed to Jane Doe P.A. as though the pelvic exam lasted a very long time, making her uncomfortable. Worse, Dr. Tyndall leaned forward during the pelvic exam so that his face was very close to Jane Doe P.A.'s face.

353.   Jane Doe P.A. thought that Dr. Tyndall's procedures and comments were inappropriate and intrusive. However, because there was a chaperone in the room, and Jane Doe P.A. had not been to see a male gynecologist before, she reassured herself that everything must be normal.

354.   Jane Doe P.A. told her friends how creepy Dr. Tyndall was. For the reminder of her time at USC, Jane Doe P.A. avoided seeing Dr. Tyndall. She recalls that there was one other OB/GYN providing women's healthcare at USC. Her appointment slots were always full and it was extremely difficult to book an appointment with her. However, Jane Doe P.A. would wait for an appointment with the other OB/GYN because she did not feel comfortable seeing Dr. Tyndall.

355.   Jane Doe P.A. has suffered emotional distress as a result of Dr. Tyndall's treatment, and is upset that neither USC nor the chaperones stopped him. Since that time and as a result of the distress, Jane Doe P.A. has only agreed to see female gynecologists.

356.   Jane Doe P.A. looks back on her experience with Dr. Tyndall with disgust. Recent revelations about the extent of his abuse of female students has caused Jane Doe P.A. emotional distress. They have caused her to relive her appointment with Dr. Tyndall and has made her extremely angry with USC.

357.   When Jane Doe P.A. first heard reports that Dr. Tyndall had abused many women, she felt validated in her experiences. She is upset and feels betrayed that USC allowed this to happen to her and so many other women.

358.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) inappropriate comments during appointment; (2) unnecessary digital penetration; (3) and failing to advise and inform Jane Doe P.A. of the procedures being performed.

- 57 -

359.   Jane Doe P.A. has thus been damaged by Dr. Tyndall's and USC's actions.

**21.   Jane Doe S.A. (2008)**

360.    Jane Doe S.A. made an appointment with Dr. Tyndall in or about spring of 2008. The doctor she regularly saw for women's health care at the student health center was out of town. Jane Doe S.A. made the appointment with Dr. Tyndall because she was having vaginal discomfort and needed to see someone right away.

361.   Dr. Tyndall performed a pelvic exam on Jane Doe S.A. There was a chaperone in the room during the exam.

362.   As Jane Doe S.A. was laying on the exam table, undressed from the waist down with her legs spread, Dr. Tyndall tapped on her labia several times with four fingers. "That's nice," he said, and then asked Jane Doe S.A. if she had had laser hair removal. Jane Doe S.A. panicked. She tried to make eye contact with the chaperone, but the chaperone avoided her gaze. When she realized that the chaperone was going to do nothing to help her, Jane Doe S.A. replied uncomfortably, "no, I just had a wax."

363.   After her examination by Dr. Tyndall, Jane Doe S.A. felt physically ill and violated. For months, she replayed the incident in her mind and felt humiliated for being touched by Dr. Tyndall and ashamed for not confronting him. She resolved never to see Dr. Tyndall again.

364.   Jane Doe S.A. later reported the incident to her regular gynecologist at the student health center, who did not seem surprised. The doctor strongly encouraged Jane Doe S.A. to file a complaint with the health center.

365.   Jane Doe S.A. wrote a letter of complaint to Dr. Lawrence Neinstein, the executive director of the student health center at the time. She received an email back from Dr. Neinstein, thanking her for bringing it to his attention and assuring her that the health center would address her complaint.

- 58 -

1723274.2

366.   When Jane Doe S.A. read news reports of Dr. Tyndall in May 2018, she understood that USC had done nothing about her complaint.

367.   Ten years after Dr. Tyndall's violative examination, Jane Doe S.A. still feels physically ill when recounting the details of the incident. She is fearful of male gynecologists and has not seen one since that day. She has experienced emotional distress both because of Dr. Tyndall's inappropriate behavior toward her, and also because of USC's inaction. She is outraged that USC allowed Dr. Tyndall to abuse women for nearly a decade after she submitted her complaint.

368.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) making inappropriate sexual comments during the pelvic exam; and (2) touching Jane Doe S.A. inappropriately during the pelvic exam.

369.   Jane Doe S.A. has thus been damaged by USC's and Dr. Tyndall's actions.

**22.   Jane Doe L.R. (2008)**

370.   In 2008, Jane Doe L.R. was studying for her master's degree in higher education at USC. She was 25 years old.

371.   In or about December of 2008, Jane Doe L.R. visited the student health center for a routine pelvic exam with Dr. Tyndall.

372.   When Jane Doe L.R. entered the exam room, she immediately felt uneasy and different than she had previously felt in other gynecologists' offices. She noticed that there were no medical instruments on the table. The exam room did not feel appropriately clinical.

373.   Dr. Tyndall used his fingers to examine Jane Doe L.R. During the exam, while his fingers were inside of Jane Doe L.R., Dr. Tyndall said, "oh you're very small," in apparent reference to Jane Doe L.R.'s vagina.

374.   During the examination, while Jane Doe L.R. was unclothed, Dr. Tyndall began asking her questions about her sexual activity. His questions went beyond the

scope of whether or not she was sexually active—he wanted her to describe her activity. Jane Doe L.R. felt very uncomfortable, but she did not feel that she was at liberty to refuse to answer the questions.

375. Jane Doe L.R. told Dr. Tyndall that she was sexually active with her boyfriend, to which Dr. Tyndall replied something to the effect of "what a lucky guy." During the course of their conversation, Dr. Tyndall made jokes about Jane Doe L.R.'s sexual activity.

376. While she was unclothed, laying on the examination table, enduring Dr. Tyndall's grossly inappropriate questions and comments, Jane Doe L.R. felt like she went into shock. In order to get through the examination, she stared at a fly that was buzzing around the room. She concentrated on the fly in an effort to block out the shame, humiliation, and panic that she was feeling.

377. After the appointment, Jane Doe L.R. walked back to her dorm room. At the time, it was winter recess, and the whole campus was empty. She remembers feeling very depressed, alone, and regretful, as if she was doing a "walk of shame."

378. Jane Doe L.R. did not see a gynecologist for the remainder of her time at USC. She has made a point to see only female gynecologists ever since her appointment with Dr. Tyndall.

379. In the months following the appointment with Dr. Tyndall, Jane Doe L.R. experienced depression and anxiety for the first time and for which she sought treatment.

380. After the incident, and during her time at USC, Jane Doe L.R. held a graduate assistant position at a women's center, where she worked as an advocate for victims of sexual abuse. She now holds an administrative position at a college in which she deals specifically with campus sexual assault. Looking back, Jane Doe L.R. believes that her professional choices were guided in part by her traumatic experience with Dr. Tyndall.

381. Ever since Jane Doe L.R. saw Dr. Tyndall's face in media reports, memories of her examination have come flooding back. She is re-living the trauma of her examination with Dr. Tyndall and experiencing anger and emotional distress about USC's failure to protect its female students over multiple decades.

382. Dr. Tyndall violated the standard of care by, *inter alia*: (1) conducting the pelvic exam improperly; and (2) making inappropriate sexual comments during the pelvic exam.

383. Jane Doe L.R. has thus been damaged by USC's and Dr. Tyndall's actions.

## 23. Jane Doe R.K. (2009)

384. Jane Doe R.K. studied at USC from 2009 to 2012.

385. In 2009, Jane Doe R.K. scheduled an appointment with Dr. Tyndall. She was 18 years old. She was considering becoming sexually active and wanted to explore options for birth control. At the time, Jane Doe R.K. had never been to a gynecologist.

386. When Jane Doe R.K. told Dr. Tyndall that she had never had sexual intercourse before, he laughed and acted as though he did not believe her. She watched him type into his notes something to the effect of "virgin supposedly suspecting initial penetration." The phrasing made her feel belittled and embarrassed.

387. After a short conversation, Dr. Tyndall prescribed Jane Doe R.K. his "favorite pill," which he claimed, "all [his] girls loved." He did not explain the numerous options for birth control or their potential side effects. Jane Doe R.K. felt confused, but she filled the prescription because she needed contraception.

388. Jane Doe R.K. returned to Dr. Tyndall several months later because her period became irregular, and she suspected that it was because of the birth control. At the second appointment, Dr. Tyndall recommended that Jane Doe R.K. have a pelvic exam and STD testing. Jane Doe R.K. responded that she thought STD testing would

- 61 -

be unnecessary because she and her partner had never had sex with anyone aside from each other. Dr. Tyndall replied sarcastically, saying something to the effect of "you two are in college, sure you are only having sex with each other."

389.   Dr. Tyndall did not address Jane Doe R.K.'s concerns about her irregular period or the side effects of the birth control he had prescribed. Instead, he simply prescribed a new pill.

390.   After that appointment, Jane Doe R.K. decided never to see Dr. Tyndall again. She felt disrespected, judged, and emotionally distressed.

391.   Instead of receiving health care from Dr. Tyndall, Jane Doe R.K. would drive an hour to see a gynecologist in her home town. Other doctors took her concerns seriously and did not make jokes about her sex life. Unlike Dr. Tyndall, they explained every exam and treatment and helped her find the contraceptive method that worked best for her.

392.   Jane Doe R.K. is outraged that USC allowed Dr. Tyndall to harass young women like herself for decades. She feels that Dr. Tyndall took advantage of her age and inexperience, and that he belittled her for his own amusement and sexual gratification.

393.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) including inappropriate and embarrassing information in Jane Doe R.K.'s medical record; (2) making inappropriate comments during appointments; (3) prescribing birth control pills without discussing potential side effects and other options; (4) performing an unnecessary pelvic exam; and (5) failing to conduct proper testing to determine why Jane Doe R.K. was experiencing irregular periods.

394.   Jane Doe R.K. has thus been damaged by USC's and Dr. Tyndall's actions.

**24.    Jane Doe H.R. (2010)**

395.    Jane Doe. H.R. attended USC from 2010-2012. She was examined by Dr. Tyndall on at least one occasion in or around 2010.

396.    During the appointment, Jane Doe H.R. told Dr. Tyndall that she was worried because she had been experiencing heavy periods and passing large blood clots. In response, Dr. Tyndall asked Jane Doe H.R. to "bring in her blood clots" after her next cycle.

397.    When Jane Doe H.R. asked how she would do that, he told her to put them in a Ziploc bag and bring it to him during her next appointment. In other words, instead of offering medical advice or a diagnosis, or referring her to a specialist, Dr. Tyndall made a highly inappropriate request. At the time, Jane Doe H.R. felt very confused but believed it to be a legitimate request because it was coming from a USC-employed doctor.

398.    Dr. Tyndall made other comments Jane Doe H.R. found inappropriate and unprofessional. He told her that he decided to be an OB/GYN because he realized it was easier and paid more than his previous career.

399.    Jane Doe H.R. does not recall a chaperone being present for her pelvic exam.

400.    After the appointment, Jane Doe H.R. decided not to follow through with the request because she could not understand how to accomplish it and felt embarrassed by the idea of bringing her menstrual blood to campus in a Ziploc bag.

401.    Since her visit to Dr. Tyndall, Jane Doe H.R. has seen other OB/GYNs who have offered sympathetic care for Jane Doe H.R.'s heavy and painful periods. On one occasion, Jane Doe H.R. relayed the encounter and Dr. Tyndall's request to another medical professional, who found it highly unusual.

402.    Since her visit to Dr. Tyndall, Jane Doe H.R. has struggled with her experiences as a patient of Dr. Tyndall, and believes that his conduct was

- 63 -

inappropriate and humiliating. She believes Dr. Tyndall abused his power as a medical professional by making a completely inappropriate request seem legitimate.

403. When Jane Doe H.R. heard about the accounts of other women in his care, she realized her experience was not an isolated incident but part of a pattern of inappropriate behavior with patients.

404. Jane Doe H.R. has experienced feelings of humiliation and confusion around her appointment with Dr. Tyndall. Jane Doe H.R. believes her ability to trust doctors has been severely impacted, and that the quality of care provided to her may suffer as a result. Jane Doe H.R. characterizes herself as an exceedingly trusting person, and is crushed that her trust of people in general, and medical professionals in particular, has been compromised by the actions of Dr. Tyndall and USC.

405. Dr. Tyndall violated the standard of care by, *inter alia*: (1) making inappropriate and embarrassing comments the appointment; (2) performing a pelvic exam without a chaperone present; and (3) failing to conduct proper testing to determine why Jane Doe H.R. was experiencing heavy periods and passing large blood clots.

406. Jane Doe H.R. has thus been damaged by Dr. Tyndall's and USC's actions.

**25. Jane Doe 1HB (2010-2011)**

407. In or about 2010-2011, as a USC undergraduate studying theater at USC, Jane Doe 1HB made an appointment for a pelvic exam at the USC student health center because she was experiencing pain in her pelvic area.

408. Jane Doe 1HB knew that Dr. Tyndall was the only gynecologist on staff at the USC student health center. Although she would have preferred to see a woman doctor, she trusted USC to provide her with safe and professional care. Furthermore, Jane Doe 1HB had received a pelvic exam from a male gynecologist prior to her visit

- 64 -

with Dr. Tyndall, and her experience had been comfortable and professional. She expected to have the same experience with Dr. Tyndall.

409. Jane Doe 1HB entered Dr. Tyndall's examination room, where his desk area was separated by a curtain. Dr. Tyndall asked Jane Doe 1HB why she was there, and she responded that she was having pelvic pain. He asked her to go behind the curtain and get undressed.

410. Jane Doe 1HB suddenly realized that there was no female chaperone in the exam room, and she became tense. She asked for a woman to be present during her exam. Dr. Tyndall obliged and brought in a female chaperone.

411. To begin the examination, while wearing her gown, Jane Doe 1HB laid down on the table and spread her legs. Dr. Tyndall inserted his fingers into Jane Doe 1HB's vagina. While Dr. Tyndall's fingers were inside of her, he asked Jane Doe 1HB if she knew how to orgasm.

412. Jane Doe 1HB became very uncomfortable as she wondered how the question could possibly be relevant to her pelvic exam. She continued staring at the ceiling and responded "yes."

413. With his fingers still inside of her, Dr. Tyndall responded that he was glad Jane Doe 1HB knew how to orgasm, because most women did not. He stated that most women have to be taught.

414. As the examination continued, Dr. Tyndall looked into Jane Doe 1HB's vagina. He commented that her cervix looked bruised. Jane Doe 1HB became very self-conscious because the doctor was looking into her most private areas and commenting on their appearance.

415. After the examination was over, the female chaperone left the room. Dr. Tyndall remained. Before Jane Doe 1HB had a chance to get dressed, Dr. Tyndall asked if she was having a lot of "rough sex." Jane Doe 1HB was horrified. She said

- 65 -

1723274.2

no. Dr. Tyndall continued. He advised her to "stop having rough sex" on account of her allegedly-bruised cervix.

416. Jane Doe 1HB left the appointment feeling distressed and violated. She blamed herself for being "tricked" into seeing a male OB/GYN, and she vowed never to return to Dr. Tyndall again.

417. Jane Doe 1HB experienced extreme emotional distress after the incident with Dr. Tyndall. She felt a loss of agency around men. At times, Jane Doe 1HB has felt nervous, awkward, and afraid to talk to men.

418. On multiple occasions after the incident with Dr. Tyndall, Jane Doe 1HB has felt uncomfortable being sexually active, and has lacked the desire to have sex with her male partners. Rather than having sex out of her own desire, as she did before, she has often felt coerced into having sex with men. Jane Doe 1HB's experience with Dr. Tyndall has severely impacted or destroyed the sexuality she previously felt.

419. Jane Doe 1HB went back to an OB/GYN in 2013, and the experience was very different. The doctor did not ask her any unnecessarily personal questions.

420. Recent media reports about Dr. Tyndall have brought back the guilt, shame, and anger that Jane Doe 1HB experienced at the time. She feels very embarrassed and distressed that she saw Tyndall, and she blames herself for expecting that USC would protect her. People around Jane Doe 1HB have made jokes about Dr. Tyndall since the media reports surfaced, making her feel like a terrible punchline that must remain hidden. Jane Doe 1HB has thus been severely damaged by Dr. Tyndall's and USC's actions.

421. Dr. Tyndall violated the standard of care by, *inter alia*: (1) remaining in examination room while Jane Doe 1HB undressed and dressed; (2) acting inappropriately during pelvic examination; making inappropriate sexual comments during digital penetration; (3) making inappropriate sexual comments after

- 66 -

1723274.2

appointment was over and chaperone had left; and (4) failing to conduct proper testing to determine why Jane Doe 1HB was experiencing pelvic pain.

422.    Jane Doe 1HB has thus been damaged by Dr. Tyndall's and USC's actions.

**26.    Jane Doe J.P. (2010-2011)**

423.    From 2009-2015, Jane Doe J.P. was a doctoral student in neuroscience at USC.

424.    In or about 2010-2011, Jane Doe J.P. made an appointment with Dr. Tyndall to refill her birth control prescription.

425.    At the time, she had been on the same birth control pill for about eight or nine years. She expected Dr. Tyndall to ask her a few questions and write her a prescription. She did not request, and did not expect, for him to perform a pelvic exam.

426.    Dr. Tyndall did perform at pelvic exam without explaining why it was necessary. During the exam, while Jane Doe J.P. had her clothes off and Dr. Tyndall was touching her, he asked Jane Doe J.P. about her ethnic background. She told him that she is Korean-American. He responded, in a tone that made Jane Doe J.P. feel sexualized and objectified, that he loved Korean people and Korean culture.

427.    Dr. Tyndall began telling Jane Doe J.P. that his wife is Filipino. Jane Doe J.P. felt deeply uncomfortable; she did not know why the doctor was telling her personal information during a pelvic exam. She feared that he was trying to communicate that he was attracted to Asian women.

428.    There was no chaperone present. Jane Doe J.P. did not know that she could, or that she should, request a chaperone.

429.    Jane Doe J.P. left the appointment feeling violated and uncomfortable. But she tried to tell herself she was overreacting. However, her feelings were validated

- 67 -

when she described the appointment to her roommate. Her roommate was shocked and thought the doctor's behavior was highly inappropriate for a medical professional.

430.  Jane Doe J.P. does not recall seeing the results of her pelvic exam.

431.  For the remainder of her time at USC, Jane Doe J.P. avoided seeing Dr. Tyndall. But that made it difficult to get the care she needed. She recalls that there was one other OB/GYN and a nurse practitioner providing women's health care at USC. Their appointment slots were always full—it was extremely difficult to book an appointment with either of them. However, Jane Doe J.P. would wait for an appointment with one of the other providers because she did not feel comfortable seeing Dr. Tyndall.

432.  Jane Doe J.P. looks back on her experience with Dr. Tyndall with disgust. Recent revelations about the extent of his abuse of female students at USC has caused Jane Doe J.P. emotional distress. They have caused her to relive her appointment with Dr. Tyndall and made her extremely angry with USC. She feels ashamed, and she has a very difficult time talking about the incident.

433.  Dr. Tyndall violated the standard of care by, *inter alia*: (1) performing an unnecessary and improper pelvic exam; (2) performing the pelvic exam without a chaperone present; and (3) making inappropriate comments during the pelvic exam.

434.  Jane Doe J.P. has thus been damaged by Dr. Tyndall's and USC's actions.

## 27.  Jane Doe 1LC (2010-2016)[58]

435.  Jane Doe 1LC is and was a student enrolled at USC. Prior to her enrollment at USC, Jane Doe 1LC had not had access to gynecological care. Upon enrolling at USC, she scheduled an appointment at the USC student health center.

---

[58] Jane Doe 1 was named in a complaint filed by Lieff Cabraser and is called here Jane Doe 1LC.

- 68 -

Following an initial visit with a different physician, she was scheduled with Dr. Tyndall.

436.    Jane Doe 1LC had approximately six appointments with Dr. Tyndall at USC's facilities between 2010 and 2016. During each visit, Jane Doe 1LC was subjected to sexual harassment and inappropriate touching during examinations as well as inappropriate verbal comments on sexual issues.

437.    During at least one appointment, Dr. Tyndall groped Jane Doe 1LC's breasts and failed to cover her with a hospital gown while performing a digital vaginal examination. During the exam, Dr. Tyndall indicated that he had difficulty "inserting [his] fingers" into her vagina and that she "must be an athlete" because she was especially "tight."

438.    Dr. Tyndall also pressured Jane Doe 1LC into agreeing to have a Nexplanon contraceptive device implanted in her arm, even though she insisted to him that she was not sexually active and had no need for contraception.

439.    Further, during several appointments with Jane Doe 1LC, Dr. Tyndall made inappropriate comments that had no legitimate medical purpose, including references to the sexual activities of his other patients.

440.    During one appointment Dr. Tyndall mentioned that many of his patients (all students) were sexually active and one student would "go crazy if she didn't have sex."

441.    During another appointment Dr. Tyndall insisted on performing a full vaginal exam even though the stated purpose of the appointment was a pap smear. Dr. Tyndall refused to take the pap smear because he told Jane Doe 1LC it was too soon and that she would need to obtain her medical records before he would take the pap smear. Dr. Tyndall insisted on performing a vaginal exam even though Jane Doe 1LC said she did not need one and it was not the purpose of the visit; Dr. Tyndall

- 69 -

responded that "You should have the vaginal exam since you are here." No nurse was present because it was only scheduled as a pap smear.

442.   During another appointment Dr. Tyndall mentioned the growing number of school shootings and his concern that female students would be scantily clad during summer and thus somehow provoke more shootings.

443.   Dr. Tyndall's inappropriate physical "treatment" and verbal statements to Jane Doe 1LC made her uncomfortable to the point of feeling violated.

444.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) performing unnecessary pelvic exams; (2) performing pelvic exams without a chaperone present; (3) making inappropriate comments during pelvic exams; (4) making inappropriate sexual comments during appointments; and (5) unnecessarily implanting a Nexplanon contraceptive device in Jane Doe 1LC's arm when it was not requested.

445.   Jane 1LC has thus been damaged by Dr. Tyndall's and USC's actions.

**28.   Jane Doe C.N. (2011)**

446.   Jane Doe C.N. attended USC from August 2010 to May 2013. She made an appointment with Dr. Tyndall at the USC student health center for a birth control consultation on February 1, 2011.

447.   When Jane Doe C.N. arrived for her appointment, Dr. Tyndall asked her why she was there. She told him she needed to get her birth control prescription refilled. Dr. Tyndall told Jane Doe C.N. that in order to get her prescription refilled, she would need to have a pelvic exam. Jane Doe C.N. had not planned to get an examination done. She had never had a pelvic exam before and did not know the normal procedures for a pelvic exam, so she had no way of knowing whether Dr. Tyndall's methods were improper.

448.   Jane Doe C.N. noticed that Dr. Tyndall had numerous personal items in the exam room, including photographs of his wife. Dr. Tyndall asked Jane Doe C.N. where she was from and she told him she was from San Francisco. When Dr. Tyndall

pointed out that Jane Doe C.N. had dark skin, she realized he was asking about her ethnic background.

449.   Jane Doe C.N. told Dr. Tyndall that her father was from Vietnam. Dr. Tyndall responded by describing the time he had spent in Vietnam. He repeatedly told her how beautiful both the country and the people were. He questioned Jane Doe C.N. as to why she never visited the country and continued to ask her questions about her knowledge of Vietnam. Jane Doe C.N. felt uncomfortable as it became very clear that Dr. Tyndall was communicating to her that he was attracted to Asian women.

450.   Dr. Tyndall told Jane Doe C.N. to get undressed and put on an examination gown. He did not leave the room while she undressed.

451.   Dr. Tyndall examined Jane Doe C.N. with his fingers. He forcefully inserted one finger into her vagina and then inserted a second finger, causing extreme pain. While he was examining her, he continued to talk about Asia. There was no female chaperone or nurse in the room when Dr. Tyndall examined Jane Doe C.N.

452.   Dr. Tyndall made other comments Jane Doe C.N. found inappropriate and unprofessional. He commented on her body and told her she needed to exercise regularly and recommended that she come back for a follow-up appointment. Jane Doe C.N. left the appointment feeling distressed and violated.

453.   The appointment was extremely uncomfortable and Jane Doe C.N. now views the OB/GYN as a scary experience. Since that time and as a result of the distress, Jane Doe C.N. has avoided going the OB/GYN.  Jane Doe C.N. waited 18 months or longer to see another OB/GYN and has only agreed to see female gynecologists since then.

454.   When Jane Doe C.N. first heard reports that Dr. Tyndall had abused many women, she immediately had a gut feeling that he was the same OB/GYN that caused her such distress and requested her medical records for confirmation. The

- 71 -

distress she felt at the time of her examination came flooding back. She is upset and feels betrayed that USC allowed this to happen to her and so many other women.

455.    Jane Doe C.N. is extremely upset and distraught by the fact that Dr. Tyndall's inappropriate behavior was allowed to go on for so long. She entrusted in her university to provide health care that would not lead to the pain and discomfort that she endured and will never forget.

456.    Dr. Tyndall violated the standard of care by, *inter alia*: (1) performing an improper and unnecessary pelvic exam; (2) making inappropriate comments during the examination; (3) performing a pelvic exam without a chaperone present; and (4) remaining in the examination room while Jane Doe C.N. undressed.

457.    Jane Doe C.N. has thus been damaged by Dr. Tyndall's and USC's actions.

**29.    Jane Doe J.L. (2011-2013)**

458.    From 2011 to 2013, Jane Doe J.L. was completing a master's degree in social work at USC. She saw Dr. Tyndall for a pap smear and pelvic exam on or about August 25, 2011 and for a birth control consultation on or about December 7, 2012.

459.    During the appointment, Dr. Tyndall asked Jane Doe J.L., a Korean-American, to meet with him in his office, which at that time was a separate room from the examination room.

460.    Dr. Tyndall discussed birth control with  Jane Doe J.L. Jane Doe J.L. mentioned that she liked the birth control she had been on when she previously lived in Korea.

461.    Dr. Tyndall immediately told Jane Doe J.L. about his Filipino wife. He said that they had a traditional Filipino wedding, and that he has great appreciation for Asian culture. Dr. Tyndall pointed out that he was wearing a traditional Filipino shirt that day.

- 72 -

1723274.2

462.    Jane Doe J.L. began to feel very uncomfortable by the tone and the subject matter of the conversation. Dr. Tyndall was sharing overly personal information, and she became very nervous. She had a sinking feeling that Dr. Tyndall was trying to communicate to her that he was attracted to Asian women. All of a sudden, she felt it was very inappropriate to be alone with the doctor. Jane Doe J.L. felt distressed by the incident and did not return to see Dr. Tyndall.

463.    Jane Doe J.L. is now an in-patient social worker in a hospital, where she works with patients and teams of doctors every day. Given her training, Jane Doe J.L. now fully realizes the extent to which Dr. Tyndall's conversation with her was inappropriate. Since her appointment with Dr. Tyndall, Jane Doe J.L. has never witnessed a doctor speaking to a patient that way.

464.    Jane Doe J.L. has also been a patient to many other doctors since, and she has never experienced the level of discomfort she did with Dr. Tyndall.

465.    In her capacity as a social worker, if Jane Doe J.L. encountered a physician sharing highly personal information with a patient in the same tone as Dr. Tyndall, and with an emphasis on the patient's ethnicity, she would report the incident.

466.    The experience with Dr. Tyndall haunts Jane Doe J.L. to this day. When she recently learned that she would have to undergo fertility treatments, she was referred to a male fertility doctor and male surgeon. She wanted to see the best doctors, but her past experiences made her feel very uncomfortable. Jane Doe J.L. has required her husband to be present during visits to make her feel safe. The trauma of seeing Dr. Tyndall as a young woman has compounded stress and emotion of undergoing fertility treatments.

467.    When the media reported on Dr. Tyndall's inappropriate behavior, Jane Doe J.L. was distressed to learn that USC had known of and allowed him to continue to treat vulnerable, young female patients.

- 73 -

1723274.2

468.   Dr. Tyndall violated the standard of care by making inappropriate and embarrassing comments during the appointment.

469.   Jane Doe J.L. has thus been damaged by Dr. Tyndall's and USC's actions.

**30.   Vanessa Carlisle (2011-2015)**

470.   Vanessa Carlisle was a graduate doctoral student in creative writing and gender studies at USC from 2011 to 2016.

471.   During her time at USC, Ms. Carlisle saw Dr. Tyndall for her gynecological care. She saw him approximately three times for her annual exams, which included pap smears.

472.   On her first visit, Dr. Tyndall impressed upon Ms. Carlisle that bearing children is dangerous and horrific, and that she should be on birth control. He told her that childbirth was one of the leading causes of death for women. Ms. Carlisle felt the warnings were inappropriate and unnecessary, especially considering she had been on birth control for more than a decade and had not expressed an interest in becoming pregnant.

473.   On each occasion that she was treated by Dr. Tyndall, Ms. Carlisle was not treated properly. He touched her in ways that did not seem clinical and seemed invasive. He often did not close the curtain to the examination room completely. He did not always knock to announce his presence before walking into the examination room when she was undressed.

474.   Dr. Tyndall performed each of Ms. Carlisle's annual breast exams with no gloves, which made Ms. Carlisle very uncomfortable.

475.   On at least one occasion, Ms. Carlisle told the doctor she was having unusual spotting. He responded by asking her if she was having "rough sex."

476.   On at least one occasion, Dr. Tyndall told Ms. Carlisle about his "gorgeous Filipina wife," and showed her photos of his wife.

- 74 -

477. While Ms. Carlisle was Dr. Tyndall's patient, she tested positive for human papillomavirus ("HPV") and needed a colposcopy. Dr. Tyndall performed the colposcopy and the test came back "clear," meaning that no further tests were needed.

478. On a subsequent visit, Ms. Carlisle tested negative for HPV. Despite this, and despite the fact that her colposcopy had come back "clear," Dr. Tyndall told Ms. Carlisle that he needed to perform an anal pap smear to make sure that the virus had not spread. He told Ms. Carlisle that the anal pap smear was a new procedure that would be "great" for her, without explaining the pros and cons based on her level of risk or giving her time to think about it, and performed the procedure. Later, Ms. Carlisle discovered through research that the anal pap smear is primarily used for extremely high risk patients who tested positive for HPV. She felt distressed and violated.

479. Ms. Carlisle identifies as bi-sexual. She informed Dr. Tyndall of this on her first visit.

480. Dr. Tyndall asked Ms. Carlisle invasive questions about her sexuality. His questions included why she was on birth control since she was not having sex with men, how she "liked" being non-heterosexual and how it was working out for her, indicating that he wanted to know how she enjoys sex with women and what kind of sexual activity she engages in with women. Dr. Tyndall also made comments to the effect that Ms. Carlisle was wise to avoid men, despite the fact that Ms. Carlisle had stated that she has sex with both men and women. Throughout his questioning, Dr. Tyndall referred to Ms. Carlisle as a "lesbian," even though she told him that she identifies as bi-sexual.

481. Ms. Carlisle felt dismissed and demeaned by this line of questioning. She also felt that Dr. Tyndall's understanding of and sensitivity to non-heterosexual identities was far below the standard of care she expected from a women's health care

1723274.2

provider. She felt the need to educate him about queer identities, even though he was her doctor.

482.    On at least one occasion, Dr. Tyndall commented that Ms. Carlisle's body looked young and fit for a woman of her age while he was examining her with her clothes off.

483.    On one occasion, Ms. Carlisle mentioned that she was having some abnormal bleeding. While he was examining her, Dr. Tyndall responded to Ms. Carlisle that her cervix was very friable, that she had the cervix of a 16-year-old girl, and therefore she was "destined to bleed."

484.    On at least one occasion, Dr. Tyndall disclosed to Ms. Carlisle that many of his patients are afraid of sex and their own sexuality. He said that he finds it difficult to treat them, because they are afraid of their own bodies.

485.    Ms. Carlisle constantly felt uncomfortable, angry, and demeaned during her appointments with Dr. Tyndall. She felt as though she was there for his entertainment and exploitation. However, she did not feel that USC provided her with any other options for women's health care. Therefore, she continued to be subjected to Dr. Tyndall's unprofessional and violating actions every year until she graduated. She felt trapped.

486.    Dr. Tyndall's conduct made Ms. Carlisle feel violated, exploited, and emotionally distressed. Media reports about Dr. Tyndall have made her feel outraged at USC for allowing his behavior to continue throughout the years, and those reports have caused the traumatic memories of his examinations to resurface, which has in turn caused Ms. Carlisle emotional distress.

487.    Dr. Tyndall violated the standard of care by, *inter alia*: (1) making inappropriate and incorrect comments about childbirth and pregnancy; (2) failing to respect Ms. Carlisle's privacy when she was undressing and dressing; (3) touching Ms. Carlisle inappropriately; (4) conducing breast exams improperly; (5) making

- 76 -

inappropriate sexual comments during appointments; (6) performing an unnecessary and inappropriate anal exam; (7) making inappropriate comments about Ms. Carlisle's sexuality; (8) inappropriately examining Ms. Carlisle while she was completely undressed; and (9) failing to perform proper tests to determine why Ms. Carlisle was experiencing abnormal bleeding.

488.   Ms. Carlisle has thus been damaged by Dr. Tyndall's and USC's actions.

**31.   Jane Doe J.C. (2011 – 2015)**

489.   Jane Doe J.C. attended USC from 2011-2015, during which she was a patient of Dr. Tyndall's for approximately the first two years.

490.     Dr. Tyndall was the first OB/GYN Jane Doe J.C. ever saw.  During the pelvic exam, Dr. Tyndall used his fingers in a pumping motion in order to "palpate" Jane Doe J.C.'s uterus and ovaries.  She did not know the normal procedures for a pelvic exam, and had no way of knowing whether Dr. Tyndall's methods were improper.

491.   Jane Doe J.C. is half Filipino.  During a couple of the appointments with Dr. Tyndall, he commented that Jane Doe J.C. was pretty. Dr. Tyndall mentioned that he completed his medical training in the Philippines, he had a Filipina wife, and that all Filipina women are beautiful. Jane Doe J.C. felt uncomfortable and felt that Dr. Tyndall was trying to get personal with her in an inappropriate way.

492.   Jane Doe J.C. saw Dr. Tyndall for approximately four visits before switching her care to Planned Parenthood. She made the switch because she felt extremely uncomfortable with Dr. Tyndall. As a people pleaser, Jane Doe J.C. originally felt like she was being difficult for not liking Dr. Tyndall. She told her friends how creepy Dr. Tyndall was and to avoid seeing him if they could, but did not realize the extent of his behavior until learning how to perform pelvic exams herself a couple of years later. When Jane Doe J.C. first heard reports that Dr. Tyndall had abused many women, she felt validated in her experiences.

- 77 -

493. As a current medical student who has learned how to perform a proper pelvic exam (as well as visits to other, more professional OB/GYN doctors), Jane Doe J.C. now knows just how inappropriate Dr. Tyndall's behavior was.

494. In her three years of medical school, she has had the privilege of witnessing doctor-patient relationships from the other side. The trust placed in the hands of a physician, especially an OB/GYN, is immense. In addition to feeling physically violated, she still currently feels emotionally violated due to that breach of trust. Looking back, she is outraged and disgusted that Dr. Tyndall was in a position of power that enabled him to abuse so many young and vulnerable women for so long. Since her experience with Dr. Tyndall, she has only felt comfortable seeing female OB/GYNs.

495. Dr. Tyndall violated the standard of care by, *inter alia*: (1) performing an improper pelvic exam; (2) unnecessary digital penetration; and (3) making inappropriate comments during appointments.

496. Jane Doe J.C. has thus been damaged by Dr. Tyndall's and USC's actions.

**32. Jane Doe F.M. (2012-2013)**

497. Jane Doe F.M. attended USC from 2009-2013. During her junior or senior year, Jane Doe F.M. saw Dr. Tyndall for an appointment at the student health center to get her birth control prescription refilled. At the time, Jane Doe F.M. had only had full gynecological exams performed a few times.

498. When Jane Doe F.M. arrived for her appointment, Dr. Tyndall asked her why she was there. She told him she needed to get her birth control prescription refilled. Dr. Tyndall then suggested, in a strangely talkative way, that he had better do a full check-up while Jane Doe F.M. was there.  Dr. Tyndall quickly left the room, told Jane Doe F.M. to take off all of her clothes, and had his nurse grab her a robe.

- 78 -

499.   Jane Doe F.M. had not intended to get an examination done, especially because she was uncomfortable with the notion of a male OB/GYN examining her, but Dr. Tyndall pushed ahead with the process. She figured Dr. Tyndall must have had her best interests at heart as a doctor.

500.   Once Jane Doe F.M. was undressed and laying on the examination table, Dr. Tyndall touched her bare breasts with his hands and digitally penetrated her, all the while chatting away with a familiarity that she found odd and uncomfortable.  A female nurse was in the examination room at the time, which made Jane Doe F.M. feel like everything Dr. Tyndall was doing must be appropriate and routine.

501.   While his fingers were inside of her, Dr. Tyndall made a joke with sexual overtones about his wife being an Asian mail-order bride.  Dr. Tyndall made a comment about how he "was used to feeling small breasts" like Jane Doe F.M.'s breasts because his wife was an Asian mail-order bride.  The tone and the subject matter of the conversation made Jane Doe F.M. very uncomfortable.

502.   Jane Doe F.M. left the examination feeling extremely uncomfortable and violated.  She has never visited a male OB/GYN again, and eventually got an IUD in order to avoid going to the OB/GYN altogether.

503.   When Jane Doe F.M. first heard reports that Dr. Tyndall had abused many women, she immediately replayed her experience with him. She was incredibly upset when she heard that USC knew about Dr. Tyndall's inappropriate behavior and did nothing to stop him from preying on young women in a very vulnerable time of their lives. Jane Doe F.M. is outraged that USC failed to protect young women who, like herself, had no context for what a gynecological exam should be like and were too embarrassed to speak up.

504.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) performing an unnecessary and inappropriate pelvic examination; (2) improper digital penetration; (3) performing an improper breast examination; (3) making inappropriate comments

- 79 -

1723274.2

during breast and pelvic exam; and (4) failing to properly drape Jane Doe F.M. during breast and pelvic exams.

505.   Jane Doe F.M. has thus been damaged by Dr. Tyndall's and USC's actions.

**33.   Jane Doe J.K. (2012-2013)**

506.   Jane Doe J.K. had USC insurance from August 2012 until September 2014.

507.   On or about August 30, 2012, Jane Doe J.K. made an appointment to see a doctor in the USC student health center because she had a growth on her genitals. She had not been to the health center before. Dr. Tyndall was the only doctor available. She did not want to see a male gynecologist, but she needed immediate care, and Dr. Tyndall was the only available doctor. Dr. Tyndall diagnosed the growth.

508.   In the spring of 2013, Jane Doe J.K. saw Nurse Practitioner Donna Beard at the USC health center for a contraception consultation.

509.   In August 2013, Jane Doe J.K. started having chronic yeast and bacterial infections. Ms. Beard was not available, so Jane Doe J.K. saw Dr. Tyndall. Because she was having chronic infections, Jane Doe J.K. saw Dr. Tyndall on several additional occasions during the fall of 2013.

510.   During one of the appointments Dr. Tyndall commented on Jane Doe J.K.'s appearance.

511.   On one occasion, Dr. Tyndall performed a breast exam on Jane Doe J.K. Dr. Tyndall conducted the exam in a way that did not feel clinical, and he commented on the appearance of Jane Doe J.K.'s breasts during the exam.

512.   On at least one occasion, Dr. Tyndall digitally penetrated Jane Doe J.K. While his fingers were inside of her vagina, he commented that she had a very strong pelvic floor and that she must be a runner. His fingers then seemed to linger insider of her vagina. There was a chaperone in the room.

- 80 -

513.   The comment made Jane Doe J.K. uncomfortable; however, she had seen many gynecologists in the past because she had frequent infections. Previously, a doctor asked about her exercise habits, because sometimes sweating in a restricted area can cause yeast infections. Thus, she told herself that the comment might have been normal. She was also reassured by the presence of a chaperone in the room.

514.   On at least one occasion Dr. Tyndall asked Jane Doe J.K. to come into his office to finish their conversation. Once, Dr. Tyndall began to close the door, and Jane Doe J.K. asked him to leave it open. She had begun to feel uneasy with the doctor, and she was especially uncomfortable talking alone with him in his office.

515.   During one of their conversations, Dr. Tyndall showed Jane Doe J.K. a photo of his wife, and he commented on his wife's appearance.

516.   Dr. Tyndall recommended that Jane Doe J.K. use a douche to treat her chronic infections, rather than taking a course of medication. When Jane Doe J.K. questioned the recommendation, because it was not what most gynecologists had recommended in the past, Dr. Tyndall insisted that douching would regulate the pH of Jane Doe J.K.'s vagina.

517.   Dr. Tyndall asked Jane Doe J.K. if she knew how to douche, and she answered that she did not. So, to demonstrate, Dr. Tyndall rolled his chair out from behind his desk and spread his legs. He held a plastic bag up to his crotch and mimicked the douching mechanism. Jane Doe J.K. could see the outline of Dr. Tyndall's penis while she was observing the demonstration. The demonstration made Jane Doe J.K. extremely uncomfortable.

518.   Jane Doe J.K. tried douching. But, throughout the entire autumn of 2013, her yeast and bacterial infections continued unabated. Thus, she continued to see Dr. Tyndall, because she needed treatment.

519.   In the summer of 2014 Jane Doe J.K. started having recurring yeast and bacterial infections again. She was cognizant of the fact that she was going to graduate

- 81 -

1723274.2

and lose her health insurance soon, so she made an appointment with the USC student health center. Dr. Tyndall was not available, so Jane Doe J.K. saw Donna Beard.

520.   Ms. Beard prescribed a course of metronidazole to treat the bacterial infection, followed by a dose of diflucan to treat any possible yeast buildup.

521.    Jane Doe J.K. told Ms. Beard that another doctor had recommended that she simply douche, rather than taking medication. Ms. Beard asked her who gave her that recommendation, and Jane Doe J.K. replied Dr. Tyndall. Ms. Beard said something to the effect of: "You shouldn't do that. That's not good treatment. And I do not recommend that you see that physician again." Jane Doe J.K. felt that Ms. Beard was trying to communicate that Dr. Tyndall was not a good or safe doctor.

522.   In the years following her time at USC, Jane Doe J.K. has seen many OB/GYNs to treat chronic bacterial and yeast infections and during pregnancy. No doctor has since recommended that she douche in order to treat her chronic infections. Likewise, no doctor has since commented about her pelvic floor during a pelvic exam, with the exception of a doctor who was performing a pelvic exam following labor and childbirth in order to assess any potential pelvic floor prolapse, as is common following pregnancy.

523.   Jane Doe J.K. made the decision to return to Dr. Tyndall multiple times, despite the fact that he made her uncomfortable, because she believed that USC would not employ a doctor who was unsafe and gave poor medical advice. Now that she knows the opposite is true, she feels deeply violated by the doctor and let down by USC.

524.   Jane Doe J.K. experienced sexual assault when she was younger, and during the time she was confused about whether the behavior was normal. There had been people around her who knew what was happening and yet did not intervene, so she told herself that the behavior was ok. She looks back on that experience and her

experience with Dr. Tyndall with a similar sense of betrayal. She feels distressed that once again, she was failed by people and a system that were supposed to protect her.

525. Dr. Tyndall violated the standard of care by, *inter alia*: (1) making inappropriate comments during appointments; (2) performing an improper breast exam while making inappropriate sexual comments; (3) performing an improper pelvic exam while making inappropriate sexual comments; and (4) failing to conduct proper testing and properly treat Jane Doe J.K.'s vaginal yeast infection.

526. Jane Doe J.K. has thus been damaged by USC's and Dr. Tyndall's actions.

**34. Jane Doe C.L. (2013)**

527. In 2013, Jane Doe C.L. was a junior at USC studying economics. She scheduled an appointment online to see a gynecologist at the student health center because she was having some pain and discomfort, and she suspected that she had a yeast infection.

528. Jane Doe C.L. had seen a gynecologist for a yeast infection before. Based on her experience, she expected Dr. Tyndall to take a tissue sample, test it, and then give her a prescription if needed.

529. When Jane Doe C.L. arrived at her appointment, she filled out some paperwork and then met with Dr. Tyndall in his office.

530. Dr. Tyndall began asking her questions about her interests. Jane Doe C.L. told him that she likes traveling and gardening. Dr. Tyndall mentioned that his wife is not American, and that they often travel internationally. He pointed to a potted plant in his office and said that he too likes plants. Jane Doe C.L. felt as though the doctor was trying to put her at ease. Dr. Tyndall asked Jane Doe C.L. about her sexual partners, and she told him that she has sex with men and women.

531. Then, Dr. Tyndall began to ask Jane Doe C.L. highly invasive questions about her sexual activity and preferences. He asked if she puts her fingers into her own

- 83 -

vagina, and if her girlfriend penetrates her with fingers. He asked how often this occurred, and which fingers they use on each other. Dr. Tyndall also asked Jane Doe C.L. if she regularly engages in oral sex on the weekends.

532.   Dr. Tyndall then asked Jane Doe C.L. how long she had been dating women, and whether she had ever been sexually intimate with a man. He asked if she had been sexually intimate with anyone aside from her girlfriend in the last month. Dr. Tyndall then asked, if she had to choose between having sex with men or women, which she would choose.

533.   Jane Doe C.L. found Dr. Tyndall's line of questioning appalling. She was highly disturbed by his interest in details about her sex life and sexual preferences. It seemed to her as though Dr. Tyndall was asking questions about her sexual orientation for his own amusement and curiosity.

534.   Dr. Tyndall informed Jane Doe C.L. that lesbians often contract yeast infections and other bacterial infections because they penetrate each other without first washing their hands.

535.   Dr. Tyndall then told Jane Doe C.L. to go behind the curtain that divided Dr. Tyndall's office from the examination room, undress, and put on a gown. Although Jane Doe C.L. felt extremely uncomfortable, she needed medical care. She followed the doctor's instructions and proceeded with the exam.

536.   After she was undressed, Dr. Tyndall entered the room and began a pelvic exam. While he was examining Jane Doe C.L., he continued to ask her questions. He asked her if she ever had sex with men, and specifically whether she had ever been penetrated by a man.

537.   Jane Doe C.L. did not want to answer Dr. Tyndall's questions because she felt that they were needlessly intrusive. But, because Dr. Tyndall was speaking from a position of authority, and from the position of a medical professional who was supposed to help her, Jane Doe C.L. felt obliged to continue answering.

- 84 -

538.   Dr. Tyndall digitally penetrated Jane Doe C.L., and using a skeptical tone, he told Jane Doe C.L. that her hymen was partially intact. He then adjusted his fingers and confirmed aloud once again than Jane Doe C.L.'s hymen was intact. Jane Doe C.L. felt significant pain and discomfort as Dr. Tyndall moved his fingers around inside of her. She felt hopeless and humiliated, and prayed for the penetration to end.

539.   Dr. Tyndall had not told Jane Doe C.L. that he was going to check her hymen (or why), nor had he asked for her consent. Jane Doe C.L. wondered if the digital penetration had even been necessary.

540.   Jane Doe C.L. resolved never to see Dr. Tyndall again. She did not want to subject herself to overt questions about her sexual activities or unnecessary digital penetration. Because she was not from California, she also wondered whether gynecologists in California behave differently than those in other states. She resolved not to see another OB/GYN for the remainder of her time in California.

541.   After the examination, Jane Doe C.L. felt disgusted by Dr. Tyndall's conduct and apparent interest in her sexual activity. She became distressed, and experienced loss of appetite and weight loss.

542.   Two years after seeing Dr. Tyndall, Jane Doe C.L. scheduled an appointment with an OB/GYN in Atlanta. She made it a point to see a woman. In sharp contrast to Dr. Tyndall, the female doctor was respectful, appropriate, and informative.

543.   Since seeing Dr. Tyndall's photo on the news, Jane Doe C.L. has suffered emotional distress. She has had difficulty sleeping, and has experienced a precipitous loss in appetite. She is currently seeking counseling to help her cope with the trauma.

544.   Jane Doe C.L. feels betrayed by her alma mater for failing to protect her and many other women from Dr. Tyndall's unprofessional and abusive behavior.

545.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) making inappropriate comments about Jane Doe C.L.'s sexuality; (2) making inappropriate

1723274.2

comments about Jane Doe C.L.'s sexual history and preferences; (3) remaining in the room while Jane Doe C.L. undressed; (4) making inappropriate comments during pelvic exam; (5) conducting the pelvic exam incorrectly and inappropriately; and (6) improper digital penetration.

546.    Jane Doe C.L. has thus been damaged by Dr. Tyndall's and USC's actions.

**35.    Jane Doe S.R. (2013)**

547.    Jane Doe S.R. attended USC as an undergraduate and graduate student. In February 2013, she made an appointment at the USC student health center with the only available physician, Dr. Tyndall, because her OB/GYN back home advised she needed to follow-up on an abnormal pap smear.

548.    When she arrived at her appointment, Jane Doe S.R. met with Dr. Tyndall in his office. Dr. Tyndall's demeanor and tone during this initial meeting made Jane Doe S.R. incredibly uncomfortable. He also sat way too close to her while they were in his office.

549.    Dr. Tyndall made comments that Jane Doe S.R. found inappropriate and unprofessional. When Jane Doe S.R. told Dr. Tyndall she was taking birth control for irregular periods, he told her if she lost weight she would have no problem getting pregnant. Dr. Tyndall gestured toward Jane Doe S.R.'s body in a demeaning way as he made this comment. At the time, Dr. Tyndall had no knowledge of Jane Doe S.R.'s gynecological history and she had no interest in being pregnant so his statement on her supposed fertility was especially creepy and upsetting.

550.    Jane Doe S.R. was extremely uncomfortable as she walked to the examination room with Dr. Tyndall. She felt an overwhelming urge to leave.

551.    Dr. Tyndall told Jane Doe S.R. to get undressed and lie down on the examination table. There was a chaperone present during the colposcopy procedure.

552.   Dr. Tyndall did not say anything else to Jane Doe S.R. when they were in the examination room. Dr. Tyndall performed a colposcopy procedure using an illuminated, magnifying instrument that allowed him to examine Jane Doe S.R.'s cervix. However, he did not tell her what to expect during the procedure. In fact, Dr. Tyndall said nothing to Jane Doe S.R. as he was examining her.

553.   Jane Doe felt frightened, trapped and unsure of what was happening. The examination and colposcopy procedure were painful. Jane Doe S.R. began to cry.

554.   When the examination was over, Dr. Tyndall walked out of the room without saying anything to Jane Doe S.R. She was still crying. The chaperone handed her a tissue and also walked out of the room. Jane Doe S.R. got up, dressed and left the examination room.

555.   Jane Doe S.R. does not recall seeing the results of the colposcopy.

556.   The appointment with Dr. Tyndall was extremely uncomfortable and Jane Doe S.R. now views the OB/GYN as a scary experience. Since that time and as a result of the distress, Jane Doe S.R. has avoided going to the OB/GYN and has only agreed to see female gynecologists.

557.   Jane Doe S.R. looks back on her experience with Dr. Tyndall with disgust. Recent revelations about the extent of his abuse of female students has caused Jane Doe S.R. emotional distress. They have caused her to relive her appointment with Dr. Tyndall and have made her extremely angry with USC.

558.   When Jane Doe S.R. first heard reports that Dr. Tyndall had abused many women, she immediately knew in her gut that he was the same OB/GYN that caused her such distress. She requested her medical records for confirmation. When Jane Doe S.R. reviewed her records from her visit with Dr. Tyndall, she was shocked to read in Dr. Tyndall's notes a comment that she "uses ecstasy occasionally—last use 2 weeks ago" because the note is untrue, so she does not understand why it is in there.

- 87 -

559.   She is upset and feels betrayed that USC allowed this to happen to her and so many other women.

560.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) making inappropriate comments and gestures to Jane Doe S.R. during the appointment; (2) failing to properly advise and inform her of the procedures being performed; and (3) performing an improper pelvic exam while making inappropriate sexual comments.

561.   Jane Doe S.R. has thus been damaged by Dr. Tyndall's and USC's actions.

## 36.   Jane Doe K.P. (2013)

562.   In 2013 Jane Doe K.P. was a student at USC. She was 21 years old at the time. She scheduled an appointment with Dr. Tyndall because it had been a few years since she had a women's health care appointment. When she called the USC student health center, she was assigned to Dr. Tyndall.

563.   Dr. Tyndall performed a pelvic exam on Jane Doe K.P. When he inserted the speculum into her vagina, he commented that she was very tight, and that the boys must love her. The comment made Jane Doe K.P. feel frightened and uncomfortable.

564.   Ever since the media has reported on Dr. Tyndall's widespread pattern of abuse, Jane Doe K.P. has felt emotionally distressed due to the memory of her examination. She is especially distressed that USC allowed Dr. Tyndall to abuse so many women throughout his years at USC.

565.   Dr. Tyndall violated the standard of care by making inappropriate sexual comments during the pelvic exam.

566.   Jane Doe K.P. has thus been damaged by Dr. Tyndall's and USC's actions.

- 88 -

1723274.2

### 37. Jane Doe 2 (2013-2014)

567. Jane Doe 2 saw Dr. Tyndall for a gynecological exam in or about 2013 or 2014. Prior to her appointment with Dr. Tyndall, she had never been examined by an OB/GYN before.

568. Jane Doe 2 made the appointment because she had engaged in sexual intercourse for the first time and had not used protection. She felt an urgency to see a doctor, and she went into the appointment feeling very nervous and vulnerable.

569. Jane Doe 2 first met with a nurse. She informed the nurse that she had engaged in unprotected sex and wanted to be tested for STDs.

570. The nurse directed Jane Doe 2 to get undressed and put on a gown. After Jane Doe 2 was wearing the gown, Dr. Tyndall and a chaperone entered the examination room.

571. As Jane Doe 2 lay on the examination table, wearing a gown and with her legs spread, she felt Dr. Tyndall insert his fingers into her vagina. He did not tell Jane Doe 2 that he was going to insert his fingers, nor did he tell her why.

572. With his fingers inside of Jane Doe 2, Dr. Tyndall said, "ok it is tight and inflamed," in reference to Jane Doe 2's vagina. He did not tell her what to expect from a pelvic exam, why he was inserting his fingers, or what the inflammation might mean.

573. The comment and procedure made Jane Doe 2 feel very uncomfortable and ashamed. However, she was reassured by the presence of the female chaperone, whom she assumed would have her best interest in mind.

574. After the examination was over, Dr. Tyndall told Jane Doe 2 to get dressed and meet with him in his office, which was a separate room from the examination room. Jane Doe 2 became alarmed that the doctor wanted to meet with her one-on-one, and there was no longer a female chaperone present. She thought he might want to discuss a medical problem.

1723274.2

575.   But in his office, Dr. Tyndall asked Jane Doe 2 to tell him about herself: what she was studying, her race and ethnicity. Jane Doe 2 told Dr. Tyndall that she was graduating. Dr. Tyndall told Jane Doe 2 about his Filipino wife.

576.   Dr. Tyndall then turned to Jane Doe 2's recent sexual encounter. He asked Jane Doe 2 if her first time having sexual intercourse had been painful, and whether it had been with a random person or with a partner.

577.   Jane Doe 2 answered the doctor's questions because she felt that she had no choice. He was an authority figure. She told him that she took the morning after pill within the recommended time and had all her HPV vaccines, hoping the information about her precautions would put a stop to the personal questions. But it did not. Rather than give medical information about the morning-after pill, Dr. Tyndall simply remarked continuously about the high price of the pill.

578.   Dr. Tyndall then told Jane Doe 2 that he had one patient who lost her virginity and contracted genital warts as a result, her partner had not exhibited symptoms at the time, and she would have to live with genital warts for the rest of her life. He added that this patient was in a "committed relationship" and the encounter had not been "a one-night stand" like Jane Doe 2's.

579.   Jane Doe 2 became very uncomfortable, in part because she felt judged, as if Dr. Tyndall was putting words in her mouth and unnecessarily characterizing her sexual encounter. She felt that the doctor was attempting to intimidate her.

580.   Dr. Tyndall told Jane Doe 2 that he wanted her to get an IUD, and that he would put in an order right away so that she could obtain it before her student health insurance ran out (she was graduating).

581.   Jane Doe 2 felt extremely uncomfortable with the conversation, but because she had never been to the gynecologist before, she did not know the degree to which the encounter was abnormal and inappropriate.

- 90 -

582.   Jane Doe 2 left the appointment feeling distressed. She vowed never to return to Dr. Tyndall.

583.   From there, Jane Doe 2 scheduled a subsequent appointment with a different OB/GYN to receive birth control. Her appointment with the other OB/GYN felt normal and comfortable.

584.   In hindsight, Jane Doe 2 realizes that Dr. Tyndall's behavior toward her was violative and highly inappropriate. She has suffered emotional distress since the appointment, and her distress has become heightened since learning that USC allowed Dr. Tyndall to abuse many women like herself.

585.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) digitally penetrating Jane Doe 2 without explanation and without obtaining consent; and (2) making inappropriate sexual comments when Jane Doe 2 was alone with Dr. Tyndall in his office.

586.   Jane Doe 2 has thus been damaged by Dr. Tyndall's and USC's actions.

**38.   Betsayda Aceituno (2013-2015)**

587.   Betsayda Aceituno was an undergraduate student at USC from August 2013 through May 2015. During that time, she had approximately three appointments with Dr. Tyndall in the student health center.

588.   Dr. Tyndall asked Ms. Aceituno where she was from because he said she had Asian features (mostly her eyes). Ms. Aceituno responded she was not Asian, that she was Latina. Dr. Tyndall's comments about Ms. Aceituno's eyes and ethnicity made her uncomfortable and uneasy.

589.   There was a chaperone in the room for some, but not all, of Ms. Aceituno's examinations.

590.   On one occasion, Dr. Tyndall inserted his fingers into Ms. Aceituno's vagina and commented that it was "very tight" and that she "would make whoever she married very happy." There was no chaperone present during this appointment.

- 91 -

591.    Dr. Tyndall's comments made Ms. Aceituno very uncomfortable and nervous. Distressed by what had occurred, Ms. Aceituno told her brother what happened. He too was disturbed by Dr. Tyndall's comments and behavior.

592.    When Ms. Aceituno first heard reports that Dr. Tyndall had abused many women, she was horrified and immediately replayed her experiences with him.

593.    Ms. Aceituno feels extremely violated and distressed, especially considering the number of visits she had with Dr. Tyndall. She feels traumatized and angry that USC failed to provide her and other female students with safe, appropriate, and professional health care.

594.    Dr. Tyndall violated the standard of care by, *inter alia*: (1) making inappropriate comments during appointments; (2) performing pelvic exams without a chaperone present; and (3) making inappropriate sexual comments while performing pelvic exams.

595.    Ms. Aceituno has thus been damaged by Dr. Tyndall's and USC's actions.

**39.     Jane Doe D.C. (2013-2015)**

596.    Jane Doe. D.C. attended USC from 2012-2016. Between approximately 2013-2015, she had an appointment with Dr. Tyndall for a pap smear and an annual exam. Although she would have preferred to see a woman doctor, she trusted USC to provide her with safe and professional care.

597.    Dr. Tyndall examined Jane Doe D.C. with a chaperone present in the room.

598.    After the examination, Dr. Tyndall gave Jane Doe D.C. a prescription for a "morning-after pill," or "Plan B" and said something to the effect of "it's my mission to end unwanted pregnancies." Jane Doe D.C. was already taking birth control and thought it was strange and inappropriate for Dr. Tyndall to prescribe her Plan B. She did not request it.

- 92 -

1723274.2

599.   Jane Doe D.C. thought that Dr. Tyndall's procedures and comments and demeanor were inappropriate and unprofessional. She left the appointment feeling very uneasy.

600.   Jane Doe D.C. resolved to never see Dr. Tyndall for a gynecological examination again. Instead, she started paying out-of-pocket to go to Planned Parenthood.

601.   The experience with Dr. Tyndall has had lasting effects on Jane Doe D.C. Among other things, since her experience with Dr. Tyndall, she has only felt comfortable seeing female OB/GYNs.

602.   When Jane Doe D.C. first heard reports in the news about Dr. Tyndall and learned that his inappropriate conduct had been going on for 30 years, she felt angry and upset that USC had failed to protect her and so many others. She is concerned that USC prioritized Dr. Tyndall's practice over the health, safety, and needs of USC's female students. When Jane Doe D.C. heard about the accounts of other women in Dr. Tyndall's care, she remembers feeling like USC did not see the worth of USC's female students and did not care about their success despite the fact that they paid the same amount to be there as the male students. By continuing to employ Dr. Tyndall even after his patients complained of his bad behavior, USC made it clear that female health was not important to them.

603.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) making inappropriate comments during the appointment; and (2) prescribing unsolicited and unwanted birth control without discussing potential side effects and other options.

604.   Jane Doe D.C. has thus been damaged by Dr. Tyndall's and USC's actions.

1723274.2

**40.    Jane Doe N.K. (2013-2017)**

605.    Jane Doe N.K. was an undergraduate student at USC from 2013-2017. During that time, she was a regular patient of Dr. Tyndall.

606.    Jane Doe N.K. saw Dr. Tyndall approximately ten times during her tenure at USC. She regularly went to Dr. Tyndall for pap smears to check for sexually-transmitted diseases.

607.    Each time Jane Doe N.K. was examined by Dr. Tyndall, he inserted his fingers into her vagina before using the speculum. On at least one occasion, he explained that he was inserting his fingers first to minimize pain and discomfort that could be caused by the speculum.

608.    On at least one occasion, Dr. Tyndall commented that Jane Doe N.K.'s vagina looked "very good" and "nice."

609.    Jane Doe N.K. always felt uncomfortable on her visits with Dr. Tyndall, but she thought that it was normal to feel uncomfortable during gynecological exams.

610.    There was a chaperone in the room for some, but not all, of Jane Doe N.K.'s examinations.

611.    Jane Doe N.K. thought that Dr. Tyndall's practices and procedures were normal until she read *Los Angeles Times* reports that told her otherwise. She feels extremely violated and distressed, especially considering the number of visits she had with Dr. Tyndall. She feels traumatized and angry that USC failed to protect her.

612.    Dr. Tyndall violated the standard of care by, *inter alia*: (1) making inappropriate comments during the pelvic exam; and (2) unnecessary digital penetration prior to inserting the speculum.

613.    Jane Doe N.K. has thus been damaged by Dr. Tyndall's and USC's actions.

- 94 -

1723274.2

**41. Jane Doe C.C. (2014)**

614.    Jane Doe C.C. saw Dr. Tyndall for a pelvic exam and pap smear on or about August 28, 2014, because she had been sexually assaulted, and she was afraid that her assailant had given her an STD.

615.    At the time, she had only previously seen a gynecologist in the OB/GYN practice used by her mother.

616.    During the examination, Dr. Tyndall digitally penetrated Jane Doe C.C. This made her feel uncomfortable, but she assumed it was normal because she had very little experience with gynecologists.

617.    When Jane Doe C.C. told Dr. Tyndall the reason for her visit, he gave her one pill for chlamydia, for which she had tested positive, as well as a pill for her current partner to take.

618.    When other women in Jane Doe C.C.'s sorority experienced sexual assault, she recommended that they see Dr. Tyndall given that he had treated her STD.

619.    Ever since the news reported on Dr. Tyndall's abuse of women at USC, Jane Doe C.C. has felt enormous guilt for sending other women to him.

620.    Jane Doe C.C. is experiencing emotional distress because she was abused by the doctor and did not even know it due to her inexperience. She feels that USC failed her, and that the university is at fault for allowing the abuse to continue unabated for many years.

621.    Dr. Tyndall violated the standard of care by conducting an unnecessary pelvic exam improperly.

622.    Jane Doe C.C. has thus been damaged by Dr. Tyndall's and USC's actions.

**42. Jane Doe 4 (2015)**

623.    Jane Doe 4 made an appointment with Dr. Tyndall in 2015 because she needed treatment for a yeast infection. She was 18 years old.

- 95 -

624. Dr. Tyndall told Jane Doe 4 that in order to diagnose her yeast infection, he would need to perform a pelvic exam, and she agreed.

625. Dr. Tyndall then performed a pelvic exam on Jane Doe 4. As he inserted his fingers into her vagina, he remarked that she was very tight, and that he needed to insert his fingers so that the speculum would fit. Because Jane Doe 4 had never had a pelvic exam, she did not know that it was not normal for Dr. Tyndall to use his fingers or to remark that she was "tight."

626. Dr. Tyndall invited Jane Doe 4 to speak with him privately in his office, which made her nervous that he had bad news to share.

627. In his office, Dr. Tyndall showed Jane Doe 4 a specimen of her vaginal swab so that she could view the yeast under a microscope. He then asked her about her major, which was biology, and gave her advice about medical school. In addition, he inquired about her sexual activities—whether she had a partner, and whether she and her partner were sleeping with multiple people. The conversation made Jane Doe 4 feel uneasy, because it seemed overly personal and unnecessary.

628. Dr. Tyndall violated the standard of care by, *inter alia*: (1) performing a pelvic exam even though Jane Doe 4 was under 21 and it was not required to treat her yeast infection; (2) digitally penetrating Jane Doe 4; and (3) inviting Jane Doe 4 to view her vaginal swab under a microscope.

629. Jane Doe 4 feels disappointed and let down by USC. She trusted that the university would not put a doctor in place who abused patients and fell short of the standard of care. Jane Doe 4 has thus been damaged by USC's and Dr. Tyndall's actions.

**43. Jane Doe C.B. (2015)**

630. Jane Doe C.B. was a student at USC from 2010-2016. In or about 2015, she saw Dr. Tyndall at the student health center for a yearly exam because she also wanted full screen for sexually transmitted diseases.

- 96 -

631.   During the appointment, Dr. Tyndall asked Jane Doe C.B. to meet with him alone in his office, which was at that time a separate room from the examination room. Once they were alone in his office, Dr. Tyndall began asking Jane Doe C.B. incredibly invasive questions about *why* she wanted an STD screening. He asked, since she identified as a lesbian, what kinds of sex acts she liked that she thought would give her an STD. Jane Doe C.B. was very uncomfortable with the tone and subject matter of Dr. Tyndall's questions, and told him so. She argued with him and told him she thought the line of questioning was weird and inappropriate. Jane Doe C.B. also told Dr. Tyndall she did not understand why the office wouldn't just be happy to do preventative medical procedures and testing.

632.   During the pelvic examination, Dr. Tyndall used his fingers in such a way as to almost mimic the same-sex sex acts he made Jane Doe C.B. describe in his office. Jane Doe C.B. felt as if Dr. Tyndall was toying with her and he seemed to get a sick thrill from what he was doing.

633.   When Jane Doe C.B. inquired about her STD screening after the exam, Dr. Tyndall wrote back that she was negative for chlamydia, syphilis, and "that one that starts with H." Jane Doe C.B. found Dr. Tyndall's note to be incredibly insensitive and its subject a weird thing to joke about. She also found his note to be medically incoherent considering there is more than one STD that starts with the letter H.

634.   After the appointment, Jane Doe C.B. complained about the invasive questioning and insensitive message to her close friends, and posted on Facebook that she wished she could have requested a female gynecologist, after being traumatized by Dr. Tyndall.  She asked for the preventative STD screening because she was beginning a sexual relationship with a new partner. She was humiliated when she had to share Tyndall's note with that partner. In contrast, Jane Doe C.B.'s new partner provided her

- 97 -

a professional report reflecting a standard battery of tests compared to Dr. Tyndall's insensitive message which lacked any real clarity about her health.

635. When Jane Doe C.B. heard about the accounts of other women in Dr. Tyndall's care, she realized her experience was not an isolated incident but part of a pattern of inappropriate behavior with women. She saw that her unease and distress at the time of the appointment were valid, and that Dr. Tyndall's sexualization of her as a lesbian-identified patient was something he had done to other women. She felt that he was punishing her, in a way, for having sex with women rather than men, and that he could wield power over her by trying to humiliate her for the sex she enjoys.

636. Jane Doe C.B. is now having a hard time finding a gynecologist within her insurance network because she refuses to see male doctors. She is traumatized by the line of questioning and sexualized exam that Dr. Tyndall put her through, and she is afraid that she's more likely to experience this behavior again with a male practitioner. Jane Doe C.B. is upset that USC failed to provide her and other female students with safe, appropriate, and professional health care.

637. Dr. Tyndall violated the standard of care by, *inter alia*: (1) making inappropriate comments about Jane Doe C.B.'s sexuality; (2) inappropriate digital penetration; and (3) delivering test results in an insensitive and unclear way.

638. Jane Doe C.B. has thus been damaged by USC's and Dr. Tyndall's actions.

**44.    Jane Doe 3 (2015-2016)**

639. Jane Doe 3 studied at USC from 2012 to 2016.

640. Jane Doe 3 had her first appointment with Dr. Tyndall on or about August 25, 2015. She learned that the first available appointment for the next several months would be Dr. Tyndall, so she decided to make an appointment with him, even though she would have preferred to see a female gynecologist.

- 98 -

1723274.2

641.   To begin the appointment, Dr. Tyndall spoke with Jane Doe 3 in his office. She sat in a chair that was placed perpendicular to his desk, and he asked her the reason for her visit. She explained that she had just returned from spending time abroad, and she wanted to get a new prescription for birth control. She told him that she had been taking birth control for several years. They then had a conversation about travelling abroad. Dr. Tyndall mentioned that his wife was from Asia, and that they had traveled around Asia together. He showed Jane Doe 3 a photo of his wife. Conversing about personal matters with Dr. Tyndall made Jane Doe 3 feel uneasy, but she told herself that he was just getting to know her as a new patient.

642.   Dr. Tyndall suggested that Jane Doe 3 have a pap smear and pelvic exam, and Jane Doe 3 agreed because it had been two years since her last exam. Dr. Tyndall also recommended that Jane Doe 3 have a breast exam, but she declined because the doctor's manner was making her feel uncomfortable.

643.   Before the examination began, a chaperone entered the room and stood behind the doctor off to the side. From Jane Doe 3's vantage point, it looked like the chaperone could see what Dr. Tyndall was doing during the exam.

644.   Dr. Tyndall told Jane Doe 3 that he was going to insert his finger into her vagina and "feel around." First, he inserted one finger, then he inserted a second finger. Jane Doe 3 felt very uncomfortable, and she wanted the examination to end as soon as possible. As he was finishing the exam, Dr. Tyndall again asked Jane Doe 3 if she wanted a breast exam. She declined again, feeling even more uncomfortable than she had before.

645.   Dr. Tyndall then informed Jane Doe 3 that he could not prescribe birth control that day—the very reason for the appointment—because he did not have time to do a consultation. Jane Doe 3 was confused as to why she would need a birth control consultation given that she had already been on birth control for several years, but she agreed to make a second appointment.

646.   On August 28, 2015, Jane Doe 3 returned to Dr. Tyndall for a birth control consultation. As part of the consultation, Dr. Tyndall showed Jane Doe 3 several laminated studies and diagrams. Jane Doe 3 did not feel that the extensive lesson was necessary or appropriate, given that she had been taking birth control for several years. She felt as though Dr. Tyndall was unnecessarily prolonging their appointment.

647.   Then, in addition to a birth control prescription, Dr. Tyndall gave Jane Doe 3 Plan B, even though she had not requested or inquired about Plan B. He also recommended that Jane Doe 3 take prenatal vitamins, even though she did not plan on getting pregnant. Jane Doe 3 left the appointment with a prescription for only several months of birth control.

648.   Dr. Tyndall made Jane Doe 3 feel very uneasy. However, he was the only gynecologist available at USC, and she needed health care. Thus, she made another appointment with him on or about January 11, 2016 for a birth control refill. At that appointment, Dr. Tyndall recommended that Jane Doe 3 carry chewable Tylenol in case she got blood clots as a result of the pill.

649.   When Jane Doe 3 saw reporting on Dr. Tyndall's pattern of abuse, she felt disappointed and disrespected. It confirmed that the uneasy feelings she experienced with Dr. Tyndall were shared by others. She had always placed trust in the medical profession, and her trust was broken. Jane Doe 3 feels USC and Dr. Tyndall took advantage of her.

650.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) making inappropriate comments during Jane Doe 3's appointments; (2) pressuring Jane Doe 3 to allow him to examine her breasts despite repeated refusals; (3) performing an improper pelvic examination; (4) making Jane Doe 3 return for separate birth control consultation; and (5) prescribing unsolicited and unwanted birth a control without discussing potential side effects and other options.

651. Jane Doe 3 has thus been damaged by USC's and Dr. Tyndall's actions.

**45. Jane Doe J.W. (2015-2017)**

652. Jane Doe. J.W. attended USC from 2013-2017. During that time, she was a regular patient of Dr. Tyndall.

653. Jane Doe J.W. saw Dr. Tyndall approximately five or six times during her tenure at USC. On multiple occasions when Jane Doe J.W. was examined by Dr. Tyndall, he inserted his fingers into her vagina before using the speculum. At the time, Jane Doe J.W. felt uncomfortable, but she did not know that his methods were abnormal and inappropriate.

654. On at least one occasion, Dr. Tyndall asked Jane Doe J.W. if she "did Kegels" because he claimed she was "particularly tight." Jane Doe J.W. found Dr. Tyndall's comment extremely inappropriate and disturbing.

655. Distressed by what had occurred, Jane Doe J.W. told her friends about Dr. Tyndall's comments. They agreed that his comments were creepy.

656. When Jane Doe J.W. learned of the reports that Dr. Tyndall had abused many women, she felt traumatized that USC failed to protect her. She feels extremely violated and distressed, especially considering the number of visits she had with Dr. Tyndall.

657. Dr. Tyndall violated the standard of care by, *inter alia*: (1) inappropriate digital penetration; and (2) making inappropriate comments during digital penetration.

658. Jane Doe J.W. has thus been damaged by USC's and Dr. Tyndall's actions.

**46. Mehrnaz Mohammadi (2016)**

659. In 2016, Mehrnaz Mohammadi was a graduate student at USC. She made an appointment at the USC student health center with the only available physician, Dr. Tyndall, because none of the other practitioners were available for at least a month.

1723274.2

660.   At the outset of the appointment, Dr. Tyndall asked Ms. Mohammadi where she was from. She told him she was from Montreal.

661.   During the physical examination and with a nurse present, Dr. Tyndall proceeded to examine her vagina. Throughout the examination, he kept talking about very personal things, such as how he and his wife had fun in Montreal.

662.   Dr. Tyndall also told Ms. Mohammadi she had a very tight vagina. He emphasized that having a tight vagina was a very good thing for her partner. He told her not everyone has a tight vagina, like she did. Dr. Tyndall's comments made Ms. Mohammadi very uncomfortable, but she tried to tell herself it was normal because a nurse was present. Ms. Mohammadi questioned whether she was too closed-minded in thinking it was wrong for Dr. Tyndall to make these comments that seemed very inappropriate.

663.   After the physical examination, Dr. Tyndall told Ms. Mohammadi to come to his office. There, he asked about her sexual encounters and told her that she could get "Plan B" whenever she needed it. He told her he could write her a few prescriptions for Plan B because accidents happen. She felt very uncomfortable with the discussion.

664.   When Ms. Mohammadi read the news about Dr. Tyndall, she was very upset. It took her several days to get past the shame she felt that Dr. Tyndall had been inappropriate with her in order to make the call for help.  Dr. Tyndall's conduct made her very uncomfortable and upset, and USC's failure to protect her and other students has caused additional distress.

665.   Dr. Tyndall violated the standard of care by, *inter alia*: (1) making inappropriate sexual comments while examining Ms. Mohammadi's vagina; and (2) making inappropriate and unprofessional comments in his office after the exam was finished.

- 102 -

1723274.2

666.    Ms. Mohammadi has thus been damaged by USC's and Dr. Tyndall's actions.

**47.    Jane Doe A.N. (2016)**

667.    Jane Doe A.N. was examined by Dr. Tyndall in or about 2016, during her senior year at USC. She had been having heavy periods and severe cramping that interfered with her daily activities, so she scheduled an appointment for an evaluation with Dr. Tyndall.

668.    At the time, Jane Doe A.N. was 21 years old, and this was her first experience with going to the OB/GYN. She did not know the normal procedures for a pelvic exam, so she had no way of knowing whether Dr. Tyndall's methods were improper.

669.    When Jane Doe A.N. arrived for her appointment, she was immediately put off by Dr. Tyndall's attempt to greet her in Vietnamese and his comments about Asian women's beauty. During the appointment, Dr. Tyndall told Jane Doe A.N. that her "skin was very beautiful," and that she "could be a model." Jane Doe A.N. found these comments to be very out-of-line at the time.

670.    Once Jane Doe A.N. was undressed and laying with her legs spread open on the examination table, Dr. Tyndall digitally penetrated her. He commented on Jane Doe A.N.'s "wetness" and asked if she had a higher level of secretion compared with her friends.  Dr. Tyndall was not wearing any gloves at the time.  Jane Doe A.N. felt extremely uncomfortable, but because of her lack of experience, she did not know that it was abnormal for OB/GYNs to perform this type of examination without gloves.

671.    Without performing any medical tests, Dr. Tyndall told Jane Doe A.N. that she needed to go on birth control to treat her heavy periods and severe cramping without providing a reason why this would help Jane Doe A.N. with her symptoms.  Dr. Tyndall similarly did not provide any explanation as to the cause of

- 103 -

these symptoms. Jane Doe A.N. did not follow Dr. Tyndall's advice because she did not trust the conclusion of his exam or the limited treatment options he offered her.

672. After the appointment, Jane Doe A.N. told a couple of her close friends that Dr. Tyndall was "creepy" and she was not going back to see him again even though it meant she would have to suffer through the heavy periods and severe cramping she was experiencing without further treatment.

673. When Jane Doe A.N. was finally able to see another OB/GYN approximately one year later, the OB/GYN performed an ultrasound exam in her office and a pap smear. The ultrasound revealed endometrial hyperplasia, polyps, and pathologic menstrual bleeding patterns. A blood panel, hormone panel, and endometrial biopsy were performed. Panel results were within normal limits and endometrial biopsy revealed presence of adenomas and ruled out neoplasms.

674. When Jane Doe A.N. first heard reports that Dr. Tyndall had abused many women, she realized she had not been the victim of an isolated occurrence, but rather a victim of a series of abuses. The distress she felt at the time of her examination came flooding back. She is upset and feels betrayed that USC allowed this to happen to her and so many other women.

675. Dr. Tyndall violated the standard of care by, *inter alia*: (1) making inappropriate comments about Jane Doe A.N.'s appearance; (2) improper digital penetration without gloves; (3) inappropriate comments during digital penetration; (4) recommending birth control without explanation; and (4) failing to conduct proper testing and properly treat Jane Doe A.N.'s heavy periods.

676. Jane Doe A.N. has thus been damaged by Dr. Tyndall's and USC's actions.

## 48. Jane Doe L.Y. (2016)

677. In 2016, Jane Doe L.Y. was an undergraduate student at USC studying psychology. She scheduled an appointment at the student health center with Dr.

- 104 -

Tyndall because she thought she should have a pelvic exam prior to graduation. It was her first ever appointment with an OB/GYN.

678.  Jane Doe L.Y. had made an appointment with Dr. Tyndall in August of 2015, but she cancelled it because she was uncomfortable about seeing a male OB/GYN.

679.  When the 2016 appointment with Dr. Tyndall began, Jane Doe L.Y. was relieved because there was a female chaperone in the room.

680.  Because it was her first appointment with an OB/GYN, Jane Doe L.Y. did not know what to expect. Dr. Tyndall told her that the exam was supposed to feel physically uncomfortable.

681.  During the exam, Dr. Tyndall used lubricant and inserted his fingers into Jane Doe L.Y.'s vagina. She did not know at the time that this was not standard practice.

682.  While his finger was inside of her, Dr. Tyndall asked Jane Doe L.Y. if she was a runner because of her "tight muscles." Although the comment made her feel nervous and violated, she had been running on the treadmill about five days a week for a month. She told herself that maybe Dr. Tyndall was just recognizing a fact about her body.

683.  Even though she was nervous and uncomfortable, the presence of a female chaperone in the room communicated to her that everything was proper. Still, during and after the examination, Jane Doe L.Y. felt in her gut that something was wrong.

684.  After the appointment, Dr. Tyndall talked to Jane Doe L.Y. alone in his office.

685.  Jane Doe L.Y. left the appointment with Dr. Tyndall feeling very uncomfortable, and vowing never to repeat the experience. She has not received

- 105 -

1723274.2

gynecological services since the incident with Dr. Tyndall, even when she felt like she should.

686.    When Jane Doe L.Y. read about Dr. Tyndall in the media, it validated her suspicion that Dr. Tyndall had acted inappropriately while examining her. Now, Jane Doe L.Y. will never see a male gynecologist again, and she has lost trust in all male physicians.

687.    Jane Doe L.Y. feels violated, and is experiencing extreme emotional distress. She has scheduled counseling services to help her cope emotionally.

688.    Dr. Tyndall violated the standard of care by, *inter alia*: (1) improper digital penetration; and (2) making inappropriate comments during digital penetration.

689.    Jane Doe L.Y. has thus been damaged by Dr. Tyndall's and USC's actions.

**49.    Jane Doe A.H. (2016)**

690.    Jane Doe A.H. is a graduate student at USC. She was examined by Dr. Tyndall on or about March 3, 2016. In order for her Aetna Student Health insurance to cover the appointment, Jane Doe A.H. was required to go to USC's student health center. The other OB/GYNs were booked for months, so the only way Jane Doe A.H. could get an appointment quickly was to see Dr. Tyndall.

691.    At her appointment with Dr. Tyndall, a nurse or chaperone was present in the room for her examination.

692.    During the pelvic exam, Dr. Tyndall used his fingers to penetrate Jane Doe A.H.  He also commented that she had "strong pelvic muscles" and asked if Jane Doe A.H. was a runner.  Jane Doe A.H. found Dr. Tyndall's comment to be extremely inappropriate and disturbing but questioned her discomfort given that a nurse was present.

693.    Dr. Tyndall also examined Jane Doe A.H.'s back and asked about her nationality.  When Jane Doe A.H. responded that she was American, Dr. Tyndall

- 106 -

asked where her parents were from. Jane Doe A.H. explained that her parents were Israeli, and Dr. Tyndall commented, "Oh that explains the (back) hair. Middle Eastern women have more (back) hair." Jane Doe A.H. found these comments to be extremely disturbing.

694. Distressed by what had occurred, Jane Doe A.H. texted some of her friends and told them what happened. They were also disturbed by Dr. Tyndall's comments and behavior.

695. Since that time and as a result of the distress, Jane Doe A.H. has only agreed to see the female gynecologists at USC to avoid another uncomfortable, distressing encounter. She also became very self-conscious about her back hair.

696. Jane Doe A.H. was very upset when she heard that complaints had been lodged against Dr. Tyndall for years and he was still allowed to practice at the USC student health center. She is extremely upset that USC put her in a position where her only option for timely gynecological treatment was to see a perpetrator who should have been dismissed decades ago. Jane Doe A.H. was also upset that she had not lodged a complaint earlier. Before the news of Dr. Tyndall's misconduct emerged, Jane Doe A.H. felt that Dr. Tyndall's comments were inappropriate but did not realize that the pelvic exam and body scan he conducted were unnecessary. At the time, Jane Doe A.H. trusted Dr. Tyndall, the chaperone, and the USC health center to perform only necessary and appropriate examinations.

697. Jane Doe A.H. feels even more violated now knowing that Dr. Tyndall touched and examined her body in inappropriate ways that did not serve any medical purpose. Jane Doe A.H. is a graduate student who studies gender and a large part of her identity is feeling that she is informed, independent, and in control of her body. She is distressed that USC contributed to the cycle of training women to accept abusive behavior, especially from men in positions of power and trust. This has

rattled Jane Doe A.H.'s identity and affected her sense of control over her life and her body.

698. Dr. Tyndall violated the standard of care by, *inter alia*: (1) improper digital penetration; (2) making inappropriate comments during digital penetration; and (3) making improper comments about Jane Doe A.H.'s body hair during a medical examination.

699. Jane Doe A.H. has thus been damaged by Dr. Tyndall's and USC's actions.

**50. Elisabeth Treadway (1999)**

700. Elisabeth Treadway was an undergraduate student at USC from 1997 to 2001. In the spring of 1999, Ms. Treadway noticed bumps on her lower abdomen that concerned her. She contacted Student Health Services and was given an appointment with Dr. Tyndall.

701. Ms. Treadway was in the room alone with Dr. Tyndall for the examination. The bumps on her abdomen could be seen without removing any clothing, and yet Dr. Tyndall insisted that Ms. Treadway completely undress from the waist down. She was not given a sheet to cover herself during the exam. Ms. Treadway found this to be unnecessary and strange at the time.

702. During the examination, Dr. Tyndall commented on Ms. Treadway's body piercing, suggesting that she must be promiscuous. He then played with the piercing using his fingers.

703. Dr. Tyndall then examined one of the bumps, repeatedly touching it so aggressively that Ms. Treadway cried out in pain. Dr. Tyndall said he also needed to feel inside of her vagina to check for more sores. He inserted his ungloved fingers and felt around for what felt to Ms. Treadway like a very long time. Dr. Tyndall said he thought she had herpes and that she should never tell anyone about it. Due to the

- 108 -

piercing and the herpes, he said, men would know "what kind of a girl" she was and would not want to be with her.

704.   Ms. Treadway felt that something was wrong with the way she was treated by Dr. Tyndall, but she had never had a herpes test or been examined by a male gynecologist and did not know what to expect. Dr. Tyndall's comments about her piercing and the possibility that she had herpes made her so ashamed that she skipped the follow-up appointment to receive the test results. She believes Dr. Tyndall attacked her character so that she would not feel comfortable reporting his conduct.

705.   Since the examination by Dr. Tyndall, Ms. Treadway has opted to have only female gynecologists. The experience has affected every relationship she's had since then, because she developed anxiety about her partners learning that she might have herpes.

706.   Elisabeth Treadway has been damaged by Dr. Tyndall's and USC's actions.

## H.   The statute of limitations is tolled based on the continuing violations doctrine and fraudulent concealment.

707.   Tyndall concealed the existence of Plaintiffs' claims and the fact that Plaintiffs had a cause of action against Tyndall and/or USC at the time his sexual assaults occurred by making material representation(s) to Plaintiffs involving a past or existing fact, including by:

   a.   Misrepresenting that his acts and/or conduct were for the purpose of conducting a vaginal examination;

   b.   Misrepresenting that digital penetration of a woman's vagina at the outset of a gynecological examination was medically appropriate, contemporaneously and/or shortly before the abrupt, sudden, quick, and unexpected sexual assaults by Tyndall;

   c.   Misrepresenting that his acts and/or conduct were for the purpose of conducting a breast examination;

- 109 -

d.  Misrepresenting that it was necessary for a female patient to be fully naked for a gynecologist to conduct a full body scan for skin irregularities;

e.  Misrepresenting that his acts and/or conduct were "treatments" and/or conformed to accepted medical practice.

708.  The material representation(s) to Plaintiffs and the Class were false in that Tyndall was actually performing these examinations for his own sexual gratification and pleasure.

709.  When Tyndall made the material representation(s), he knew that they were false in that he knew that the examinations were not proper, appropriate, legitimate, and/or considered within standard of care by any physician of any specialty and/or gynecology.

710.  Tyndall made the material representation(s) with the intent that the material representation(s) should be acted upon by Plaintiffs and the Class in that Plaintiffs and the Class members should believe that the examinations were proper, appropriate, and legitimate; should not believe that they had been sexually assaulted; should not believe that they had been sexually assaulted so that he could prevent discovery of his sexual assaults; should continue to be seen by him so that he could continue to sexually assault them; should not question and/or report the conduct to appropriate authorities; and should not reasonably believe and not be aware of a possible cause of action that they have against Tyndall and/or USC.

711.  Plaintiffs and Class members acted in reliance upon the material representation(s) in that they:

a.  Reasonably believed that the examinations were proper, appropriate, and legitimate;

b.  Reasonably did not believe that they had been sexually assaulted;

c.  Did not believe that they should question and/or report the conduct to appropriate authorities; and,

- 110 -

d.  Did not reasonably believe that they had and were not aware of a possible cause of action that they had against Tyndall and/or USC.

712.   Tyndall further concealed the fraud by affirmative act(s) that were designed and/or planned to prevent inquiry and escape investigation and prevent subsequent discovery of his fraud in that he:

a.  Misrepresented to other medical professionals in the examination room that digitally penetrating female patients was medically necessary and appropriate;

b.  Prevented other medical professionals, chaperones, and/or caregivers from being in the room during examinations and treatments of Plaintiffs and Class members so that he could sexually assault them; and

c.  Did not abide by or follow the standard of care which requires another medical professional, chaperone, parent, guardian, and/or caregiver be in the room during the examination and treatment of minors and female patients.

713.   Directors, managers, supervisors, physicians, nurses, and chaperones in USC's student health center took affirmative steps to fraudulently conceal Tyndall's misconduct, including, but not limited to, by depressing complaints made by patients through the imposition of onerous reporting requirements on them.

714.   Directors, managers, supervisors, physicians, nurses, chaperones in USC's student health center also misrepresented that Tyndall's conduct during examinations was proper, including, without limitation, by (i) watching Tyndall's conduct as a purported chaperone without stopping the improper conduct; (ii) permitting Tyndall to conduct examinations without a chaperone present; and (iii) scheduling female patients for appointments with Tyndall despite having full knowledge of his improper conduct.

715.   The actions and inactions of Tyndall and USC constituted fraudulent concealment.

- 111 -

716.    The statute of limitations for each of Plaintiffs' causes of actions was equitably tolled, and Defendants are equitably estopped from asserting the statute of limitations as a defense, by reason of their wrongful conduct.

717.    As part of Defendants' wrongful attempt to conceal Tyndall's propensity to sexually abuse young female students, and his past sexual abuse, from public scrutiny and criminal investigation, Defendants implemented various measures with the intent and effect of making Tyndall's conduct harder to detect and ensuring that other student-patients with whom he came into contact, including Plaintiffs, would be sexually abused and assaulted, including:

a.    Permitting Tyndall to remain in a position of authority and trust after Defendants knew or should have known that he molested his young female patients;

b.    Scheduling female patients for appointments with Tyndall, including appointments without a nurse or chaperone present, despite being aware of his improper conduct;

c.    Placing Tyndall in a separate and secluded environment at the university health center, and granting him unfettered access to and control over patients even when he was purporting to provide extremely sensitive gynecological treatment, thereby allowing Tyndall to physically and sexually interact with young female students at USC, including Plaintiffs;

d.    Holding out Tyndall to Plaintiffs, other USC patients, USC alumni, and the public at large as a trustworthy person of good moral character who was capable and worthy of being granted unsupervised access to the student-patients of USC;

e.    Failing to disclose and actively concealing Tyndall's prior record of misconduct, sexual abuse, harassment, and molestation, and his propensity to commit such acts towards student-patients in the university health center, from its students, the public at large, and law enforcement;

1723274.2

f.      Failing to investigate or otherwise confirm or deny such facts about Tyndall, including prior complaints, claims, and investigations relating to sexual abuse suffered at his hands;

g.      Failing to implement reasonable safeguards to avoid acts of unlawful sexual conduct by Tyndall, such as by avoiding placement of Tyndall in functions or environments in which he would necessarily have intimate contact with young female patients; and

h.      Failing to implement systems or procedures to supervise or monitor doctors, chaperones, and other USC agents to ensure that they did not molest or abuse patients in Defendants' care and, further, that they report all reasonable suspicions of sexual assault or battery to law enforcement as mandated by Section 11160 of the California Penal Code.

718.   At all times pertinent to this action, Tyndall was an agent, apparent agent, servant, and employee of USC and operated within the scope of his employment and his negligence is imputed to USC.

719.   Defendants engaged in, joined in, and conspired with each of the other Defendants and wrongdoers in carrying out the tortuous and unlawful activities herein described.  Each Defendant is legally responsible for the occurrences herein alleged, and Plaintiff's damages, as herein alleged, were proximately caused by all Defendants.

720.   Plaintiffs and Class members did not know, could not have reasonably known, and were not reasonably aware of a possible cause of action that they had against Tyndall and/or USC until the May 15, 2018 publication of a story about Tyndall's misconduct in the *Los Angeles Times*.

## V.    CLASS ALLEGATIONS

721.   Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3) and 23(c)(4) on behalf of themselves and the following Class:

> All women who were seen for treatment by Dr. George M.
> Tyndall at the University of Southern California student
> health center during the period from August 14, 1989 to June

- 113 -

21, 2016 (a) for Women's Health Issues, or (b) whose treatment by Dr. George M. Tyndall included an examination by him of her breast or genital areas, or (c) whose treatment included the taking of photographs or videotapes of her unclothed or partially clothed body. "Women's Health Issues" includes but is not limited to any issue relating to breast, vaginal, urinary tract, bowel, gynecological, or sexual health, including contraception and fertility.

722. The Class consists of tens of thousands of women, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual members are ascertainable through records maintained by USC.

723. The claims of Plaintiffs are typical of the Class. The claims of the Plaintiffs and the Class are based on the same legal theories and arise from the same unlawful pattern and practice of sexual harassment and assault.

724. There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect only individual Class members within the meaning of Fed. R. Civ. P. 23(a)(2) and (b)(3). Class treatment of common issues under Fed. R. Civ. P. 23(c)(4) will materially advance the litigation.

725. Common questions of fact and law affecting members of the Class include, but are not limited to, the following:

    a.    Whether Tyndall engaged in sexual harassment, invasion of privacy, assault, and battery;

    b.    Whether Tyndall's sexual harassment, invasion of privacy, assault, and battery was committed within the scope of his employment at USC;

    c.    Whether the USC Defendants had knowledge of Tyndall's sexual harassment, invasion of privacy, assault, and battery and inappropriate contact;

1723274.2

d. Whether the USC Defendants facilitated Tyndall's pattern and practice of sexual harassment, invasion of privacy, assault, and battery;

e. Whether the USC Defendants or Tyndall engaged in conduct designed to suppress complaints or reports regarding Tyndall's conduct;

f. Whether the USC Defendants negligently retained or supervised Tyndall;

g. Whether the USC Defendants ratified Tyndall's conduct; and

h. Whether the USC Defendants are responsible for Tyndall's conduct under the doctrine of *respondeat superior.*

726. Absent a class action, most of the members of the Class would find the cost of litigating their claims to be prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation, particularly as to USC's legal responsibility for Tyndall's actions, in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

727. Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other respective Class members, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to those of the other members of the Class.

1723274.2

# VI. CAUSES OF ACTION

## COUNT I

### NEGLIGENT SUPERVISION AND RETENTION
### (AGAINST USC AND USC TRUSTEES)

728. Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

729. At all times material since 1989 and until Tyndall was removed in 2016, the USC Defendants employed Tyndall.

730. Tyndall was unfit or incompetent to work directly with female patients and posed a particular risk of sexually harassing, violating, and assaulting them.

731. The USC Defendants knew or should have known that Tyndall was unfit or incompetent to work directly with female patients and posed a particular risk of sexually harassing, violating, and assaulting them, and that this unfitness created a particular risk to Plaintiffs and the Class.

732. Tyndall's unfitness and particular risk to female patients harmed Plaintiffs and the Class.

733. The USC Defendants negligence in supervising and or retaining Tyndall was a substantial factor in causing harm to Plaintiffs and the Class.

734. As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs and Class members were damaged.

## COUNT II

### VIOLATIONS OF TITLE IX, 20 U.S.C. § 1681(a), *et seq*.
### (AGAINST USC AND USC TRUSTEES)

735. Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

736. Title IX of the Education Amendments Act of 1972 states, "No person in the United States shall on the basis of sex, be . . . subject to discrimination under any

- 116 -

education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681, *et seq.*

737.   Plaintiffs and members of the Class are "persons" under Title IX.

738.   USC receives federal financial assistance for its education program and is therefore subject to the provisions of Title IX.

739.   USC is required under Title IX to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

740.   Tyndall's conduct described above constitutes sexual harassment, abuse, and assault, and constitutes sex discrimination under Title IX.

741.   The USC Defendants were on notice of Tyndall's conduct as described above. The USC Defendants nonetheless failed to carry out their duties to investigate and take corrective action under Title IX.

742.   As a direct and proximate result of the USC Defendants' actions and/or inactions, Plaintiffs and members of the Class were damaged.

**COUNT III**

**SEXUAL ABUSE AND HARASSMENT IN THE EDUCATIONAL SETTING [CAL. EDUC. CODE § 220] (AGAINST USC, USC TRUSTEES, AND TYNDALL)**

743.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

744.   Section 220 of the California Education Code provides in pertinent part: "No person shall be subjected to discrimination on the basis of disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion, sexual orientation, or any other characteristic that is contained in the definition of hate crimes set forth in Section 422.55 of the Penal Code, including immigration status, in any program or activity conducted by an educational institution that receives, or benefits from, state financial assistance, or enrolls pupils who receive state student financial aid."

- 117 -

745.   Plaintiffs and the Class members were harmed by being subjected to sexual abuse, harassment and molestation at USC because of Plaintiffs and the Class members' gender and Defendants are responsible for that harm.

746.   Plaintiffs and the Class members suffered harassment that was so severe, pervasive, and offensive that it effectively deprived Plaintiffs and the Class members of the right of equal access to educational benefits and opportunities.

747.   As a result of Defendants' conduct, Plaintiffs and the members of the Class have been damaged in an amount to be proven at trial.

748.   Further, Defendants acted willfully and maliciously with the intent to harm Plaintiffs and the Class members, and in conscious disregard of the rights of Plaintiffs and the Class members, so as to constitute malice and oppression under California Civil Code section 3294. Plaintiffs and the Class members are therefore entitled to the recovery of punitive damages, in an amount to be determined at trial.

**COUNT IV**

**VIOLATION OF THE CALIFORNIA EQUITY IN HIGHER EDUCATION ACT [CAL. EDUC. CODE § 66250] (AGAINST USC, USC TRUSTEES, AND TYNDALL)**

749.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

750.   Section 66281.5 of the California Equity in Higher Education Act provides in pertinent part: "(a) It is the policy of the State of California, pursuant to Section 66251, that all persons, regardless of their sex, should enjoy freedom from discrimination of any kind in the postsecondary educational institution of the state. The purpose of this section is to provide notification of the prohibition against sexual harassment as a form of sexual discrimination and to provide notification of available remedies."

751.   The USC Defendants' conduct as alleged herein constitutes sexual harassment as a form of sexual discrimination against Plaintiffs and the members of

- 118 -

the Class, and violated the Equity in Higher Education Act. Plaintiffs are entitled to enforce the Act through a civil action pursuant to Education Code Section 66292.4.

752.   As a result of Defendants' conduct, Plaintiffs and the members of the Class have been damaged in an amount to be proven at trial.

**COUNT V**

**GENDER VIOLENCE [CAL. CIV. CODE § 52.4]**
**(AGAINST TYNDALL AND USC)**

753.   Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

754.   California Civil Code § 52.4 provides that gender violence is a form of sex discrimination and includes "[a] physical intrusion or physical invasion of a sexual nature under coercive conditions . . . ." *Id.* at §52.4(c)(2).

755.   California Civil Code § 52.4 incorporates the definition of "gender" from California Civil Code § 51, which provides: "'Gender' means sex, and includes a person's gender identity and gender expression."

756.   Plaintiffs and the Class members are female.

757.   Tyndall physically intruded and/or invaded the bodies of Plaintiffs and Class members during medical examinations in a sexual manner. The conditions were coercive in that Plaintiffs and Class members were required to place their trust in their physician because he was held out to be an expert in gynecology by USC.

758.   USC participated in the physical intrusion and/or invasion of the bodies of Plaintiffs and Class members during medical examinations by being physically present in the room through agent chaperones or other clinic staff members and/or by bringing Plaintiffs and the Class members into the examination rooms and providing instructions to remove their clothing knowing that Tyndall would assault them in a sexual manner.

759.   Plaintiffs were injured as a result of the gender violence, and seek all remedies provided for in Civil Code Section 52.4(a), including, but not limited to,

- 119 -

actual damages, compensatory, damages, punitive damages, injunctive relief, costs, attorneys' fees, or any other appropriate relief.

### COUNT VI

### GROSS NEGLIGENCE
### (AGAINST USC, USC TRUSTEES, AND TYNDALL)

760.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

761.   The USC Defendants owed Plaintiffs and Class members a duty to use due care to ensure their safety and freedom from sexual assault, abuse, and molestation while interacting with their employees, representatives, and/or agents, including Tyndall.

762.   Tyndall owed Plaintiffs a duty of due care in carrying out medical treatment as an employee, agent, and/or representative of the USC Defendants.

763.   By seeking medical treatment from Tyndall in the course of his employment, agency, and/or representation of the USC Defendants, a special, confidential, and fiduciary relationship between Plaintiffs and Tyndall was created, resulting in Tyndall owing Plaintiffs a duty to use due care.

764.   The USC Defendants' failure to adequately supervise Tyndall, especially after USC knew or should have known of complaints regarding his nonconsensual sexual touching and assaults during medical examinations was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

765.   Tyndall's conduct in sexually assaulting, abusing, and molesting Plaintiffs in the course of his employment, agency, and/or representation of the USC Defendants and under the guise of rendering "medical treatment" was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

- 120 -

766.   The USC Defendants' conduct demonstrated a willful disregard for precautions to ensure Plaintiffs' safety.

767.   The USC Defendants' conduct as described above demonstrated a willful disregard for substantial risks to Plaintiffs and Class members.

768.   The USC Defendants breached duties owed to Plaintiffs and Class members and were grossly negligent when they conducted themselves by the actions described above, said acts having been committed with reckless disregard for Plaintiffs and Class members' health, safety, constitutional and/or statutory rights, and with a substantial lack of concern as to whether an injury would result.

769.   As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs and Class members were damaged.

## COUNT VII

### INVASION OF PRIVACY
### (AGAINST USC, USC TRUSTEES, AND TYNDALL)

770.   Plaintiff Jane Doe D.D. realleges and incorporates by reference the allegations contained in the previous paragraphs.

771.   Dr. Tyndall photographed women—often for illegitimate purposes—without informed consent, and without protecting their privacy.

772.   Students have alleged that Dr. Tyndall's photos were taken with a Polaroid camera.[59]

773.   Chaperones from the 1990's questioned whether Dr. Tyndall used his camera for legitimate medical purposes. One chaperone said that she witnessed Dr. Tyndall taking photographs of hundreds of patients' genitalia, while another

---

[59] See First Amended Complaint, *Mohazab v. USC*, No. BC706902, ¶ 62 (L.A. Supr. Ct. June 12, 2018); Complaint, *A.S. v. USC*, BC709964, ¶ 10 (L.A. Supr. Ct. June 13, 2018); Complaint, *Does 21-28 v. USC*, No. BC709671, ¶ 13 (L.A. Supr. Ct. June 18, 2018).

1723274.2

chaperone stated that she witnessed Dr. Tyndall taking photographs of 50 to 100 women.[60]

774.    Bernadette Kosterlitzky, a clinic nurse from 1992 to 2013, said that after a chaperone alerted administrators to Tyndall's use of a camera, then-Executive Director Dr. Lawrence Neinstein ordered it removed. Dr. Tyndall claimed that he stopped using the camera. [61]

775.    However, former patients allege that Dr. Tyndall continued to photograph patients' genitalia at least during the last six years.[62]

776.    In 2016, colleagues found a box full of photographs and slides of patients' genitalia dating back to 1990 in Dr. Tyndall's office. Some of the photos were labeled with patients identifying information.[63]

777.    Although gynecologists can have legitimate medical reasons to take photographs—including research, teaching, and soliciting second opinions from colleagues—Dr. Tyndall's practice violated the standard of care. He did not receive informed consent from patients before photographing them, he gave patients incorrect information about photographs' ability to help diagnose STDs and cancer, and he did not protect the privacy of patients he photographed.

778.    Doctors must obtain informed consent in order to provide medical treatment. "Consent is based on the disclosure of information and a sharing of

---

[60] http://www.latimes.com/local/california/la-me-usc-doctor-misconduct-complaints-20180515-story.html

[61] *Id.*

[62] Complaint, *Does 5-10 v. USC*, No. BC705677, ¶ 44 (L.A. Supr. Ct. May 25, 2018); Complaint, Does 14-20 v. USC, No. BC707898 ¶ 63.b. (L.A. Supr. Ct. June 6, 2018).

[63] http://www.latimes.com/local/california/la-me-usc-doctor-misconduct-complaints-20180515-story.html.

- 122 -

interpretations of its meaning by a medical professional. The accuracy of disclosure, insofar as it is possible, is governed by the ethical requirement of truth-telling."[64]

779.   Dr. Tyndall photographed patients' genitalia without their consent and/or without offering truthful explanations for the photos.[65]

780.   Dr. Tyndall photographed patients before, during, and after he had made sexualizing or other inappropriate comments about their appearance or sexual activities.[66]

781.   Even when he did ask patients for permission to take photographs, Dr. Tyndall did not give them truthful information about the purpose of the photos. Moreover, he did not tell patients what he planned to do with the photos or how they would be stored.

782.   Dr. Tyndall told one patient that he could diagnose her cervical cancer by painting her genitals with iodine and taking photographs.[67] For other patients, he told them that the photos could diagnose STDs and cancer, but he did not accurately explain the reason for, or limits of, using photography to make a diagnosis.[68] He did not regularly inform patients of the "results" or findings of their photographs.[69]

---

[64] American College of Obstetricians and Gynecologists, Committee Opinion No. 439 (2009), https://www.acog.org/Clinical-Guidance-and-Publications/Committee-Opinions/Committee-on-Ethics/Informed-Consent.

[65] *See, e.g.* First Amended Complaint, *Mohazab v. USC*, No. BC 706902, ¶ 47 (L.A. Supr. Ct. June 12, 2018); Complaint, *A.S. v. USC*, BC709964, ¶ 10 (L.A. Supr. Ct. June 13, 2018); Complaint, *Vaill v. USC*, No BC716639, ¶¶ 36, 43-46 (L.A. Supr. Ct. Aug. 6, 2018).

[66] *Does 21-28 v. USC*, No. 709671, ¶ 9 (L.A. Supr. Ct. June 18, 2018).

[67] *Supra* ¶¶ 158-59.

[68] *See, e.g. supra* ¶ 273; Complaint, *S.B. v. USC*, No. BC707321, ¶ 59 (L.A. Supr. Ct. May 24, 2018); Complaint, *Does 21-28 v. USC*, No. 709671, ¶¶ 52.d, 57.b.-c. (L.A. Supr. Ct. June 18, 2018).

[69] *See supra* ¶ 274.

783.   Dr. Tyndall did not protect the privacy of patients he photographed.[70] For some patients, he captured other parts of their bodies and even their faces.[71] He did not keep images of other women's vaginas confidential.[72]

784.   Tyndall intentionally intruded upon Plaintiff and the Class members' solitude, seclusion or private affairs and concerns by photographing their gynecological and/or other examinations, treatment and/or care without authorization or consent. This intrusion is highly offensive to reasonable individuals, such as Plaintiff and the Class members, and was totally unwarranted and unjustified, constituting invasion of privacy, and a violation of the Health Insurance Portability and Accountability Act  of 2016, Pub. L. 104-191, 110 Stat. 1936 (HIPAA).

785.   Defendant Tyndall carried out such actions and conduct as an employee, agent and/or representative of the USC Defendants, and such actions and conduct were carried out under one of USC's programs, which provides medical treatment to students, athletes, and the public. The USC Defendants are liable and vicariously liable for Defendant Tyndall's conduct.

786.   As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs and Class members were damaged.

**COUNT VIII**

**NEGLIGENT FAILURE TO WARN, TRAIN, OR EDUCATE (AGAINST USC AND USC TRUSTEES)**

787.   Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

---

[70] HIPAA regulations prohibit healthcare providers from disclosing protected health information. *See generally* 45 C.F.R. §164.502.

[71] Complaint, *J.A. v. USC*, BC710178, ¶ 40 (L.A. Supr. Ct.); Complaint, *Davis v. USC*, No. BC714891, ¶ 31 (L.A. Supr. Ct. June 14, 2018).

[72] Complaint, *Does 21-28 v. USC*, No. 709671 at ¶ 13.

1723274.2

788.   The USC Defendants owed Plaintiffs and the Class members a duty to take reasonable protective measures to protect them and other student-patients from the risk of sexual harassment, molestation, and abuse by Defendant Tyndall by properly warning, training, or educating Plaintiffs and the Class members and others about how to avoid such a risk.

789.   The USC Defendants breached their duty to take reasonable protective measures to protect Plaintiffs and other patients from the risk of sexual harassment, molestation, and abuse by Defendant Tyndall, such as the failure to properly warn, train or educate Plaintiffs and the Class members and other patients about how to avoid such a particular risk that Tyndall posed—of sexual misconduct.

790. The USC Defendants breached their duty to take reasonable protective measures to protect Plaintiffs, Class members, and other patients from the risk of sexual harassment, molestation and abuse by Defendant Tyndall, by failing to supervise and stop their employees, including Tyndall, from committing wrongful sexual acts with student patients, including Plaintiffs and the Class members.

791.   As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs and Class members were damaged.

## COUNT IX

### CIVIL BATTERY
### (AGAINST TYNDALL AND USC)

792.   Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

793.   Tyndall intended to commit an act of unwanted contact and/or caused imminent apprehension of such an act against Plaintiffs and Class members. He did so by, *inter alia*:

    a.    Isolating Plaintiffs and Class members in closed quarters and dismissing any bystanders; and

    b.    Causing sexual contact.

794. Tyndall did commit an unwanted contact with Plaintiffs and each Class member's person or property in a harmful or offensive manner, including, but not limited to, by causing molestation or sexual contact between Tyndall and each woman.

795. Tyndall's battery of Plaintiffs and the Class caused harm, including physical, mental, and/or emotional harm of each Class Member.

796. Tyndall's conduct was committed within the scope of his employment at USC. A causal nexus existed between Tyndall's medical examinations, USC's pattern of allowing Tyndall to examine female patients without a chaperone, and the use of his role to batter the women. Each act of battery of a Class Member was foreseeable given, *inter alia*, USC's knowledge that Tyndall failed to follow protocols concerning the use of chaperones and taking of photographs. USC knew due to complaints from patients and staff members, and the commission of the acts at the USC student health center.

797. It is fair to include the losses resulting from Tyndall's conduct among other costs of USC's business. Assaults in the context of a medical examination, where women must subject themselves to extreme vulnerability in order to get the medical care they need, are among the possible adverse events that lead female patients to expect physician offices and student health centers to take extra precautions to ensure that they are protected from the dominance of a physician in the doctor-patient relationship.

798. Holding USC liable furthers the underlying policy goals of *respondeat superior*, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiffs and the Class members do not have separate remedies under Title VII because they were not employees of USC.

**COUNT X**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(AGAINST TYNDALL AND USC)**

799.    Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

800.    Tyndall's extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Plaintiffs and the Class members.

801.    Tyndall's outrageous conduct was not the type of ordinary physician examination or even rude or obnoxious behavior that women should be expected to tolerate. Rather, Tyndall's conduct exceeded all possible bounds of decency.

802.    Tyndall acted with intent or recklessness, knowing that his female victims were likely to endure emotional distress given the relationship and trust placed in physicians by patients. In fact, he used this trust to subdue the women and prevent them from complaining or suing based on his actions. He did so with deliberate disregard as to the high possibility that severe emotional distress would occur.

803.    Tyndall's conduct caused suffering for Plaintiffs and the Class members at levels that no reasonable person should have to endure.

804.    Tyndall's conduct was committed within the scope of his employment at USC. A causal nexus existed between Tyndall's medical examinations, USC's pattern of allowing Tyndall to examine female patients without a chaperone, and the use of his role to batter the women. Each act of battery of a Class Member was foreseeable given, *inter alia*, USC's knowledge that Tyndall failed to follow protocols concerning the use of chaperones and taking of photographs. USC knew of Tyndall's conduct due to complaints from patients and staff members, and the commission of the acts at USC's student health center.

805.    It is fair to include the losses resulting from Tyndall's conduct among other costs of USC's business. Assaults in the context of a medical examination, where women must subject themselves to extreme vulnerability in order to get the

- 127 -

medical care they need, are among the possible adverse events that lead female patients to expect physician offices and student-health centers to take extra precautions to ensure that they are protected from the dominance of a physician in the doctor-patient relationship.

806.   Holding USC liable furthers the underlying policy goals of respondent superior, including the prevention of future injuries and assurance of compensation to victims, given that Plaintiffs and the Class members do not have separate remedies under Title VII because they were not employees of USC.

## COUNT XI

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST TYNDALL AND USC)

807.   Plaintiffs restate and incorporate herein by reference the preceding paragraphs as if fully set forth herein.

808.   Tyndall's conduct negligently caused emotional distress to Plaintiffs and the Class members.

809.   Tyndall could reasonably foresee that his action would have caused emotional distress to Plaintiffs and the Class members.

810.   Plaintiffs and the Class members were in a specific zone of danger meeting with Tyndall in the examination room and at risk of physical harm, causing their fear when the examination became sexual in nature.

811.   Plaintiffs and the Class members, during their medical examination, suffered distress and emotional harm.

812.   Tyndall's conduct was committed within the scope of his employment at USC. A causal nexus existed between Tyndall's medical examinations, USC's pattern of allowing Tyndall to examine female patients without a chaperone, and the use of his role to batter the women. Each act of battery of a Class Member was foreseeable given, *inter alia*, USC's knowledge that Tyndall failed to follow protocols concerning the use of chaperones and taking of photographs. USC knew due to complaints from

- 128 -

patients and staff members, and the commission of the acts at USC's student health
center.

813.   It is fair to include the losses resulting from Tyndall's conduct among
other costs of USC's business. Assaults in the context of a medical examination,
where women must subject themselves to extreme vulnerability in order to get the
medical care they need, are among the possible adverse events that lead female
patients to expect physician offices and student-health centers to take extra precautions
to ensure that they are protected from the dominance of a physician in the doctor-
patient relationship.

814.   Holding USC liable furthers the underlying policy goals of respondent
superior, including the prevention of future injuries and assurance of compensation to
victims, given that Plaintiffs and the Class members do not have separate remedies
under Title VII because they were not employees of USC.

## COUNT XII

### RATIFICATION
### (AGAINST USC AND USC TRUSTEES)

815.   Plaintiffs restate and incorporate herein by reference the preceding
paragraphs as if fully set forth herein.

816.   Tyndall was an agent and employee of USC between 1989 and 2016.

817.   Tyndall was acting at all times in his position as an agent of and on behalf
of USC.

818.   All acts or omissions alleged were ratified by USC and USC Trustees. As
alleged *supra*, many of USC's employees, managers, and supervisors, including other
medical personnel in the student health center, knew Tyndall was sexually abusing
female students and refused to take any action to stop him. Moreover, USC's
managers, supervisors, executives, and directors hid this information so Tyndall could
continue to work for USC.

1723274.2

819.   With knowledge of Tyndall's sexual misconduct, no disciplinary action was taken, and he was allowed to be alone with female students who attended USC.

820.   USC is thus responsible for Tyndall's acts of assault, battery, and intentional or negligent infliction of emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, pray that this Court:

A.   Certify the Class, name Plaintiffs as representatives of the Class, and appoint their lawyers as Class Counsel;

B.   Enter judgment against George Tyndall in favor of Plaintiffs and the Class;

C.   Enter judgment against University of Southern California in favor of Plaintiffs and the Class;

D.   Enter judgment against the Board of Trustees of the University of Southern California in favor of Plaintiffs and the Class;

E.   Enter appropriate equitable relief as the Court deems just, proper and fair;

F.   Award Plaintiffs and the Class members damages for pain and suffering, and compensatory and punitive damages; and

G.   Award Plaintiffs their reasonable attorneys' fees and costs.

Dated:  May 17, 2019                  Respectfully submitted,

                                      HAGENS BERMAN SOBOL SHAPIRO LLP

                                      By:   _/s/ Steve W. Berman_____
                                             Steve W. Berman
                                      Shelby R. Smith
                                      HAGENS BERMAN SOBOL
                                      SHAPIRO LLP
                                      1301 Second Avenue, Suite 2000
                                      Seattle, WA 98101
                                      Tel.: 206-623-7292

1723274.2

Fax: 206-623-0594
Email: steve@hbsslaw.com
Email: shelby@hbsslaw.com

Christopher R. Pitoun
HAGENS BERMAN SOBOL
SHAPIRO LLP
301 N. Lake Ave., Suite 920
Pasadena, CA 91101
Tel.: 213-330-7150
Fax: 213-330-7152
Email: christopherp@hbsslaw.com

Annika K. Martin (*pro hac vice*)
Jonathan D. Selbin
Evan J. Ballan
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel.: (415) 956-1000
Fax: (415) 956-1008
Email: akmartin@lchb.com
Email: jselbin@lchb.com
Email: eballan@lchb.com

Daniel C. Girard
Elizabeth A. Kramer
GIRARD GIBBS LLP
601 California Street, Suite 1400
San Francisco, California 94108
Tel.: (415) 981-4800
Fax: (415) 981-4846
Email: dcg@girardgibbs.com
Email: je@girardgibbs.com
Email: eak@girardgibbs.com

Joseph G. Sauder
SAUDER SCHELKOPF LLC
555 Lancaster Avenue
Berwyn, Pennsylvania 19312

1  

2  Tel: (610) 200-0580  
   Fax:   (610)727-4360  
3  Email: jgs@sstriallawyers.com  

4  Jonathan Shub  
   KOHN, SWIFT & GRAF, P.C.  
5  1600 Market Street  
6  25th Floor  
   Philadelphia, Pennsylvania 19103  
7  Email:jshub@kohnswift.com  
   Tel: (215) 238-1700  
8  Fax: (215) 238-1968  
9  Email: jshub@kohnswift.com  

10  

11  

12  

13  

14  

15  

16  

17  

18  

19  

20  

21  

22  

23  

24  

25  

26  

27  

28

# CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2019, I electronically filed the foregoing document using the CM/ECF system, which will send notification of such filing to all counsel of record registered in the CM/ECF system. I also caused a copy of the foregoing document to be served *via first class mail* on the following:

| | |
|---|---|
| John B. Quinn<br>Michael E. Williams<br>Shon Morgan<br>**QUINN EMANUEL URQUHART &<br>SULLIVAN, LLP**<br>865 South Figueroa Street, 10th Floor<br>Los Angeles, CA 90017-2543 | Stephen C. Fraser<br>Alexander M. Watson<br>**FRASER WATSON & CROUTCH LLP**<br>100 W Broadway # 650<br>Glendale, CA 91210 |
| N. Denise Taylor<br>**TAYLOR DEMARCO LLP**<br>1000 Wilshire Blvd. Ste. 600<br>Los Angeles, CA 90017-2463 | |

_____*/s/ Steve W. Berman*_____
Steve W. Berman

- 133 -

1723274.2