O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| IRONSHORE SPECIALTY INSURANCE COMPANY, | ) ) ) | Case No. 2:21-cv-01272 -DDP |
|---|---|---|
| Plaintiff, | ) ) ) ) | **ORDER DENYING DEFENDANT UNIVERSITY OF SOUTHERN CALIFORNIA'S MOTION TO DISMISS COUNT II OF THE COMPLAINT** |
| v. | ) ) | |
| UNIVERSITY OF SOUTHERN CALIFORNIA, and GEORGE M. TYNDALL, | ) ) ) ) | [Dkt. 30] |
| Defendants. | ) ) | |

Presently before the court is University of Southern California ("USC")'s Motion to Dismiss Count II of the Complaint. (Dkt. 30.) Having considered the parties' submissions, and heard oral argument, the court DENIES the motion and adopts the following order.

///

///

///

## I. BACKGROUND

This action concerns an insurance dispute between Ironshore Specialty Insurance Company ("Plaintiff"), University of Southern California ("USC") and George M. Tyndall ("Dr. Tyndall").

From approximately 1989 until 2017, Dr. Tyndall performed gynecological services in the USC Student Health Center. (Compl. ¶¶ 10, 11.) According to Plaintiff, in June 2016, "the USC Office of Equity and Diversity ("OED") opened an investigation into Dr. Tyndall" after a colleague "raised concerns over Dr. Tyndall's interactions with patients." (*Id.* ¶ 12.) The OED conducted interviews with nurses and medical assistants from the Student Health Center, who alleged that Dr. Tyndall "frequently made inappropriate comments during examinations that upset patients and resulted in patient complaints, that Dr. Tyndall commonly inserted one or two fingers into the patient's vaginal opening before inserting the speculum, that Dr. Tyndall conducted full body checks which he did not report in the patient's chart, and that Dr. Tyndall did not practice proper hygiene." (*Id.*) Further, the interviewees "expressed concern about Dr. Tyndall's practices with respect to advising patients about performing breast examinations." (*Id.*) Plaintiff alleges that "[o]n or about June 17, 2016, USC placed Dr. Tyndall on paid leave while USC's internal investigations proceeded." (*Id.* ¶ 15.)

Plaintiff alleges that students lodged complaints against Dr. Tyndall prior to the OED investigation. (*See id.* ¶ 16.) In 2013, someone complained that "Dr. Tyndall made inappropriate sexual and racial comments, and that some students did not want to be seen by Dr. Tyndall because he made them uncomfortable." (*Id.*) Additionally, "[i]n January and April 2016, students reported several instances when Dr. Tyndall allegedly discriminated on the basis of race." (*Id.* ¶ 16.)

As part of the OED investigation, co-directors of the USC Student Health Center retained an outside medical review firm, MDReview, to review Dr. Tyndall's medical practice. (*Id.* ¶ 17.) Plaintiff alleges that MDReview "concluded that several of Dr.

2

Tyndall's practices were not 'within current standard of care' and that he 'repeatedly exhibits behavior that is unprofessional, inappropriate, and/or unusual.'" (*Id.*) Moreover, "[t]he report noted that 'a number of significant concerns exist that would raise serious questions about patient physical and psychological safety were Dr. Tyndall to return to practice,' including gaps in his 'knowledge, clinical judgment, and adherence to current accepted practice guidelines regarding women's health,' and failure to follow 'current basic fundamentals of hygiene and infection control practices.'" (*Id.*) On January 31, 2017, "OED issued reports on its investigation that concluded that Dr. Tyndall had violated USC's policies on sexual and racial harassment." (*Id.* ¶ 18.) According to Plaintiff, the OED's conclusions were not disclosed to Plaintiff or to the public. (*Id.*)

Plaintiff alleges that USC initiated termination proceedings against Dr. Tyndall on or about May 16, 2017. (*Id.* ¶ 21.) "USC presented Dr. Tyndall with a severance agreement," which ended Dr. Tyndall's employment, effective June 30, 2017. (*Id.* ¶ 22.) Plaintiff alleges that Dr. Tyndall's termination, and the reasons for it, were not disclosed to Plaintiff or to the public. (*Id.* ¶ 23.)

In 2017, Plaintiff issued a Follow Form Excess Policy (the "Policy") to USC for the policy period of July 1, 2017 to July 1, 2018. (*Id.* ¶ 48.)[1] Plaintiff alleges that "[w]hen USC applied to [Plaintiff] to renew the excess policy for the 2017-18 period, USC failed to disclose any of the . . . facts and allegations regarding Dr. Tyndall." (*Id.* ¶ 113.) Plaintiff alleges that USC had previously "provided its insurers, including [Plaintiff], with

---

[1] It appears that Plaintiff's Policy provides excess coverage under the same terms and conditions as the underlying insurance policy issued by BETA Risk Management Authority ("BETArma"), which provides USC with Healthcare Entity Professional Liability coverage. (Compl. ¶¶ 50, 51.) Plaintiff's Policy provides USC with $20 million of coverage in each policy year, in excess of $80 million of underlying coverage per claim. (*Id.* ¶¶ 6, 49, Ex. A.)

3

periodic reports of claims and incidents that might result in claims without limiting its reports to incidents potentially involving damages in excess of primary coverage." (*Id.* ¶ 125.) Because USC did not provide any such reports prior to the issuance of the 2017-2018 policy, Plaintiff alleges, Plaintiff "had no reason to believe that USC was omitting potential claims of the magnitude presented by the allegations against Dr. Tyndall." (*Id.* ¶ 126.)

"On or before May 8, 2018, USC learned that the *Los Angeles Times* planned to publish an article concerning allegations made against Dr. Tyndall." (*Id.* ¶ 25.) Plaintiff alleges that the day before the article was published, "USC issued its first statements concerning the matter to the public." (*Id.* ¶ 118.) The article reported that "USC had allowed Dr. Tyndall to continue practicing in the Student Health Center as a gynecologist 'although he had been accused repeatedly of misconduct toward young patients.'" (*Id.* ¶ 25.) "Within days, the first lawsuits were filed by Dr. Tyndall's former patients against him and USC, alleging sexual assault and battery, discrimination, and numerous other torts and statutory violations." (*Id.*) Plaintiff alleges that "USC demanded coverage from [Plaintiff] for the lawsuits arising from the allegations about Dr. Tyndall's conduct from its healthcare professional liability carriers under the policies issued for the 2017-18 period." (*Id.* 121.)

Plaintiff filed this action on February 11, 2021, asserting claims for declaratory judgment and alternatively, rescission of the Policy pursuant to California Insurance Code Section 330 *et seq.* and/or common law. (*See generally id.*) USC now moves to dismiss Plaintiff's rescission claim.

**II. LEGAL STANDARD**

A complaint will survive a motion to dismiss when it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of

4

material fact and must construe those facts in the light favorable to the plaintiff." *Resnick v. Hayes*, 213 F.3d 443, 447 (2000). Although a complaint need not include "detailed factual allegations," it must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Conclusory allegations or allegations that are no more than a statement of a legal conclusion "are not entitled to the assumption of truth." *Id.* at 679. In other words, a pleading that merely offers "labels and conclusions," a "formulaic recitation of the elements," or "naked assertions" will not be sufficient to state a claim upon which relief can be granted. *Id.* at 678 (citations and internal quotation marks omitted).

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *Iqbal*, 556 U.S. at 679. Plaintiffs must allege "plausible grounds to infer" that their claims rise "above the speculative level." *Twombly*, 550 U.S. at 555-56. "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 at 679.

**III. DISCUSSION**

Plaintiff's rescission claim is based on alleged concealment pursuant to California Insurance Code § 330 *et seq.* Under California Insurance Code § 330, "neglect to communicate that which a party knows, and ought to communicate is concealment." Cal. Ins. Code § 330. Concealment, whether intentional or unintentional, entitles the injured party to rescind the insurance contract. Cal. Ins. Code § 331. Thus, under the statute, negligent or even innocent concealment warrants rescission. *Barrera v. State Farm Mut. Auto Ins. Co.*, 71 Cal.2d 659, 666 n.4 (1969).

USC argues that Plaintiff's Complaint "fails to allege facts giving rise to a duty to disclose." (Mot. at 16:10-12.) Under California Insurance Code § 332, a party to an insurance contract must communicate to the other, in good faith, all facts within its knowledge (1) which are material to the insurance contract, *or* (2) which it believes to be

5

material to the insurance contract. Cal. Ins. Code § 332. Moreover, the party to whom the communication is due must have no means of ascertaining such facts. *Id.* As such, the duty to disclose applies to information that is "material," a term that is itself defined under the insurance code. *See* Cal. Ins. Code §§ 332, 334.

Materiality "is to be determined not by the event, but solely by the probable and reasonable inference of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries." Cal. Ins. Code § 334. "The question is whether or not the matter misstated or concealed could reasonably be considered in affecting the insurer's decision as to whether or not to enter into the contract, in estimating the degree or character of the risk, or in fixing the premium." *Clarendon Nat. Ins. Co. v. Ins. Co. of the West*, 442 F. Supp. 2d 914, 935 (E.D. Cal. 2006). The test is subjective in the sense that the critical question is the effect the information would have had on the insurer, not some average reasonable insurer. *Id.*

Plaintiff alleges that prior to applying for excess liability coverage, USC failed to disclose numerous facts material to Plaintiff's assessment of the risk in assuming liability. Plaintiff alleges that USC failed to disclose in its application that, in 2016, OED opened an investigation into Dr. Tyndall's medical practices in response to an employee complaint; that, as part of its investigation, USC's outside consultant concluded that some of Dr. Tyndall's practices fell outside the standard of care and that his behavior was "unprofessional, inappropriate, and/or unusual"; that Dr. Tyndall's practice raised "significant concerns . . . about patient physical and psychological safety were Dr. Tyndall to return to practice"; that on January 31, 2017, OED concluded Dr. Tyndall had violated USC's policies on sexual and race harassment; that USC chose to terminate Dr. Tyndall after the OED's findings were revealed; and the reasons for Dr. Tyndall's

6

termination.² (Compl. ¶¶ 12, 17, 18, 20, 21). Plaintiff alleges that had it "known of the allegations against Dr. Tyndall, [Plaintiff] would not have issued coverage on the same terms, and certainly would not have agreed to provide coverage for claims arising out of Dr. Tyndall's alleged misconduct." (*Id.* ¶ 128.)

USC contends that because the Complaint does not allege that Plaintiff asked USC to provide any such information on its application for insurance, Plaintiff has failed to plead materiality as a matter of law. (Mot. at 17:23-24) (citing *American Mut. Liab. Ins. Co. v. Goff*, 281 F.2d 689, 694 (9th Cir. 1960)) ("*Goff*"). Alternatively, USC argues that Plaintiff has failed to allege facts sufficient to support an inference that USC reasonably believed the information pertaining to Dr. Tyndall was material.

Plaintiff's "application" instructs proposed insureds to disclose all "documents, materials or other information furnished or available, and all other statements made, to the Insurer and to the insurer(s) of the Underlying Insurance, whether directly or indirectly, concerning the business and/or operations of the Insured." (Compl. ¶ 110; Ex. A, § I.)³ Plaintiff contends that such language qualifies as an inquiry that warrants disclosure of information such as that pertaining to Dr. Tyndall. The court does not agree. An insurer may demonstrate by the terms of its policy what information it deems material by asking specific questions on its application. *See Imperial Cas. & Indemn. Co. v. Sogomonian*, 198 Cal. App. 3d 169, 179 (1988) ("The fact that the insurer has demanded answers to specific questions in an application for insurance is in itself usually sufficient to establish materiality as a matter of law.). Here, however, the application did not ask

---

² Plaintiff alleges that the information pertaining to Dr. Tyndall was within USC's knowledge at the time it applied for excess liability coverage.

³ "Courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

7

questions about prior employee discipline, complaints, investigations, or alleged sexual misconduct. Rather, Plaintiff's application broadly requested general information "concerning" USC's "business and/or operations."[4] Thus, because Plaintiff has not pled that any questions were asked on the application that warranted disclosure of the information pertaining to Dr. Tyndall's alleged conduct, the court cannot infer that the materiality of such information was established by the terms of the Policy.

Nevertheless, even though Plaintiff's application did not specifically ask about the information pertaining to Dr. Tyndall, a failure to inquire is not necessarily dispositive on the question of materiality. Although "a failure to inquire into [the alleged concealed facts] in the first instance has been held to demonstrate a lack of interest in them, negativing their materiality," the Ninth Circuit has indicated that materiality can be shown in other ways, such as by showing that a reasonable person *should have known* or *believed* the non-disclosed facts were material to the insurer's assessment of the risk in assuming liability. *See Goff*, 281 F.2d at 693; *Atl. Mut. Ins. Co. v. Cooney*, 303 F.2d 253, 267-78 (9th Cir. 1962) (concluding that even though the insurer did not make a specific inquiry regarding the concealed information, insured could have also shown that "[defendant], as a reasonable man, should have known that his assumed liability was material to the risk"). District courts within the circuit have come to similar conclusions. *See, e.g.*, *Clarendon Nat. Ins. Co.*, 442 F. Supp. 2d at 936 ("[T]he more reasoned view is that the fact that information was solicited on an application for insurance is a factor to be considered in determining materiality, but it is not the sole factor; determination of materiality remains a question to be determined based on a multitude of factors.").[5]

---

[4] Of course, it is logical that the level of generality or specificity in the inquiry bears on the issue of whether any alleged failure to provide notice of risks to the insurer is a failure of the insurer to ask or a failure of the insured to respond.

[5] The court notes that at argument, USC acknowledged that certain circumstances might give rise to a duty to disclose, even information that was never affirmatively sought.

8

Here, Plaintiff has sufficiently alleged facts to support the inference that USC either reasonably believed or, at minimum, should have known that the allegations pertaining to Dr. Tyndall were material to Plaintiff's decision to issue the Policy. Plaintiff alleges that "USC knew that it was applying for healthcare professional liability coverage on a claims-made basis and therefore incidents that had happened in previous years would be relevant to an insurer that was evaluating the risk that a claim would be presented in the 2017-18 policy period." (Compl. ¶ 115.) Moreover, USC had allegedly previously "provided its insurers, including Ironshore, with periodic reports of claims and incidents that might result in claims without limiting its reports to incidents potentially involving damages in excess of primary coverage." (*Id.* ¶ 125.) However, when USC applied for coverage for 2017-2018, USC allegedly did not disclose that "[it] had completed its investigation of the allegations against Dr. Tyndall, had found that he had violated USC's race and sexual harassment policies in response to complaints of patient harm, and upon information and belief had decided to terminate Dr. Tyndall." (*Id.* ¶ 111.) Based on these facts, it is plausible that USC deviated from its practice of providing updated incident reports because it knew Plaintiff would deny coverage if such facts were disclosed.

USC argues that it had no reason to believe the allegations against Dr. Tyndall were material because "[a]t the time the Policy was issued, Dr. Tyndall had already been terminated and had not been seeing patients for a year." (Reply at 11:3-6.) Moreover, USC contends that while working at USC, Dr. Tyndall never had a single lawsuit or demand for payment brought against him based on harassment, discrimination or malpractice, and the OED's 2016 investigation revealed "only a small number of students (and staff) who raised questions about Dr. Tyndall." (*Id.* at 11:6-11.) Further, most of the complaints against Dr. Tyndall were made at a time well outside the then applicable two-year statute of limitations." (*Id.* at 11:11-12.) To further emphasize the absence of a reason to believe that the information about Dr. Tyndall was material, USC highlights

9

that the MDReview report "did not make any findings that Dr. Tyndall had engaged in any abuse, molestation, or serial misconduct of the type that could give rise to over $80 million in liability." (*Id.* at 4:11). USC's arguments, at best, create a factual dispute regarding whether USC's belief was reasonable. At this stage, the court must assume the truth of all factual allegations raised in the Complaint and draw all reasonable inferences from those facts in the light most favorable to Plaintiff, the non-moving party. *Resnick*, 213 F.3d at 447.

USC further argues that because Plaintiff "has not alleged that USC concealed facts in response to a specific inquiry, it was required to allege that USC fraudulently concealed information in order to obtain insurance that it otherwise could not have obtained." (Mot. 18:21-25, Reply 14:11-13.) However, the California Insurance Code plainly provides that "[c]oncealment, whether intentional or unintentional, entitles the injured party to rescind insurance." Cal. Ins. Code § 331. The Ninth Circuit as well as other district courts construe the statute to mean that "[t]he presence of an intent to deceive is not essential." *Gates v. Gen. Cas. Co. of Am.*, 120 F.2d 925, 927 (9th Cir. 1941); *Clarendon Nat. Ins. Co. v. Ins. Co. of the West*, 442 F. Supp. 2d 914, 921 (E.D. Cal. 2006) ("California statutory law provides that concealment, whether intentional or unintentional, entitles the injured party to rescind the contract. . . . Thus, under the statute, negligent or even innocent concealment warrants rescission."). As such, the court is not inclined to dismiss on the basis that Plaintiff failed to plead fraudulent concealment.

Next, Defendant argues that Plaintiff's rescission claim does not satisfy the particularity standard under Federal Rule of Civil Procedure 9(b). USC argues that because concealment is a species of fraud, Rule 9(b) applies. The court is skeptical that the rule applies in this context. Even if Rule 9(b) is applicable, however, district courts within this circuit have observed that a concealment claim "can succeed without the same level of specificity required by a normal fraud claim." *Anderson v. Apple Inc.*, 500 F.

10

Supp. 3d 993, 1018 (N.D. Cal. Nov. 16, 2020); *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1267 (C.D. Cal. 2007). "This is because '[r]equiring a plaintiff to identify (or suffer dismissal) the precise time, place, and content of an event that (by definition) did not occur would effectively gut state laws prohibiting fraud-by-omission.'" *In re Toyota Motor Corp.*, 754 F. Supp. 2d 1145, 1190-91 (C.D. Cal. 2010).

Here, Plaintiff's Complaint contains many detailed allegations regarding USC's conduct and knowledge related to the allegations against Dr. Tyndall. (*See* Compl. ¶¶ 12, 15, 17-23, 25, 111.) Plaintiff specifically alleges what facts were known to USC prior to USC applying for excess liability coverage: that in 2016, OED opened an internal investigation of Dr. Tyndall's medical practice, that OED concluded, among other things, that Dr. Tyndall violated USC's sexual and race harassment policies, that Dr. Tyndall was terminated, and the reasons for his termination. (Compl. ¶¶ 12, 18, 19, 21, 22, 113.) Plaintiff further alleges that "USC did not disclose any information concerning the allegations to the public until May 16, 2018," and therefore "[Plaintiff] could not have independently discovered the risk that the allegations made against Dr. Tyndall were likely to result in claims against both Dr. Tyndall and USC." (*Id.* ¶ 117.) Plaintiff also alleges that "USC knew that it was applying for healthcare professional liability coverage on a claims-made basis and therefore incidents that had happened in previous years would be relevant to an insurer that was evaluating the risk that a claim would be presented in the 2017-18 policy period." (*Id.* ¶ 115.) These allegations, taken together, support the inference that USC was aware of material information prior to applying for excess liability insurance, and that "[h]ad USC disclosed the facts and allegations regarding Dr. Tyndall, at a minimum, [Plaintiff] would not have offered insurance coverage on the terms that it did." (*Id.* ¶ 116.) Plaintiff has therefore pled sufficient facts to support the circumstances surrounding USC's alleged concealment. As such, the court declines to dismiss Plaintiff's rescission claim for failure to plead with particularity.

///

11

## IV. CONCLUSION

For the reasons stated above, the court DENIES USC's Motion to Dismiss Count II of the Complaint.

**IT IS SO ORDERED.**

Dated: January 21, 2022

_____
DEAN D. PREGERSON
UNITED STATES DISTRICT JUDGE